JUDGE SULLIVAN

Robert J.A. Zito
Michael Shapiro
Alan S. Lewis
Kenneth S. Levine
Laura Anne Reeds

CARTER LEDYARD & MILBURN LLP
2 Wall Street
New York, NY 10005
Tel: (212) 732-3200
Fax: (212) 732-3232
*Attorneys for Plaintiff Christopher Finazzo*



08 CV 02176

RECEIVED
MAR 04 2008
U.S.D.C. S.D.N.Y.
CASHIERS

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------X

CHRISTOPHER L. FINAZZO,

                             Plaintiff,

          - against -

SECURITIES AND EXCHANGE
COMMISSION,

                         Defendant.

------------------------------------------------------------X

**COMPLAINT FOR
DECLARATORY
AND INJUNCTIVE RELIEF**

       Plaintiff, Christopher L. Finazzo, by his attorneys, Carter Ledyard & Milburn LLP, as

and for his Complaint against the defendant respectfully alleges, based upon information and

belief, as follows:

<div align="center">

**PRELIMINARY STATEMENT**

</div>

       1.     This lawsuit challenges the misappropriation of privileged communications

between plaintiff, Christopher L. Finazzo, and his attorney, the subsequent use and disclosure of

such information in public disclosures, and the use of such information as the basis of an

investigation by the defendant, the Securities and Exchange Commission.

6277204.5

## JURISDICTION AND VENUE

2.       This case presents a federal question within this Court's jurisdiction under 28 U.S.C. § 1331. The Court also has jurisdiction under the Administrative Procedures Act, 5 U.S.C. § 702. The Court has authority to grant declaratory relief pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201 et seq. The Court has authority to grant injunctive relief pursuant to Rule 65 of the Federal Rules of Civil Procedure. Venue is proper in this district under 28 U.S.C. § 1391(e).

## PARTIES

3.       Plaintiff, Christopher L. Finazzo ("Mr. Finazzo") is a citizen of the State of New York.

4.       Defendant, the Securities and Exchange Commission (the "Commission") is an agency of the United States government.

## FACTUAL ALLEGATIONS

5.       From February 1, 2004 to November 7, 2006, Mr. Finazzo was employed by Aéropostale, Inc. ("Aéropostale" or "the Company"), a publicly traded clothing design company. During this time, Mr. Finazzo became Aéropostale's Executive Vice President and Chief Merchandizing Officer. Mr. Finazzo was also employed for many years by Aéropostale's predecessor entities in interest.

6.       Under Mr. Finazzo's leadership, the Company was transformed from what had been a failing division of Macy's to a hugely successful, independent public company. Between 1996 and 2007, Aéropostale grew from approximately 80 to over 700 stores, its annual sales increased from less than $124 million to $1.4 billion, and its profits surged from $17 million to $455 million.

7.      On August 24, 2006, when Mr. Finazzo was still employed by Aéropostale, his personal lawyer, Angela Siegel ("Attorney Siegel"), sent an email to Mr. Finazzo at his Aéropostale email address (the "Attorney Siegel Email"). Attorney Siegel, a trusts and estates lawyer, was then representing Mr. Finazzo in the context of his estate planning.

8.      The Attorney Siegel Email, its contents and attachment, was sent from an address clearly identified as belonging to an attorney: "lawoffice@angelasiegel.com." The closing lines indicated that it was written by "Angela Siegel, Esq., Law Office of Angela Siegel," and the following statement also appears on the email:

> ***** PRIVILEGE AND CONFIDENTIALITY NOTICE *****
> The information contained in this e-mail is confidential and may be protected by the attorney-client privilege and/or work product doctrine. It is intended for the use of the named recipient only. **If you have received this communication in error, please notify the sender immediately by reply to this e-mail or by telephone.**

(emphasis added).

9.      Attorney Siegel attached to her email a Word document titled "Finazzo Family Assets" (the "FFA Document") that she had prepared based upon confidential information given to her by Mr. Finazzo during meetings held as part of her estate planning advice to Mr. Finazzo. The document consists of a list of Mr. Finazzo's assets, including interests in various business entities. The language of the Attorney Siegel Email, its contents and attachment, clearly indicated that Mr. Finazzo communicated the information on the FFA Document to Attorney Siegel for the sole purpose of seeking legal advice.

10.      During September 2006, Aéropostale undertook an internal investigation that focused on whether hotel expenses during an Aéropostale conference in Las Vegas earlier that year had been properly charged to the Company. The investigation had nothing to do with Mr. Finazzo. The investigation was supervised by Aéropostale's outside counsel, Katten Muchin

Rosenman LLP ("KMR"), which, in turn, retained the services of Kroll, Inc. ("Kroll"), a

subsidiary of Marsh & McLennan Companies, Inc., to assist in the investigation.

11.     While reviewing emails in connection with their investigation, Kroll investigators,

supervised by KMR attorneys, found, opened, and read the confidential and privileged Attorney

Siegel Email, its contents and attachment, that had been sent to Mr. Finazzo.

12.     N.Y. County Lawyers' Ass'n Comm. on Prof. Ethics, Op. No. 730 (July 19, 2002)

("Opinion 730") states:

> A lawyer has ethical obligations upon receipt of inadvertently
> disclosed privileged information.  If a lawyer receives information
> which the lawyer knows or believes was not intended for the lawyer
> and contains secrets, confidences or other privileged matter, the
> lawyer, upon recognition of same, shall, without further review or
> other use thereof, notify the sender and (insofar as it shall have been
> in written or other tangible form) abide by sender's instructions
> regarding return or destruction of the information.

13.     Upon discovery of the Attorney Siegel Email, its contents and attachment, neither

Kroll, KMR, nor Aéropostale lawyers notified Attorney Siegel that they had stumbled upon her

privileged communication and, as a result, failed to comply with their ethical obligations.  Nor

did they notify Mr. Finazzo that his privileged email had been opened.  Furthermore, they took

no steps to segregate and protect the privileged email from further unauthorized dissemination.

Rather, they kept their discovery secret from both the sender, Attorney Siegel, and the recipient,

Mr. Finazzo, while they conferred and discussed among themselves about the email, its

privileged contents, and their plan of action vis-à-vis Mr. Finazzo.

14.     The Attorney Siegel Email, its contents and attachment, contained information

about Mr. Finazzo's financial interests which Aéropostale contends should have been disclosed

internally at the Company.  Aéropostale eventually used the Attorney Siegel Email, its contents

and attachment, as the sole basis on which to terminate Mr. Finazzo's employment.

6277204.5                                    - 4 -

15. On November 7, 2006, Edward M. Slezak, Esq., Aéropostale's General Counsel, and Julian Geiger, Aéropostale's President and CEO, called Mr. Finazzo into an unscheduled meeting. Mr. Finazzo was given no notice or the opportunity to consult with an attorney. Messrs. Slezak and Geiger showed Mr. Finazzo the FFA Document and asked him about his interests in the business entities listed on the FFA Document. They concealed that they had obtained the information through privileged communications between Mr. Finazzo and his attorney. Messrs. Slezak and Geiger then told him that he had breached his employment agreement and was being fired for alleged conflicts of interests.

16. On November 8, 2006, Aéropostale issued a press release stating that Mr. Finazzo was fired because of his ownership interest in business entities listed on the FFA Document (and attached to the Attorney Siegel Email):

> Aéropostale (NYSE: ARO) . . . Mr. Finazzo concealed personal ownership interests in, and served as an officer of, entities affiliated with one of the Company's primary vendors, South Bay Apparel, Inc. These activities, and their concealment, constitute conflicts of interest in breach of the Company's Code of Business Conduct and Ethics and violations of Mr. Finazzo's employment agreement.

17. During the week of June 25, 2007, Mr. Finazzo's counsel, Carter Ledyard & Milburn LLP ("CL&M"), for the first time obtained copies of the Attorney Siegel Email and the FFA Document from Attorney Siegel. Until then, CL&M did not know that the Attorney Siegel Email, its contents and attachment, was the source of the information that Aéropostale had used as the basis to terminate Mr. Finazzo's employment and to make its public statements about Mr. Finazzo. Mr. Finazzo and CL&M also did not know that Aéropostale's attorneys had continuously concealed such fact contrary to their ethical obligations.

18.     On June 29, 2007, upon review of the Attorney Siegel Email and the attached

FFA Document, CL&M sent a written demand to KMR that they take the following corrective

actions:

> 1.     Cease and desist from any further invasions of Mr. Finazzo's statutory and common law privileges, including without limitation, his attorney-client and attorney work-product privileges (the "Privileges");
>
> 2.     Return to us all copies of all privileged documents, including their attachments, including without limitation, the Attorney Siegel Email and its attached FFA Document, and any other documents or parts thereof that contain privileged information taken or extracted from the privileged documents (collectively, the "Privileged Documents") in the possession, custody and/or control of the Aéropostale Parties;
>
> 3.     Permanently delete or otherwise destroy all electronic, digital or other non-tangible copies or records of all Privileged Documents in the possession, custody and/or control of the Aéropostale Parties;
>
> 4.     Provide a certificate addressed to us, as counsel for Mr. Finazzo, signed by a senior officer of Aéropostale confirming that the actions described in Items 2 and 3 above have been accomplished;
>
> 5.     Take such other actions necessary to safeguard Mr. Finazzo's Privileges; and
>
> 6.     Rescind all action taken by the Aéropostale Parties as a result of the breach of the Privileges and otherwise restore Mr. Finazzo and his Privileges *status quo ante*.

19.     Aéropostale and KMR refused to take any such actions at that time, and continue

to refuse to take any such actions to this day.

20.     On January 10, 2008, the Commission issued a formal Order of Investigation

relating to Mr. Finazzo's employment with Aéropostale.  The Commission proceeded to serve

Mr. Finazzo with an administrative subpoena dated January 16, 2008 (the "Subpoena," attached

as Exhibit A), seeking documents and testimony relating to entities listed in the FFA Document.

21.     On January 16, 2008, CL&M wrote to Aéropostale, notifying it that Mr. Finazzo

had received a subpoena, and advising it that all emails exchanged between Mr. Finazzo and his

attorneys, regardless of whether such communications took place through Aéropostale's email

system, and all information derived from the privileged communications, "are either protected

under the attorney-client privilege and/or the attorney work product doctrine and/or contain

information that is derived from privileged sources," and that therefore no documents should be

produced.

22.    On January 25, 2008, CL&M sent a letter to the Commission responding to the

Subpoena (attached hereto as Exhibit B). The letter explained the Company's and KMR's

misconduct and, with legal citations, advised the Commission to seek judicial approval before

proceeding with its investigation. The letter explained:

> But for the wrongful actions of the Company and its lawyers, Mr. Finazzo
> would have proceeded with his scheduled retirement with the benefit of a
> significant compensation package. There would have been no 8-Ks filed
> relating to Mr. Finazzo's firing and no investigation, formal or informal,
> would have been commenced by the U.S. Securities & Exchange
> Commission ("Commission"). The genesis of this entire matter is the
> Company's belief that the Attorney Siegel Email and its attached FFA
> Document, evidenced a so-called "conflict of interest" by Mr. Finazzo.
> Had KMR and Kroll (and by extension, the Company, as principal
> responsible for its agents' actions) complied with their legal and ethical
> obligations to segregate the email, notify Ms. Siegel and, upon her request,
> return the email unread, the chain of events that led to the Subpoena would
> not have begun. Without the email, there would have been no suspicion of
> a conflict of interest, no firing, no 8-K filing, no request for a formal
> investigation order and no subpoena.

23.    The letter also concluded:

> The Commission's investigation is solely the result of its receipt of
> purloined and tainted attorney-client privileged information, not from an
> innocent recipient, but from lawyers who have definite and affirmative
> obligations when coming into receipt of such privileged information.
> Indeed, the legal staff at the Commission have these same obligations, to
> segregate the communication, notify the attorney/sender and, upon
> request, to return the information. If the legal staff seeks to proceed in
> some other fashion they may do so only after seeking the imprimatur of a
> court.

## LEGAL FRAMEWORK

24.     Aéropostale's, KMR's and Kroll's actions in reviewing and then disclosing the privileged Attorney Siegel Email, its contents and attachment, were improper. Accordingly, all information derived from that violation of the attorney-client communication must be suppressed.

25.     The Attorney Siegel Email, its contents and attachment, comprise a confidential communication "for the purpose of facilitating the rendition of legal advice." Spectrum Sys. Int'l Corp. v. Chem. Bank, 78 N.Y.2d 371, 378 (1991); Rossi v. Blue Cross & Blue Shield of Greater New York, 73 N.Y.2d 588, 593 (1989); see also CPLR § 4548 (the attorney-client privilege attaches to email communications as well as more traditional methods).

26.     The attorney-client privilege applies to work emails, even where an employee has accepted his employer's email policy, where the employee still has an objectively reasonable belief that the communication will remain private. Curto v. Med. World Commc'n, Inc., No. 03CV6327, 2006 WL 1318387 (E.D.N.Y. May 15, 2006); In re Asia Global Crossing Ltd., 322 B.R. 247 (S.D.N.Y. 2005). In determining whether the employee's belief is objectively reasonable, New York courts will consider: (1) whether the employer maintains a policy banning personal and other objectionable use, (2) whether the employer monitors its employee's computers and emails, (3) whether third parties have the right of access to the computers or emails, and (4) whether the employee was aware of the use and monitoring policies. See Asia Global Crossing, 322 B.R. at 257.

27.     Here, although Aéropostale had an email policy that stated that it may monitor emails and Mr. Finazzo may have been aware of the policy, the policy did not prohibit his personal use of the email system. The company permitted its employee to use its email system

for purposes other than Aéropostale's business. Aéropostale also did not have a practice of actually reviewing its employees' emails. Moreover, the Attorney Siegel Email, its contents and attachment, was not sent by Mr. Finazzo, but rather by Ms. Siegel who was completely unaware of Aéropostale's email policy at the time she sent it. She therefore could not have possibly waived Mr. Finazzo's privilege by sending him an unsolicited email attaching a confidential document.

28.    When an attorney encounters a document that, on its face, appears to be privileged, he or she must stop reading the document and notify the sender immediately. Am. Express v. Accu-Weather, Inc., No. 91 Civ. 6485, 1996 WL 346388, at *2 (June 25, 1996 S.D.N.Y.), Galison v. Greenberg, 5 Misc.3d 1025(A), 799 N.Y.S.2d 160 (Sup. Ct. N.Y. Co. 2004); Ass'n of the Bar of the City of N.Y. Comm. on Prof. & Jud. Ethics, Op. no. 2003-04 (Dec. 2003, reissued Apr. 9, 2004) ("Opinion 2003-04"); N.Y. County Lawyers' Ass'n Comm. on Prof. Ethics, Op. No. 730 (July 19, 2002) ("Opinion 730").

29.    But for the wrongful review of the Attorney Siegel Email, its contents and attachment, the privileged FFA Document would not have been disclosed, and would not have led to an investigation by the Commission. The Commission is prohibited from relying on the improper information in performing its own investigation. Rather, Mr. Finazzo must be returned to the *status quo ante*.

30.    It is black-letter law that confidential attorney-client communications are protected from disclosure and inadmissible as evidence. CPLR §§ 3101(b), 4503(a); Spectrum Sys. Int'l, 78 N.Y.2d at 377; see also Surgical Design Corp. v. Correa, 21 A.D.3d 409, 410 (2d Dep't 2005); Manuf. & Traders Trust Co. v. Servotronics, Inc., 132 A.D.2d 392, 398 (4th Dep't 1987). When inadvertently disclosed, such communications must be suppressed and expunged.

This includes not only the privileged documents themselves, but all documents and other evidence that cannot be shown to have been "obtained from an independently developed, unrelated, non-privileged, unsuppressed source." In re Beiny, 129 A.D.2d 126, 142 (1st Dep't 1987); see United States v. Longo, 70 F.Supp. 2d 225, 264 (W.D.N.Y. 1999) ("Where a violation of the attorney-client privilege is demonstrated, the remedy for such a violation is the suppression of evidence derived from the privileged communication.").

31.    Where attorneys for an opposing party have actually made use of privileged documents, exclusion of the evidence will be insufficient to ameliorate prejudice, and disqualification of tainted counsel is appropriate to return the parties to the *status quo ante.* Richards v. Jain, 168 F.Supp.2d 1195, 1205 (W.D. Wash. 2001); In re Marketing Invest. Corp., 80 S.W.3d 4451–52 (Ct. App. Tex. 1998); Beiny, 129 A.D.2d at 141–42; see also Hull v. Celanese Corp., 513 F.2d 568, 571 (S.D.N.Y. 1975) ("In the disqualification situation, any doubt is to be resolved in favor of disqualification.").

### Count I
### (For Declaratory Relief)

32.    Mr. Finazzo repeats and re-alleges all of the allegations set forth in paragraphs 5 through 31 as though fully set forth herein.

33.    That the Attorney Siegel Email, its contents and attachment, were a privileged attorney-client communication.

34.    That neither Aéropostale, nor its outside counsel KMR, had the right to review the Attorney Siegel Email, its contents and attachment, because of its obviously privileged nature.

35.    That Aéropostale lawyers and KMR violated their professional obligations by disclosing the Attorney Siegel Email, its contents and attachment.

6277204.5

36.    That the Commission's investigation based on those public statements is improper because the basis for the investigation is misappropriated privileged information and breaches by attorneys of their professional obligations.

37.    That because the Commission investigation is based on tainted information, the Commission Subpoena served on him is improper and should be quashed.

38.    Aéropostale, KMR and the Commission contend that the Attorney Siegel Email, its contents and attachment, was not a protected attorney-client communication, apparently because it was sent to Mr. Finazzo on Aéropostale's corporate server.

39.    The Commission contends that its investigation is valid because it is not based directly on privileged information, and it cannot be held responsible for the possible violations of third parties.

40.    By reason of the foregoing, a justiciable controversy exists, and Plaintiff seeks a judicial determination, pursuant to 28 U.S.C. § 2201(a) as to whether: (a) the Attorney Siegel Email, its contents and attachment, was a communication protected under the attorney-client privilege; (b) KMR breached its professional responsibilities by reviewing the Attorney Siegel Email, its contents and attachment, without a judicial determination that the information contained therein was not privileged; (c) KMR breached its professional responsibilities by not informing Attorney Siegel of the received communication; (d) KMR breached its professional responsibilities by using the information contained in the Attorney Siegel Email, its contents and attachment, in filings with the Commission; (e) but for the conduct of KMR, the defendant would have been unaware of the information that is the basis of its investigation; and (f) the Commission is prohibited from using information that was obtained directly or indirectly from any privileged sources.

## Count II
## (For Injunctive Relief)

41.     Mr. Finazzo repeats and re-alleges all of the allegations set forth in paragraphs 5 through 31 as though fully set forth herein.

42.     That the Commission's current investigation and the Staff involved with that investigation have been so tainted by exposure to material protected by the attorney-client privilege that simply disallowing receipt of privileged material into evidence will be insufficient to return Mr. Finazzo to the *status quo ante*.

43.     That all subpoenas issued by the Commission pursuant to its formal Order of Investigation are tainted by the breach of Mr. Finazzo's attorney-client privilege and must be quashed.

44.     That furthermore, the only remedy that would sufficiently ameliorate the prejudice caused by the breach of his attorney-client privilege would be to enjoin the Commission and its Staff from using any information that was obtained directly or indirectly from any privileged sources.

45.     That Mr. Finazzo would suffer irreparable injury if the requested injunctive relief is not granted.

46.     That, by reason of the foregoing, injunctive relief is proper under Rule 65 of the Federal Rules of Civil Procedure.

**WHEREFORE**, Plaintiff demands judgment as follows:

A.     Declaring that the Attorney Siegel Email, its contents and attachment, was a communication protected under the attorney-client privilege;

6277204.5                                        - 12 -

B.    Declaring that KMR breached its professional responsibilities by reviewing the Attorney Siegel Email, its contents and attachment, without a judicial determination that the information contained therein was not privileged;

C.    Declaring that KMR breached its professional responsibilities by not informing Attorney Siegel of their discovery of the Attorney Siegel Email, its contents and attachment;

D.    Declaring that KMR breached its professional responsibilities by using the information contained in the Attorney Siegel Email, its contents and attachment, in filings with the Securities and Exchange Commission;

E.    Declaring that but for the conduct of KMR, the defendant would have been unaware of the information that is the basis of its investigation;

F.    Declaring that the Commission is unable to use information that was obtained directly or indirectly from any privileged sources;

G.    Enjoining the Commission and its Staff from enforcing the subpoenas issued pursuant to its formal Order of Investigation;

H.    Enjoining the Commission and its Staff permanently from using any information that was obtained directly or indirectly from any privileged sources;

I.    Disqualifying those Commission Staff members who have become tainted by being in possession of information that is either privileged or derived from privileged sources; and

J.    Granting Mr. Finazzo such other and further relief as this Court may deem just and proper.

CARTER LEDYARD & MILBURN LLP

By _____
Robert J. A. Zito
Michael Shapiro
Alan S. Lewis
Kenneth S. Levine
Laura Anne Reeds
2 Wall Street
New York, NY 10005
Tel: (212) 732-3200
Fax: (212) 732-3232

*Attorneys for Plaintiff Christopher Finazzo*

# EXHIBIT A

1336418.1
1336418.1



## SUBPOENA

# UNITED STATES OF AMERICA
## SECURITIES AND EXCHANGE COMMISSION

**In re Aeropostale, Inc. (NY-7802)**

To:    Christopher Finazzo
       49 Chestnut Street
       Garden City, NY 11530-6334

☒    **YOU MUST PRODUCE** everything specified in the Attachment to this subpoena to officers of the Securities and Exchange Commission, at the place, date and time specified below:

February 6, 2008 at 10:00 a.m.

Securities and Exchange Commission
3 World Financial Center
  Suite 400
New York, New York 10281

☒    **YOU MUST TESTIFY** before officers of the Securities and Exchange Commission, at the place, date and time specified below:

February 13, 2008 at 10:00 a.m.

Securities and Exchange Commission
3 World Financial Center
  Suite 400
New York, New York 10281

**FEDERAL LAW REQUIRES YOU TO COMPLY WITH THIS SUBPOENA.**
Failure to comply may subject you to a fine and/or imprisonment.

By:    _Michael D. Birnbaum_                    Date:    January 16, 2008
       Michael D. Birnbaum
       Attorney, Division of Enforcement
       (212) 336-0523

I am an officer of the Securities and Exchange Commission authorized to issue subpoenas in this matter. The Securities and Exchange Commission has issued a formal order authorizing this investigation under Section 20(a) of the Securities Act of 1933 and Section 21(a) of the Securities Exchange Act of 1934.

NOTICE TO WITNESS:    If you claim a witness fee or mileage, submit this subpoena with the claim voucher.

**ATTACHMENT A**
**AEROPOSTALE (NY-7802)**

**DOCUMENTS REQUESTED**

1.  Documents sufficient to identify all entities that conducted any business with Aeropostale at any time during Your employment at Aeropostale:

    a.  in which You owned any equity stake at any time;

    b.  from which You drew any salary or other compensation at any time;

    c.  that employed You or any immediate family member of yours at any time during your employment at Aeropostale; or

    d.  with which You participated in any joint venture or joint ownership of any property, whether that venture or ownership was with the entity itself or any employee or representative thereof.

2.  For all of the entities identified in response to Request 1 (the "Entities"), documents sufficient to identify:

    a.  Your primary contact at the Entity – if the identity of that contact changed over time, indicate when that change occurred;

    b.  all compensation paid directly or indirectly to You from any Entity, including, without limitation, the nature of such compensation, dates on which such compensation was paid, and the service for which such compensation was awarded; and

    c.  all property owned jointly or otherwise in combination by You and any Entity or employee thereof.

3.  All employment contracts or compensation agreements with any Entity.

4.  All communications between You and any Entity or representative thereof.

5.  All communications between You and any immediate family member concerning actual or contemplated business involving Aeropostale.

6.  Documents sufficient to identify all compensation You received from Aeropostale from your first employment at the Company to the present, including, without limitation, any stock options and pension or other retirement benefits You received or are entitled to receive.

7.  Tax returns filed in Your name for years 1999 through 2006 and tax returns for any entity You owned or controlled at any time from 1999 through 2006, including any drafts thereof.

8.   All documents relating to Aeropostale's policies or procedures concerning disclosure of Aeropostale employees' or executives' personal interests in other entities, whether affiliated or unaffiliated with Aeropostale.

9.   All documents relating to any disclosure You made to Aeropostale concerning Your interest in any entity other than Aeropostale, whether affiliated or unaffiliated with the Company.

10.  Documents sufficient to identify any bank or brokerage accounts You have held since the inception of Your employment at Aeropostale.

11.  Documents sufficient to identify any transaction in which You participated involving Aeropostale stock, including, without limitation, any purchase or sale of, or compensation awarded to you in the form of, Company stock, options or related financial product.

# DEFINITIONS

1.      The term "document" means all records and other tangible forms of expression including, without limitation, originals, drafts or finished versions, or annotated or nonconforming copies, however created, produced or stored (manually, mechanically, electronically or otherwise), and by whomever prepared, produced, sent, dated or received, including, without limitation, books, papers, work papers, files, permanent files, personnel files, notes, review notes, confirmations, accounts statements, correspondence, memoranda, reports, records, journals, registers, analyses, plans, manuals, policies, ledger sheets, schedules, invoices, telegrams, faxes, telexes, wires, electronic mail messages, telephone logs, telephone messages, message slips, minutes, notes or records or transcriptions of conversations or communications or meetings, tape recordings, disks, and other electronic media, microfilm, microfiche, storage devices, press releases, contracts, agreements, calendars, date books, appointment books, diaries, notices, bank statements, summaries, wire transfers, checks, invoices, drafts for money, bills, billing files, and records of payment.

2.      "Aeropostale, Inc." or "Aeropostale" shall mean and refer to Aeropostale, Inc. and all predecessors, successors, officers, directors, employees, agents, accountants, and attorneys of the foregoing, including any aliases, code names, or trade or business names used by any of the foregoing.

3.      "You" or "Your" shall refer to Christopher Finazzo and any individual or entity working on Christopher Finazzo's behalf.

4.      The term "concerning" means relating to, referring to, describing, reflecting, evidencing, or constituting.

5.    The term "communications" means the transmittal of information (in the form of facts, ideas, inquiries or otherwise).

6.    The connectives "and" and "or" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of the discovery request all responses that might otherwise be construed to be outside of its scope.

7.    The use of the singular form of any word includes the plural and vice versa.

## INSTRUCTIONS

1.    Please provide a cover letter that describes the documents being produced pursuant to each request number. Each document requested is to be produced in its entirety, including all non-identical copies and drafts, without abbreviation, expurgation, or redaction.

2.    Each request shall be answered fully unless it is subject to a good faith objection, in which event the reason for your objection shall be stated in detail. If an objection pertains to only a portion of a request, or a word, or phrase, or clause contained within a request, you are required to state your objection to that portion only, and to respond to the remainder of the request.

3.    If any document sought is withheld on grounds of privilege: (i) identify each such document, including, without limitation, the date, subject matter, present custodian, author or preparer, and each person to whom the substance of the document was communicated, in whole or in part; (ii) state the nature of the privilege asserted, and all facts upon which that assertion is based; and (iii) indicate the number of the request to which the document or thing is responsive. If a document is withheld on grounds of

attorney-client privilege, also state the identity of the attorney and client involved; the date when the attorney was retained; the duration of the retention; and the general subject matter of the retention.

4. The request for production of documents embodied herein shall be deemed continuing and impose upon you the obligation to promptly supplement and amend your production.

5. Unless otherwise specified, the time period covered by this request is the date of your first employment with Aeropostale, Inc. through the present.

# EXHIBIT B

# CARTER LEDYARD & MILBURN LLP

*Counselors at Law*

**Robert J.A. Zito**
*Partner*
•
*Direct Dial: 212-238-8768*
*E-mail: zito@clm.com*

*2 Wall Street*
*New York, NY 10005-2072*
•
*Tel (212) 732-3200*
*Fax (212) 732-3232*

*701 8th Street, N.W., Suite 410*
*Washington, DC 20001-3893*
*(202) 898-1515*
•
*570 Lexington Avenue*
*New York, NY 10022-6856*
*(212) 371-2720*

January 25, 2008

**BY EMAIL & REGULAR MAIL**

Michael D. Birnbaum, Esq.
Staff Attorney
U.S. Securities and Exchange Commission
3 World Financial Center, Suite 4300
New York, NY 10281-1022

Re:    Aéropostale, Inc. (NY - 7802)

Dear Mr. Birnbaum:

We represent Mr. Christopher Finazzo in connection with his termination by Aéropostale, Inc. ("Aéropostale" or the "Company") as well as in relation to your January 16, 2008 subpoena (the "Subpoena"). We write to request that you withdraw the Subpoena because it, and the investigation from which it emanates, had its genesis in an improperly obtained and disclosed privileged attorney-client communications. As will be explained in greater detail below, lawyers in New York have specific ethical and legal obligations that arise when they come into possession of attorney-client privileged material. The failure to abide by those obligations and indeed, deliberate violation of requisite duties, including improper disclosure, fatally taints that which flows from the violation.

As you may know, Mr. Finazzo's employment was abruptly terminated after many years of service for alleged "conflicts of interest" purportedly arising out of business interests Mr. Finazzo allegedly had in affiliates of a vendor for the Company. Mr. Finazzo was fired on November 8, 2006, about two months before his scheduled retirement. Mr. Finazzo is not currently employed by a public company.

In brief, during the summer of 2006, Kroll private investigators, under the supervision of Aéropostale's outside lawyers, Katten Muchin Rosenman LLP ("KMR"), were conducting an investigation that had nothing to do with Mr. Finazzo. In the course of that investigation, Aéropostale searched Mr. Finazzo's computer and reviewed his emails, which were not only unrelated to the investigation then being conducted, but, far more importantly, some of which were protected by Mr. Finazzo's attorney-client privilege.

6217707.3

Michael D. Birnbaum, Esq.
January 25, 2008
Page 2

Because the Subpoena issues from an investigation built entirely on information Aéropostale initially discovered through the invasion of Mr. Finazzo's attorney-client privilege, the Subpoena should be withdrawn.

**A.     Aéropostale's Intentional Violation Of Mr. Finazzo's Attorney-Client Privilege**

On August 24, 2006, a date when Mr. Finazzo was still employed by Aéropostale, his personal lawyer, Angela Siegel ("Attorney Siegel"), sent an email to Mr. Finazzo at his Aéropostale email address (the "Attorney Siegel Email"). Attorney Siegel, a trusts and estates lawyer, was then representing Mr. Finazzo in the context of his estate planning. The Attorney Siegel Email was not a response to a specific email or other communication from Mr. Finazzo.

The Attorney Siegel Email was sent from an address clearly identified as belonging to an attorney: "lawoffice@angelasiegel.com." Additionally, the closing lines indicated that it was written by "Angela Siegel, Esq., Law Office of Angela Siegel."

Further still, the following explicit warning appears on the face of the email:

> *****PRIVILEGE AND CONFIDENTIALITY NOTICE*****
>
> The information contained in this e-mail is confidential and may be protected by the attorney-client privilege and/or work product doctrine. It is intended for the use of the named recipient only. *If you have received this communication in error, please notify the sender immediately by reply to this e-mail or by telephone.*

(Emphasis supplied.)

Attorney Siegel attached to her email a Word document titled "Finazzo Family Assets" (the "FFA Document") that she had prepared based upon confidential information given to her by Mr. Finazzo during meetings held as part of her estate planning advice to Mr. Finazzo. The document consists of a list of Mr. Finazzo's assets, including interests in various business entities. The language of the Attorney Siegel Email clearly indicated that Mr. Finazzo communicated the information on the FFA Document to Attorney Siegel for the sole purpose of seeking legal advice.

Kroll, KMR and Aéropostale personnel, upon discovery of the Attorney Siegel email, failed to stop reviewing its obviously privileged contents.[1] Instead, they not only reviewed the privileged information, but then used it as the sole basis on which to terminate Mr. Finazzo's employment.

---

[1] Prior to the investigation that led Aéropostale to review Mr. Finazzo's (and several other Aéropostale employees) emails, Aéropostale had never before conducted a company-wide review of its employees' emails.

6217707.3

Michael D. Birnbaum, Esq.
January 25, 2008
Page 3

On November 7, 2006, Edward M. Slezak, Esq., Aéropostale's General Counsel, and Julian Geiger, Aéropostale's President and CEO, suddenly called Mr. Finazzo into an unplanned meeting prior to which Mr. Finazzo had received no opportunity to consult with an attorney (or prior notice of any kind) and confronted him with the FFA Document. Messrs. Slezak and Geiger asked Mr. Finazzo about his interests in the business entities listed on the FFA Document without telling him that it was obtained by opening the privileged Attorney Siegel Email and then told him that he had breached his employment agreement (the "Agreement") and was being fired for alleged "conflicts of interests." Messrs. Slezak and Geiger handed Mr. Finazzo a copy of a press release announcing Mr. Finazzo's termination that they said would be issued on the following day. Kroll investigators then ushered Mr. Finazzo to the door.

During the week of June 25, 2007, Mr. Finazzo's counsel, Carter Ledyard & Milburn LLP ("CLM") for the first time obtained copies of the Attorney Siegel Email and the FFA Document from Attorney Siegel. Until then, Mr. Finazzo and his counsel did not know that the Attorney Siegel Email was the source of the information that Aéropostale had used as its basis to terminate Mr. Finazzo's employment and Aéropostale's attorneys continuously concealed such fact contrary to their ethical obligations.

On June 29, 2007, upon seeing the obviously privileged nature of the documents, we sent a written demand to KMR that they take the following corrective action:

1.  Cease and desist from any further invasions of Mr. Finazzo's statutory and common law privileges, including, without limitation, his attorney-client and attorney work product privileges (the "Privileges");

2.  Return to us all copies of all privileged documents, including their attachments, including without limitation, the Attorney Siegel Email and its attached FFA Document, and any other documents or parts thereof that contain privileged information taken or extracted from the privileged documents (collectively, the "Privileged Documents") in the possession, custody and/or control of the Aéropostale Parties;

3.  Permanently delete or otherwise destroy all electronic, digital or other non-tangible copies or records of all Privileged Documents in the possession, custody and/or control of the Aéropostale Parties;

4.  Provide a certificate addressed to us, as counsel for Mr. Finazzo, signed by a senior officer of Aéropostale confirming that the actions described in Items 2 and 3 above have been accomplished;

5.  Take such other actions necessary to safeguard Mr. Finazzo's Privileges; and

Michael D. Birnbaum, Esq.
January 25, 2008
Page 4

      6.   Rescind all action taken by the Aéropostale Parties as a result of the breach of the
Privileges and otherwise restore Mr. Finazzo and his Privileges *status quo ante.*

**B.**    **The Attorney Siegel Email And Its Attached FFA Document Are Unequivocally
Privileged Under The Attorney-Client Privilege**

      It should be abundantly clear that the Attorney Siegel Email and the attached FFA
Document comprise a confidential communication sent by Attorney Siegel to Mr. Finazzo "for
the purpose of facilitating the rendition of legal advice." Spectrum Sys. Int'l Corp. v. Chem.
Bank, 78 N.Y.2d 371, 378 (1991); Rossi v. Blue Cross & Blue Shield of Greater New York, 73
N.Y.2d 588, 593 (1989); see also CPLR § 4548 (the attorney-client privilege attaches to email
communications as well as more traditional methods). Indeed, even a cursory examination of the
Attorney Siegel and the attached FFA Document reveals that Attorney Siegel intended them to
be treated as privileged. Therefore, these documents are unequivocally protected by the
attorney-client privilege.

**C.**    **Aéropostale's Attorneys Violated Their Professional Obligations Under Dr 1-
102(A)(5) And The Formal Ethics Opinions Thereunder**

      An attorney has strict and clearly delineated professional obligations that are triggered by
access to information that is intended to be privileged. It is hornbook law that when an attorney
encounters a document that, on its face, appears to be privileged, he or she *must* stop reading the
document and notify the sender immediately. Am. Express v. Accu-Weather, Inc., No. 91 Civ.
6485, 1996 WL 346388, at *2 (June 25, 1996 S.D.N.Y.), Galison, 2004 WL 2848123 at *2; see
also Ass'n of the Bar of the City of N.Y. Comm. on Prof. & Jud. Ethics, Op. No. 2003-04 (Dec.
2003, reissued Apr. 9, 2004) ("Opinion 2003-04"); N.Y. County Lawyers' Ass'n Comm. on Prof.
Ethics, Op. No. 730 (July 19, 2002) ("Opinion 730").

      As Opinion 730 states:

> A lawyer has ethical obligations upon receipt of inadvertently
> disclosed privileged information. If a lawyer receives information
> which the lawyer knows or believes was not intended for the
> lawyer and contains secrets, confidences or other privileged matter,
> the lawyer, upon recognition of same, shall, without further review
> or other use thereof, notify the sender and (insofar as it shall have
> been in written or other tangible form) abide by sender's
> instructions regarding return or destruction of the information.

Opinion 2003-04 provides identical direction. Justice Cahn of the Commercial Division of the
New York County Supreme Court has held that these duties are mandatory in a litigation context.
See Galison v. Greenberg, 5 Misc.3d 1025(A), 799 N.Y.S.2d 160 (Sup. Ct. N.Y. Co. 2004).

6217707.3

Michael D. Birnbaum, Esq.
January 25, 2008
Page 5

Attorney Siegel's privileged communication was explicitly intended for Mr. Finazzo alone and no one else. Yet, at no time, did Aéropostale's attorneys or anyone acting on their behalf,[2] ever inform Attorney Siegel that they had intercepted her privileged communication, as they were duty bound to do. Indeed, not only did Aéropostale's attorneys fail in their professional obligations to inform Attorney Siegel and to cease reviewing the email, but they reviewed the email, opened the attached Word document, and then affirmatively (and improperly) used the privileged information against Mr. Finazzo to fire him.

Opinion 730 required, at a minimum, that the Aéropostale lawyers not open the email attachment ("without further review") and inform Attorney Siegel that they had her email ("notify the sender"). They did neither. Regardless of whether Aéropostale's attorneys believed that the privilege had been waived, they were obliged to comply with such ethical requirements and raise the privilege issue later. See Ass'n of the Bar of the City of N.Y., Op. No. 2003-04. Remarkably, however, Aéropostale's attorneys continue to this day to decline to comply with their ethical obligations.

Here, it cannot be disputed seriously that the Aéropostale attorneys failed to heed their ethical mandates: They completely failed to notify Attorney Siegel, the sender of the documents, and instead improperly continued to review the privileged documents and to use the privileged information contained in such documents as the basis to fire Mr. Finazzo. Given these *prima facie* violations of the ethical standards, the only question is to determine the appropriate remedy for such egregious violations in the context of the Subpoena, addressed in Section E, below.

**D.    Mr. Finazzo Did Not Waive His Attorney-Client Privilege**

The attorney-client privilege applies to work emails, even where an employee has accepted his employer's email policy, where the employee still has an objectively reasonable belief that the communication will remain private. Curto v. Med. World Commc'n, Inc., No. 03CV6327, 2006 WL 1318387 (E.D.N.Y. May 15, 2006); In re Asia Global Crossing Ltd., 322 B.R. 247 (S.D.N.Y. 2005). In determining whether the employee's belief is objectively reasonable, New York courts will consider: (1) whether the employer maintains a policy banning personal and other objectionable use, (2) whether the employer monitors its employee's computers and emails, (3) whether third parties have the right of access to the computers or emails, and (4) whether the employee was aware of the use and monitoring policies. See Asia, 322 B.R. at 257.

---

[2] Attorneys bear responsibility for ensuring that any non-lawyers involved in the review of documents that were sent or received are aware of this obligation, and notify the supervising attorney if the review uncovers documents that appear on their face to be privileged. Richards v. Jain, 168 F.Supp.2d 1195, 1200–02 (W.D. Wash. 2001). Breaches of the attorney-client privilege by non-lawyers working with an attorney are imputed to that attorney. Id.; see also United States v. SAE Civil Constr., Inc., No. 4 CV 95-3058, 1996 WL 148521, at *4 (D. Neb. Jan. 29, 1996) ("It is of little importance that the harborer of the confidential information in the present case is not an attorney or a member of a firm's non-attorney support staff.").

Here, although Aéropostale had an email policy that stated that it *may* monitor emails, the policy did not prohibit Mr. Finazzo's personal use of the email system. In other words, the Company permitted its employee to use its email system for purposes other than Aéropostale's business. More importantly, Aéropostale did not have a practice of actually reviewing its employees' emails. In fact, we are unaware of any other instance in the Company's history where an employee's emails had been reviewed by the Company, let alone confiscated, concealed and used as a basis for a legal claim against the employee.

Moreover, the Attorney Siegel Email was not sent by Mr. Finazzo, but rather by Attorney Siegel who was completely unaware of and not bound by Aéropostale's email policy at the time she sent it. She therefore could not have possibly waived Mr. Finazzo's privilege by sending him an unsolicited email attaching a confidential document. She also took every reasonable step to ensure the protection of the privilege. Not only did Attorney Siegel include a confidentiality notice on the email, but the body of the email confirmed that the communication concerned confidential legal advice sought by Mr. Finazzo and that the attached document had been prepared by Attorney Siegel in furtherance of that advice. Under the circumstances, Mr. Finazzo had an objectively reasonable belief that the Attorney Siegel Email would remain confidential and thus he did not waive the privilege. See Asia, 322 B.R. at 261.

The recent cases of Long v. Marriberi America Corp., 2006 WL2998671 (SDNY 2006) and Scott v. Beth Israel Medical Center, 2007 WL 305335 (Sup. Ct. N.Y. County, Oct. 17, 2007) do not compel a contrary result. Both Long and Scott are readily distinguishable.

Although the courts in Long and Scott both held that the plaintiffs in those cases had waived their attorney-client privilege with respect to work emails, the facts of those cases differ significantly from the facts here. First, the employers' counsel in Long and Scott immediately segregated the privileged documents and alerted the employees' counsel of their possession of the documents. The parties then sought immediate judicial review of, and decision on, the privilege issue. This is in stark contrast to Aéropostale's and KMR's continued use and concealment of the Attorney Siegel Email and the FFA Document. Second, the employees in Long and Scott had corresponded over company email on numerous occasions over a lengthy period of time, and sometimes with several attorneys. Here, Attorney Siegel sent the Attorney Siegel Email and the FAA Document without Mr. Finazzo's solicitation, knowledge and consent. This was the first and only instance that Attorney Siegel communicated with Mr. Finazzo through his work email. Finally, the employers' email policies in Long and Scott prohibited personal use of their email system. Aéropostale's does not. Thus, Long and Scott are inapposite.

Michael D. Birnbaum, Esq.
January 25, 2008
Page 7

**E.      The Subpoena Should Be Withdrawn Because Of The Sec's Receipt And Affirmative Use Of The Information Obtained By Aéropostale As Its Lawyer From Their Knowing Breach Of Mr. Finazzo's Attorney-Client Privilege**

        But for the wrongful actions of the Company and its lawyers, Mr. Finazzo would have proceeded with his scheduled retirement with the benefit of a significant compensation package. There would have been no 8-Ks filed relating to Mr. Finazzo's firing and no investigation, formal or informal, would have been commenced by the U.S. Securities & Exchange Commission ("Commission"). The genesis of this entire matter is the Company's belief that the Attorney Siegel Email and its attached FFA Document, evidenced a so-called "conflict of interest" by Mr. Finazzo. Had KMR and Kroll (and by extension, the Company, as principal responsible for its agents' actions) complied with their legal and ethical obligations to segregate the email, notify Ms. Siegel and, upon her request, return the email unread, the chain of events that led to the Subpoena would not have begun. Without the email, there would have been no suspicion of a conflict of interest, no firing, no 8-K filing, no request for a formal investigation order and no subpoena.

        As has been held by the Southern District of New York,

> [I]t is possible for an agency to break the attorney-client privilege and then secure a ruling validating is action. However, their course has two pitfalls. First, if the agency is wrong and the violation of the privilege is found to be improper, the agency risks suppression of all evidence attributable to the breach, not merely the direct testimony of the attorney. Second, the need for collateral litigation expends recourses and delays resolution of the case.
>
> Two alternative courses would avoid these privileges. The agency can, of course, seek judicial approval before seeking to breach the attorney-client privilege, See First Federal, 110 FRD at 566 (disclosure of privileged information should ordinarily occur under court supervision). A less onerous safeguard would be to instruct the client to obtain advice of an attorney not under investigation.

SEC v. Forma 177 FRD 516, 526-7 (SDNY 1987). Of course, the second alternative suggested in Forma is inapplicable to the matter at hand. Accordingly, as wisely explained in Forma, the Subpoena herein should be withdrawn and the Commission, if so advised, should seek judicial approval before any re-issuance.

        Also instructive is SEC v. OKC Corp., 474 F. Supp. 1031, 1040 (N.D. Tex 1979), aff'd sub nom OKC Corp. v. Williams 614 F. 2d 58 (5th Cir. 1980), where, in the face of a corporation's claim of breach of attorney-client privilege by virtue of an inadvertent disclosure

Michael D. Birnbaum, Esq.
January 25, 2008
Page 8

by a single director of a confidential report, the Commission agreed to hold its investigation in
abeyance pending a determination by the district court concerning the use of the confidential
report. Unlike KMR and Aéropostale, the OKC director who disclosed the confidential report,
possessed it, in the first instance, rightfully. The question before the court, to which the matter
was properly committed, was unauthorized disclosure by a rightful possessor. By contrast,
should the Commission act prudently and seek judicial authorization for a subpoena, the issue
will be one of unauthorized disclosure by a wrongful possessor *ab initio*. Under such
circumstance, it is our view, after a survey of applicable case law, that a court will order that
both the improperly obtained attorney-client communication and all information derived, directly
or indirectly, from the initial disclosure, be suppressed. See, e.g. U.S. v. Lin Lyn Trading, Ltd.,
925 F. Supp. 1507, 1517 (D. Utah 1996) aff'd in part, rev'd in part and remanded 149 F. 3d 1112
(10th Cir 1998) (affirming suppression); U.S. v. Longo 70 F. Supp. 2d 255, 264 (W.D. N.Y 1999)
(citing Forma).

**F.    The Dispute Between Aéropostale And Mr. Finazzo Was A Private Matter Which
        Was Amicably Resolved Via A Confidential Settlement Agreement**

        In addition to the numerous problems arising from the inexcusable breach of Mr.
Finazzo's attorney-client privilege, including the unavoidable tainting of the investigation by the
Commission, the order of investigation and the Subpoena, there is another simple and
fundamental reason why the Subpoena should be withdrawn and the investigation closed. The
dispute between the Company and Mr. Finazzo was a private one. It did not in any way
implicate the Company's financial stability, the value of the stock or any other matters that may
be of concern to the investing public and, by extension, to the Commission. If Mr. Finazzo's
alleged conflict of interests affected the financial disclosure of the Company, if at all, such were
plainly immaterial and certainly did not give rise to a restatement of the Company's financial
statements. There was no effect upon the public market for the Company stock.

        The Company's concern was that the alleged conflict of interest, that it learned of from
the Attorney Siegel Email, may have, in some fashion, caused the Company to have lost money.
It was that concern that led the Company to file for arbitration.

        As you are probably aware, the parties entered into a negotiated confidential agreement
settling all claims to each sides' satisfaction. From the Commission's perspective, the most
salient aspect of the settlement should be that it did not result in a Form 8-K filing by the
Company. From the Company's standpoint, after due consideration and advice from its
securities counsel, a public filing was neither necessary nor required. The settlement with Mr.
Finazzo was immaterial to the Company *vis-à-vis* its public reporting obligations.

        Under such circumstances, we believe that the staff too should conclude that the dispute
between the Company and Mr. Finazzo was private and immaterial to the investing public and

Michael D. Birnbaum, Esq.
January 25, 2008
Page 9

did not implicate any breach of the securities laws. In short, there is simply nothing here that ought to be of interest to the staff.

Without in any way waiving Mr. Finazzo's attorney-client privilege with Attorney Siegel, let us posit a hypothetical scenario to further the analysis. Suppose a multi-billion dollar company, such as Aéropostale, knows that its chief marketing office (the "CMO") has a longstanding personal relationship with the principal shareholder of a major vendor ("the Vendor"). Suppose further that the Company, over the course of many years, has exploited that relationship to achieve very favorable supply contracts with that vendor. Lastly, suppose that the Company also eventually learns that its CMO and the Vendor, as part of their lengthy friendship, have privately invested together in different projects over the course of many years.

The Company reacts by firing the CMO and making an arbitration claim identical to the one made against Mr. Finazzo. After extensive negotiations, the claim is settled with no Form 8-K or other public filing from the Company. Under those circumstances, we respectfully suggest that there is simply no reasonable basis for the staff to believe that a violation of the securities laws has occurred.

**G.    Conclusion**

Aéropostale's invasion of Mr. Finazzo's attorney-client privilege was blatant and inexcusable. But for the invasion of the privilege, Mr. Finazzo's employment would not have been terminated and this proceeding would not have ensued.

Significantly, there is no evidence that the alleged undisclosed "conflicts of interest" materially damaged Aéropostale in any fashion. This is borne out by the Company's settlement with Mr. Finazzo and subsequent absence of any public filing or disclosure. Indeed, quite the contrary, the Company benefited greatly from these relationships and touted them in their initial registration statement and in other disclosures.

Ignoring an attorney's strict ethical obligations to comply with instructions, Aéropostale's attorneys simply refused and continue to refuse to abide by their ethical obligations as of the writing of this letter. As is articulated in the above-referenced ethics opinions, regardless of whether KMR believes that the documents are privileged, they should have complied with such instructions until a determination had been made. Aéropostale's attorneys' intentional, repeated and continuous violations of their professional obligations warrant a withdrawal of the Subpoena and that all evidenced derived from privileged sources be suppressed and expunged and requires that KMR be disqualified from representing Aéropostale.

While the Commission is incapable of restoring Mr. Finazzo to the *status quo ante vis-à-vis* the Company, it may and should do so with regard to its investigation. The Commission's investigation is solely the result of its receipt of purloined and tainted attorney-client privileged

Michael D. Birnbaum, Esq.
January 25, 2008
Page 10

information, not from an innocent recipient, but from lawyers who have definite and affirmative obligations when coming into receipt of such privileged information. Indeed, the legal staff at the Commission have these same obligations, to segregate the communication, notify the attorney/sender and, upon request, to return the information. If the legal staff seeks to proceed in some other fashion they may do so only after seeking the imprimatur of a court. Also, to the extent that the staff has come into possession of such material, in writing, electronic form, orally or otherwise, we respectfully request that it be returned to us and that we be informed if the staff has, in any way, reviewed any attorney-client privileged, or colorably privileged, information. Finally, we respectfully request that you inform us whether the staff presented any information to the Commission that was derived from privileged sources, including without limitation, the Attorney Siegel Email, in connection with the issuance of the order of investigation, dated January 10, 2008.

Sincerely,

Robert J.A. Zito

RJAZ:ma

6217707.3