IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| CHRISTOPHER L. FINAZZO,<br><br>                           Plaintiff,<br><br>vs.<br><br>SECURITIES AND EXCHANGE COMMISSION,<br><br>                         Defendant. | **08-cv-02176 (RS)**<br><br><br>**MEMORANDUM OF LAW IN SUPPORT OF MOTION BY THE SECURITIES AND EXCHANGE COMMISSION TO DISMISS THE COMPLAINT** |

# TABLE OF CONTENTS

BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

    I.     THERE IS NO SUBJECT MATTER JURISDICTION OVER
          FINAZZO'S CLAIMS BECAUSE SOVEREIGN IMMUNITY BARS
          THIS ACTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

          A.    The Declaratory Judgment Act and Rule 65 Do Not
               Waive Sovereign Immunity. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

          B.    The APA and Section 1331 Do Not Waive Sovereign Immunity
               In This Case. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

    II.    FINAZZO HAS NOT STATED A CLAIM FOR WHICH RELIEF
          CAN BE GRANTED. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

          A.    Finazzo Is Estopped from Challenging the Commission's
               Enforcement of its Subpoenas. . . . . . . . . . . . . . . . . . . . . . . . . 11

          B.    As a Matter of Law, Finazzo Cannot Prevail on His Claim that
               the Remedy for an Alleged Breach of Privilege by a Third Party
               Includes Enjoining a Government Investigation. . . . . . . . . . . 14

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

# TABLE OF AUTHORITIES

## CASES

*Central Hudson Gas & Elec. Corp. v. Empresa Naviera Santa S.A.*,
  56 F.3d 359 (2nd Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Commonwealth v. Fewell*,
  654 A.2d 1109 (Pa. Super. Ct. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*FDIC v. Meyer*,
  510 U.S. 471 (1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Homer v. Eddy*,
  341 F.2d 477 (4th Cir. 1965) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*In re Beiny*,
  129 A.D.2d 126 (NY App. Div. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*In re SEC ex rel. Glotzer*,
  374 F.3d 184 (2nd Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Johnson v. Watkins*,
  101 F.3d 792 (2nd Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Kramer v. Time Warner Inc.*,
  937 F.2d 767 (2nd Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*Lane v. Pena*,
  518 U.S. 187 (1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Makarova v. United States*,
  201 F.3d 110 (2nd Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*New York State Nat. Org. for Women v. Terry*,
  886 F.2d 1339 (2nd Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Paradyne v. United States DOJ*,
    647 F. Supp. 1228 (D.D.C. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*SEC v. Independence Drilling Corp.*,
    595 F.2d 1006 (5th Cir. 1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*SEC v. OKC Corp.*,
    474 F.Supp. 1031 (N.D. Tex. 1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Shaffer v. C.I.R.*,
    515 F.Supp. 748 (E.D. La. 1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Skelly Oil v. Phillips Petroleum*,
    339 U.S. 667 (1950) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Sprecher v. Graber*,
    716 F.2d 968 (2nd Cir. 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 13

*Sprecher v. Von Stein*,
    772 F.2d 16 (2nd Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*State v. Smith*,
    704 A.2d 73 (N.J. Super. Ct. App. Div. 1997) . . . . . . . . . . . . . . . . . . . . . . 17

*United States v. Bonnell*,
    483 F.Supp. 1070 (D. Minn. 1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*United States v. Calandra*,
    414 U.S. 338 (1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*United States v. Longo*,
    70 F.Supp.2d 225 (W.D.N.Y. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*United States v. Sherwood*,
    312 U.S. 584 (1941) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*United States v. White*,
   970 F.2d 328 (7th Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Warner Jenkinson Co. v. Allied Chemical Corp.*,
   567 F.2d 184 (2nd Cir. 1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8


## STATUTES

Administrative Procedure Act
   5 U.S.C. 701 *et seq.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 9

Declaratory Judgment Act
   28 U.S.C. 2201 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

Federal Question Jurisdiction
   28 U.S.C. 1331 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

Securities Exchange Act of 1934, Section 10(b)
   15 U.S.C. 78j(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Securities Exchange Act of 1934, Section 13(a)
   15 U.S.C. 78m(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Securities Exchange Act of 1934, Section 14(a)
   15 U.S.C. 78n(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Securities Exchange Act of 1934, Sections 21(a) and (b)
   15 U.S.C. 78u(a) and (b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

## REGULATIONS

17 CFR 229.404
       Regulation S-K Item 404 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

17 CFR 240.13a-1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

17 CFR 240.13a-11 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

## RULES

Fed. R. Civ. P. 12(b)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 20

Fed. R. Civ. Proc. 12(b)(6) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 19, 20

Fed. R. Civ. Proc. 65 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 8

Fed. R. Evid. 201 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

## OTHER AUTHORITIES

Form 8-K, Item 5.02(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Mosteller, Robert P., "Admissibility of Fruits of Breached Evidentiary Privileges: The Importance of Adversarial Fairness, Party Culpability, and Fear of Immunity," 81 *Washington University Law Quarterly* 961 (Winter 2003) . . . . . . . . . . . . . . 15

*SEC v. Finazzo et al.*,
       2nd Cir. Docket No. 08-1733 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*SEC v. Finazzo et al.*,
       S.D.N.Y. Case No. M-18-304 (Baer, J.) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| CHRISTOPHER L. FINAZZO,<br><br>                       Plaintiff,<br><br>vs.<br><br>SECURITIES AND EXCHANGE<br>COMMISSION,<br><br>                       Defendant. | **08-cv-02176 (RS)**<br><br><br>**MEMORANDUM OF LAW IN SUPPORT OF MOTION BY THE SECURITIES AND EXCHANGE COMMISSION TO DISMISS THE COMPLAINT** |

The Securities and Exchange Commission files this memorandum in support of its motion, made pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6), to dismiss the Complaint.

## BACKGROUND

On February 27, 2008, the Commission filed a subpoena enforcement action against Christopher Finazzo – the former Executive Vice President and Chief Merchandising Officer for Aeropostale, Inc. – and another party, who had each refused to comply with administrative subpoenas the Commission issued in connection with a formal investigation entitled *In the Matter of Aeropostale, Inc.* (NY-7802). *SEC v. Finazzo et al.*, S.D.N.Y. Case No. M-18-304 (Baer, J.). Each of those subpoenas specified that the Staff sought only non-privileged responsive documents.

Nearly a week later, Finazzo filed the instant Complaint.[1]  He alleges that Aeropostale and other third parties – notably, <u>not</u> including the Commission – violated his attorney-client privilege by reviewing an allegedly protected email and attached document he received at his corporate email address.  Complaint ¶¶ 11-15, 19, 24, 34-35, B-D.  He claims the only way to effectively remedy that alleged breach is to halt the Commission's investigation into his possible violations of the federal securities laws, and he seeks injunctive and declaratory relief against the Commission to that end.  Complaint ¶¶ 36-37, 42-45; *see also* n.8 and accompanying text, below.

Before the Commission ever began its investigation, Aeropostale conducted an internal investigation (which Finazzo asserts was unrelated to him), in the course of which the company and/or its agents discovered and reviewed the allegedly privileged documents.  Aeropostale terminated Finazzo's employment as a result of the information it learned from those documents.  Complaint ¶ 15.  As required by the federal securities laws, on November 8, 2006 Aeropostale made a

---

[1]Although Finazzo identified the Complaint as related to the already-pending subpoena enforcement action, the clerk assigned it as though the actions were not related, apparently because the subpoena enforcement action is a summary proceeding handled through the Part I miscellaneous docket whereas this Complaint is handled on the regular civil docket.

2

public filing (the "Form 8-K") disclosing the termination.[2]  Exhibit 1[3]; *see also*

Complaint ¶ 16.  In April 2007, when Aeropostale publicly filed its required

annual report (the "Form 10-K"; *see* 17 CFR 240.13a-1), it elaborated further on

the reasons for Finazzo's termination:

> • [Finazzo] concealed * * * and failed to disclose in corporate disclosure documents, his personal ownership interests in, and officer positions of, certain corporate entities affiliated with one of our primary vendors at the time, South Bay Apparel, Inc.,
>
> • without the knowledge or authorization of our management, executed a corporate Guaranty Agreement in March 1999, that, had it been enforceable, would have obligated us to guarantee any payments due from South Bay Apparel, Inc. to Tricot Richelieu, Inc., an apparel manufacturer and vendor to South Bay Apparel, Inc., and
>
> • failed to disclose unauthorized business relationships and transactions between immediate and extended family members of Mr. Finazzo and certain other of our vendors.

Exhibit 2.

---

[2]Companies must file a Form 8-K with the Commission to announce major events of potential import to shareholders.  *See* 17 CFR 240.13a-11.  Form 8-K requires disclosure "[i]f * * * any named executive officer * * * is terminated from that position."  Form 8-K, Item 5.02(b).

[3]The Court can take judicial notice of the contents of Aeropostale's publicly-filed Forms 8-K and 10-K, and of the contents of transcripts and other publicly-filed documents entered in *SEC v. Finazzo et al.* (including documents filed on appeal), without converting this motion into one for summary judgment.  *See, e.g.*, Fed. R. Evid. 201; *Kramer v. Time Warner Inc.*, 937 F.2d 767, 774 (2nd Cir. 1991).  A copy of each cited document that can be judicially noticed is attached as an Exhibit for the Court's convenience.

As a result of Aeropostale's public filings, the Commission staff became aware of the possibility that Aeropostale, Finazzo and others may have violated the federal securities laws and only then began an informal investigation in or around the summer of 2007.[4]  Notably, the Complaint does not (and cannot) make a single allegation that the Commission was in any way involved in either the Aeropostale internal investigation or the discovery of the allegedly privileged email or that it has ever obtained or reviewed the email or its attachment.  As noted above, the Complaint places responsibility for the breach solely on third parties.

As part of its investigation, the Commission subpoenaed documents and testimony from both Finazzo and South Bay.  As noted above, both refused to comply (South Bay doing so at Finazzo's request), and the Commission sought an order enforcing its subpoena.

In the subpoena enforcement action, Finazzo made the same arguments contained in the Complaint.  *See, e.g.*, Exhibit 3; Exhibit 4 at pp.4-5 ("the subject

---

[4]Certain related-party transactions must be publicly disclosed to permit investors to assess whether the terms of the transaction were fair and arms-length or whether the transactions represented self-dealing.  *See, e.g.*, Regulation S-K Item 404 [17 CFR 229.404].  Improper disclosures could violate, among other provisions, Sections 10(b), 13(a) and 14(a) of the Securities Exchange Act of 1934 [15 U.S.C. 78j(b), 78m(a) & 78n(a)].

matter [of the subpoena enforcement action and this Complaint] is identical"); *id.* at pp.8-19.  He also sought essentially the same relief as he seeks in the Complaint: to avoid enforcement of the subpoena.  *Cf.* Exhibit 3 at pp.18-20 (arguing that the Commission's investigation is "tainted" and urging that the subpoenas be quashed) *with* Complaint ¶¶ 36-37, 43 (asking for a judgment that the Commission's investigation is improper and the subpoenas should be quashed).

On March 26, 2008 the Court entered an order rejecting Finazzo's (and South Bay's) arguments and enforcing the subpoenas.  Exhibit 5.  The Court first found that the Commission had made a *prima facie* showing that the subpoenas should be enforced, because the investigation is being "conducted pursuant to a legitimate purpose" and the documents sought are relevant and not already in the Commission's possession.  *Id.* at pp.3-4.  It then specifically rejected Finazzo's arguments that the investigation is "tainted" by the alleged violation of his privilege and that the subpoenas were issued in bad faith or for an improper purpose.  *Id.* at p.4.  The Court noted that the Commission is seeking only <u>non-privileged</u> documents from both Finazzo and South Bay, and observed that "Finazzo has not cited any authority that would preclude the Commission from relying on the non-privileged information sought by the" subpoenas at a

5

subsequent trial. *Id.* at p.5. It concluded by soundly rejecting Finazzo's argument

that the Commission was somehow complicit in the alleged breach,[5] stating:

> It is undisputed that the Commission publicly encourages corporations to
> engage in self-regulation and to disclose any unlawful conduct uncovered
> by internal investigations. It is something else to allege that the
> Commission encourages, or condones, internal corporate investigations that
> violate an employee's attorney-client privilege.

*Id.* at p.7 (emphasis added).

Finazzo sought a stay of Judge Baer's ruling to pursue an appeal. Judge

Wood denied his request (Exhibit 6), and a similar motion to the appellate court

followed. After briefing and argument, the Court of Appeals denied Finazzo's

motion without comment. *SEC v. Finazzo et al.*, 2nd Cir. Docket No. 08-1733.

---

[5]In short, Finazzo argued that two documents issued by DOJ (the
"Thompson and McNulty memos") and one issued by the SEC (the "Seaboard
Report"), wherein the government encouraged companies to investigate and self-
report potential wrongdoing, "deputized" every public company and thereby made
actions taken by private parties in internal investigations "state action." The
Complaint does not include this argument or allege any facts that would support
the argument.

**ARGUMENT**

**I.     THERE IS NO SUBJECT MATTER JURISDICTION OVER FINAZZO'S CLAIMS BECAUSE SOVEREIGN IMMUNITY BARS THIS ACTION.**

The United States, "as sovereign, is immune from suit save as it consents to be sued." *United States v. Sherwood*, 312 U.S. 584, 586 (1941). Thus, consent to suit is a prerequisite to subject matter jurisdiction over a claim against the United States, its agencies and officials. *See FDIC v. Meyer*, 510 U.S. 471, 475 (1994). Sovereign immunity extends to the Commission. *SEC v. Independence Drilling Corp.*, 595 F.2d 1006, 1008 (5th Cir. 1979); *Homer v. Eddy*, 341 F.2d 477, 480 (4th Cir. 1965); *In re SEC ex rel. Glotzer*, 374 F.3d 184, 192 (2nd Cir. 2004).

To overcome this immunity, any waiver must be "expressed in unequivocal statutory text and cannot be implied" and "will be strictly construed, in terms of its scope, in favor of the sovereign." *Lane v. Pena*, 518 U.S. 187, 192 (1996). Finazzo carries the burden of identifying such an express statutory waiver. *See Makarova v. United States*, 201 F.3d 110, 113 (2nd Cir. 2000); *Paradyne v. United States DOJ*, 647 F. Supp. 1228, 1231 (D.D.C. 1986).  Finazzo fails to meet this burden, as none of the statutes referenced in his complaint – federal question (28 U.S.C. 1331), the Declaratory Judgment Act ("DJA") (28 U.S.C. 2201), the Administrative Procedure Act ("APA") (5 U.S.C. 701 *et seq*.), or least of all Fed.

R. Civ. Proc. 65 – constitutes such a waiver or can provide subject matter jurisdiction for his claims.

### A.    The Declaratory Judgment Act and Rule 65 Do Not Waive Sovereign Immunity.

It is well recognized that the DJA does not provide an independent grant of jurisdiction or waive the government's sovereign immunity. *Skelly Oil v. Phillips Petroleum*, 339 U.S. 667, 671 (1950); *Warner Jenkinson Co. v. Allied Chemical Corp.*, 567 F.2d 184, 186 (2nd Cir. 1977) ("The Declaratory Judgment Act * * * does not independently create federal jurisdiction").

Similarly, while Finazzo observes that the Court has authority to grant injunctive relief pursuant to Fed. R. Civ. Proc. 65, that is simply a general provision of judicial procedure and nowhere indicates Congress intended it to function as a waiver of sovereign immunity. *See, e.g.*, *Shaffer v. C.I.R.*, 515 F.Supp. 748, 751 (E.D. La. 1981).

### B.    The APA and Section 1331 Do Not Waive Sovereign Immunity In This Case.

Finazzo's reliance upon the APA and Section 1331 is equally misplaced. The Second Circuit long ago resolved the question of whether Congress has waived sovereign immunity under either of these provisions to permit a suit seeking equitable relief for alleged wrongdoing in a Commission investigation.

*Sprecher v. Graber*, 716 F.2d 968 (2nd Cir. 1983).  Concluding it has not, the court

relied on two points.  First, the initiation of an investigation and decision to issue a

subpoena have each been committed to the Commission's discretion by Congress

and are not judicially reviewable under the APA.  *Id.* at 974 (citing 15 U.S.C.

78u(a) and (b)); *see also* 5 U.S.C. 701(a)(2).[6]  Second, a subpoena enforcement

action "is the <u>exclusive</u> method by which the validity of SEC investigations and

subpoenas may be tested in the federal courts.  * * * We hold, therefore, that

[equitable actions challenging Commission investigations] are barred by the

doctrine of sovereign immunity."  *Id.* at 975 (emphasis added).

The Second Circuit later re-affirmed the *Graber* principle, stating that "a

district court has no jurisdiction to award non-monetary relief against an agency

---

[6]15 U.S.C. 78u(a)(1) states in pertinent part:

> The Commission may, in its discretion, make such investigations as it
> deems necessary to determine whether any person has violated, is
> violating, or is about to violate any provision of this title, the rules or
> regulations thereunder * * *."

15 U.S.C. 78u(b) states in pertinent part:

> For the purpose of any such investigation * * * any member of the
> Commission or any officer designated by it is empowered to
> administer oaths and affirmations, subpoena witnesses, compel their
> attendance, take evidence, and require the production of any books,
> papers, correspondence, memoranda, or other records which the
> Commission deems relevant or material to the inquiry. * * *

on a claim that it is conducting an improper investigation where another statute

provides an exclusive avenue of redress, or where the action complained of is

committed to agency discretion.  The <u>exclusive method for testing the validity of</u>

<u>the SEC's investigatory motives or methods</u> is a contested subpoena enforcement

proceeding * * *." *Sprecher v. Von Stein*, 772 F.2d 16 (2nd Cir. 1985) (emphasis

added).

Thus, in the *Sprecher* line of cases the court clearly (and correctly)

foreclosed any argument that the APA waives sovereign immunity to challenge the

initiation or conduct of a Commission investigation.  Because none of Finazzo's

asserted jurisdictional bases provide the requisite waiver of sovereign immunity,

the Complaint must be dismissed for lack of jurisdiction.  Fed. R. Civ. P. 12(b)(1).


## II.    FINAZZO HAS NOT STATED A CLAIM FOR WHICH RELIEF CAN BE GRANTED.

Even if Congress had waived sovereign immunity (which it has not),

Finazzo's complaint would still have to be dismissed because it fails to state a

claim for which relief can be granted.

10

## A.    Finazzo Is Estopped from Challenging the Commission's Enforcement of its Subpoenas.

Finazzo seeks a declaratory judgment that "the Commission's investigation * * * is improper * * * [and] the Commission Subpoena served on [Finazzo] is improper and should be quashed" (Complaint ¶¶ 36-37); injunctive relief that "all subpoenas issued by the Commission * * * must be quashed" or else "Finazzo would suffer irreparable injury" (Complaint ¶¶ 43, 45); and judgment "[e]njoining the Commission and its Staff from enforcing the subpoenas issued pursuant to its formal Order of Investigation" (Complaint ¶ G).[7]

However, all of these claims have already been fully litigated between Finazzo and the Commission in the subpoena enforcement action.  Finazzo's sole defense was identical to the instant Complaint: he argued that the Commission's entire investigation is "tainted" by the breach of Finazzo's attorney-client privilege by Aeropostale and its outside counsel.  *See, e.g.*, Exhibits 3, 4.  His requested relief was likewise identical to the relief he seeks in the Complaint: to have the subpoenas quashed and declare that the Commission cannot investigate

---

[7]The Complaint also requests judgment that various third parties, not named as defendants, violated Finazzo's privilege and their own professional obligations.  Complaint ¶¶ 33-35, 40.  Those requests do not state a claim against the Commission itself.  Even accepting the Complaint's allegations about the third parties' actions as true, Finazzo cannot prevail against the Commission as a matter of law.  *See* Section II(B), below.

anything that was revealed in Aeropostale's public filings.[8]  Exhibit 3 at p.18.

Judge Baer has already rejected his arguments, and denied his requested relief,

ruling instead that the Commission's subpoenas are not improper and must be

complied with on pain of contempt.  Exhibit 5.  Thus, whether by claim preclusion

or issue preclusion, Finazzo's claims are barred.  *See, e.g.*, *Central Hudson Gas &*

*Elec. Corp. v. Empresa Naviera Santa S.A.*, 56 F.3d 359, 366 (2nd Cir. 1995) ("The

doctrine of res judicata, or claim preclusion, holds that following entry of a valid

final judgment, 'the parties to the suit * * * are thereafter bound "* * * as to every

matter which was offered and received to sustain <u>or defeat</u> the claim or demand

* * *"'") (internal citations omitted) (emphasis added); *id.* at 368 ("Collateral

estoppel, or issue preclusion, bars the relitigation of issues actually litigated and

---

[8]While Finazzo did not specifically request an injunction against the
Commission's investigation in the subpoena enforcement action, the sweeping
rationale of his argument (had it prevailed) would have been to the same effect:
precluding the Commission from investigating his conduct, since the investigation
arose solely from Aeropostale's public disclosures.  Thus, his request for an
injunction here is a distinction without a difference.  Similarly, the broad sweep of
his argument, especially when coupled with the requests for relief quoted above,
belies any suggestion that he is not trying to halt the Commission's investigation
into his potential securities law violations as publicly revealed by Aeropostale.

decided in the prior proceeding, as long as that determination was essential to that judgment").[9]

In addition to meeting the technical requirements for preclusion, this case comports with the important underlying principles of preclusion:

> The doctrine [of preclusion] promotes important goals: it allows a party only one opportunity to litigate an issue thereby conserving the time and resources of the parties and the court; promotes the finality of judgments; preserves the integrity of the judicial system by eliminating inconsistent results; and ensures that a party not be able to relitigate issues already decided against it in prior litigation.

*Johnson v. Watkins*, 101 F.3d 792, 795 (2nd Cir. 1996) (internal citations omitted).

Because Judge Baer has already considered and rejected Finazzo's claims, Finazzo cannot achieve any relief on his Complaint, and the Complaint should be dismissed. Fed. R. Civ. Proc. 12(b)(6).

---

[9]In *Sprecher v. Graber*, 716 F.2d 968 (2nd Cir. 1983), the court did not accord collateral effect to certain aspects of an earlier subpoena enforcement action where discovery, which was not available in the summary action, may have led to a different outcome. It did accord collateral effect to one finding ("Count 3") where discovery would not have changed the outcome. *Id.* at 973. Here, the situation is the same as *Sprecher*'s Count 3: the Court can accept all the allegations in the Complaint as true, so discovery is not necessary and would not lead to a different outcome.

13

**B.    As a Matter of Law, Finazzo Cannot Prevail on His Claim that the Remedy for an Alleged Breach of Privilege by a Third Party Includes Enjoining a Government Investigation.**

The only question that Finazzo could theoretically pursue in this action is his request to halt the Commission's entire investigation (at least insofar as it pertains to him).  Complaint ¶¶ 36, 40(f), 44.  As discussed above (n.8), given the sweeping effect of Finazzo's arguments in the subpoena enforcement action, the Court should find that this claim is barred.

In any event, the claim would have to be dismissed because Finazzo cannot prevail on his argument as a matter of law.  To enjoin the investigation, Finazzo would have to prove that – even though the Commission has not engaged in any wrongdoing – its "investigation * * * is improper because the basis for the investigation is misappropriated [by third parties] privileged information and breaches by [third party] attorneys of their professional obligations." Complaint ¶ 36.[10]  The Complaint does not point to any support for this extraordinary proposition.

_____

[10]The argument herein assumes *arguendo* that Aeropostale did violate Finazzo's privilege.  However, it is entirely possible that the asset list was not privileged in the first instance, or that Finazzo waived any privilege, in either of which case Finazzo also could not prevail.

14

As Judge Baer has already noted, Finazzo's claim raises an evidentiary

question in the nature of a "fruit of the poisonous tree" analysis.  Exhibit 5 at p.5.

Courts making such an analysis have consistently looked at whether the

government had any role in procuring the privileged information.[11]  Even taking

the allegations in the Complaint as true, the Commission comes to this

investigation with clean hands,[12] and thus Finazzo has no basis in law for stopping

---

[11]*See generally* Mosteller, Robert P., "Admissibility of Fruits of Breached Evidentiary Privileges: The Importance of Adversarial Fairness, Party Culpability, and Fear of Immunity," 81 *Washington University Law Quarterly* 961 (Winter 2003) (collecting state and federal cases that address making derivative use of privileged information, and concluding that where an action is being taken by the government; "party responsibility/culpability is absolutely critical. * * * [C]ourts simply do not find a violation of the attorney-client privilege by private parties sufficient to justify suppressing fruits of the violation" [at 989-90]).

[12]The two cases Finazzo cites in the Complaint (at ¶ 30) are thus inapposite. In *In re Beiny*, 129 A.D.2d 126 (NY App. Div. 1987), the court faced a law firm that "chose to chart a course which it knew to be at variance with acceptable practice so as to obtain by stealth that which could not be readily obtained through proper channels" and accordingly held that "in light of the deceitful and thoroughly unprincipled effort used to obtain the documents, and the substantial prejudice visited upon the unnotified adverse party, suppression of the information was properly ordered."

In *United States v. Longo*, 70 F.Supp.2d 225 (W.D.N.Y. 1999), the court refused to suppress information that a legal secretary provided to the government, explaining that "[t]o determine whether a private party acted as a government agent in conducting a search, courts consider whether the defendant has demonstrated government knowledge and acquiescence in the search, and whether the private searcher intended to assist law enforcement as opposed simply to achieve his own ends.  Knowledge and acquiescence, *simpliciter,* however, will be insufficient to attribute the private party's action to the government unless the

the investigation.  As one court noted, to halt a civil investigation based on a

violation of the attorney-client privilege by a private party would be to "place

* * * attorney-client privilege on a higher plane than fourth amendment protected

privacy.  Plainly stating this result reveals that the reasoning path that leads to it is

gossamer.  The ultimate truth is that the attorney-client privilege does not enjoy

that level in the hierarchy of values * * *."  *SEC v. OKC Corp.*, 474 F.Supp. 1031,

1040 (N.D. Tex. 1979).  Indeed, when Finazzo made his full argument on this

point in the subpoena enforcement action, Judge Baer observed that Finazzo had

not cited any authority that would support his proposition.  Exhibit 5 at p.5.

Two cases explain why the law is not and should not be as Finazzo wishes it

were.  In *OKC Corp.*, the Commission by innocent means received a privileged

report.  Later in the Commission's investigation, the court enforced a Commission

subpoena for other corporate records, explaining that where the government has

not engineered the intrusion into privilege, the only conduct to be deterred is the

disclosure of privileged information by private actors to the government.  474

F.Supp. at 1039-40.  Because private actors typically do not have an incentive to

disclose privileged information, the "marginal effectiveness of denying use to an

---

circumstances demonstrate <u>the government explicitly or implicitly instigated the
search</u>." (emphasis added)

innocent agency [of] reports produced not by a state [actor] but by a private citizen is not justified." *Id.*

This case typifies the concern expressed by the *OKC* court. Adopting Finazzo's argument would have the effect of suppressing any investigation into his potential self-dealings, since (according to Finazzo) anything the Commission has learned is tied to the public disclosures and in turn to the disputed document. Yet preventing the government from being able to investigate (or, accordingly, prosecute) his potentially serious wrongdoing would not serve any greater public good, because it would provide little or no additional incentive for private parties to respect the attorney-client privilege. Such a result would be unwarranted not only in this case, but would set a precedent that would permit a variety of serious violations to go un-investigated, and thus un-prosecuted.[13]

---

[13] *See, e.g., Commonwealth v. Fewell*, 654 A.2d 1109 (Pa. Super. Ct. 1995) (refusing to overturn a criminal conviction that stemmed from a psychiatrist's disclosure of privileged information that a patient had admitted suffocating her infant son, because there was no government misconduct); *State v. Smith*, 704 A.2d 73 (N.J. Super. Ct. App. Div. 1997) ("If defendant's confidences were violated by a [private party], he may sue the offending party. But to conceal evidence of defendant's guilt to the end that he may escape conviction would constitute a serious insult to the judicial process"); *United States v. White*, 970 F.2d 328, 335 (7th Cir. 1992) (refusing to reverse a fraud conviction where the prosecutor used allegedly privileged documents in the investigation in part because the government was not responsible for the breach of privilege).

Similarly, in *United States v. Bonnell*, 483 F.Supp. 1070, 1081 (D. Minn. 1979), an individual resisted an IRS summons on the ground that the summons was based on privileged work product that was (allegedly) wrongfully disclosed to the IRS.  The court noted that an administrative investigation is not a trial, and thus an exclusionary rule was not warranted.  *Id.* at 1079-80.  It also concluded that precluding the government from using information it innocently acquired would impose a substantial cost on the public interest by hampering the government's ability to collect relevant evidence, while only marginally advancing the goals of evidentiary privileges.  *Id.* at 1081-82.  Lastly, it likened an administrative investigation to a grand jury proceeding, and noted that investigators in both types of proceedings have broad authority to use information even if it derives from evidence obtained in violation of an individual's rights.  *Id.* at 1080-81; *see also United States v. Calandra*, 414 U.S. 338, 353-55 (1974) (explaining that because a "grand jury does not finally adjudicate guilt or innocence, it has traditionally been allowed to pursue its investigative and accusatorial functions unimpeded by the evidentiary and procedural restrictions applicable to a criminal trial").[14]  Applying those sound legal principles to

---

[14]While the *Bonnell* court made a passing reference in a footnote to there being "less reason to bar the use of fruits of a violation of the work-product doctrine than to preclude exploitation of illegally seized evidence or privileged

18

Finazzo's allegations likewise leads to the conclusion that the Commission (and, by extension, the public) should not be penalized for the purely private actions of third parties.

Because Finazzo cannot prevail as a matter of law on his argument that the Commission's investigation is improper,[15] he has failed to state a claim for which relief can be granted and the Complaint should be dismissed. Fed. R. Civ. Proc. 12(b)(6).

*   *   *

_____

attorney-client communications" (*id.* at n.17), in the immediately preceding text the court explained that its analysis "is applicable also to all fruits defenses." The legal framework of the *Bonnell* case is thus fully applicable to the case at bar.

[15]To obtain a permanent injunction, Finazzo would first have to prevail on the merits of his claim, which is unlikely for the reasons discussed in the text above. Even in the unlikely event that he did prevail, however, to obtain the extraordinary remedy of an injunction he would also have to show that he has no other adequate remedy at law and that he would suffer irreparable harm if an injunction was not granted. *See, e.g.*, *New York State Nat. Org. for Women v. Terry*, 886 F.2d 1339, 1362 (2nd Cir. 1989). The Complaint does not allege any facts that would show he meets either of those requirements, providing yet another reason Count II should be dismissed as a matter of law.

## CONCLUSION

The Commission respectfully requests that the Complaint be dismissed for lack of subject matter jurisdiction and/or for failure to state a claim for which relief can be granted.  Fed. R. Civ. Proc. 12(b)(1), (6).

May 30, 2008                                Respectfully submitted,

                                            RICHARD M. HUMES
                                            Associate General Counsel

                                            MELINDA HARDY
                                            Assistant General Counsel

                                            */s/ Karen J. Shimp*
                                            KAREN J. SHIMP
                                            Senior Counsel

                                            U.S. SECURITIES AND
                                            EXCHANGE COMMISSION
                                            100 F Street NE
                                            Washington, DC 20549-9612
                                            Tel: (202) 551-5007 (Ms. Shimp)
                                            Fax: (202) 772-9263
                                            shimpk@sec.gov

20

# Exhibit 1

**Aeropostale Form 8-K filed November 7, 2006**

**Filed in *SEC v. Finazzo* as Exhibit 1 to
Application for Order to Show Cause
(February 27, 2008)**

# UNITED STATES SECURITIES AND EXCHANGE COMMISSION
## Washington, D.C. 20549

---

# FORM 8-K

## CURRENT REPORT
### Pursuant to Section 13 or 15(d) of the
### Securities Exchange Act of 1934

Date of Report (Date of earliest event reported) <u>November 7, 2006</u>

# Aeropostale, Inc.

(Exact name of registrant as specified in its charter)

| Delaware | 001-31314 | 31-1443880 |
|---|---|---|
| (State or other jurisdiction of incorporation) | (Commission File Number) | (I.R.S. Employer Identification No.) |

| 112 West 34th Street, 22nd Floor, New York, NY | 10120 |
|---|---|
| (Address of principal executive offices) | (Zip Code) |

Registrant's telephone number, including area code **(646) 485-5398**

**Not Applicable**

(Former name or former address, if changed since last report.)

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions:

☐ Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐ Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐ Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐ Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13a-4(c))

**Item 1.02. Termination of a Material Definitive Agreement**

On November 8, 2006, Aeropostale, Inc. (the "Company") announced it has terminated for cause Christopher L. Finazzo, the Company's former Executive Vice President and Chief Merchandising Officer, effective November 7, 2006, and in this regard terminated his employment agreement dated as of February 1, 2004 with the Company (the "Agreement"). The Agreement has been filed as an Exhibit to the Company's Form 10-K filed with the Securities and Exchange Commission on April 14, 2004 and is hereby incorporated by reference herein.

The Company's action was taken based upon initial information uncovered by management and after an independent investigation was conducted at the direction, and under the supervision, of a special committee of the Board of Directors. The investigation, carried out by outside legal counsel and a third-party investigation firm, revealed that Mr. Finazzo had concealed personal ownership interests in, and served as an officer of, entities affiliated with one of the Company's largest vendors, South Bay Apparel, Inc. These activities by Mr. Finazzo and their concealment, constitute conflicts of interest in breach of the Company's Code of Business Ethics, and violations of Mr. Finazzo's employment agreement.

A copy of the Company's press release with respect to this matter is attached as Exhibit 99.1 and is hereby incorporated by reference herein. The information set forth below under Item 5.02 is hereby incorporated by reference in this Item 1.02.

**Item 5.02.  Departure of Directors or Principal Officers; Election of Directors; Appointment of Principal Officers; Compensatory Arrangements of Certain Officers**

On November 7, 2006, the Company terminated for cause Christopher L. Finazzo, the Company's former Executive Vice President and Chief Merchandizing Officer, effective that date. Julian R. Geiger, Chairman and Chief Executive Officer of the Company, has assumed Mr. Finazzo's merchandising responsibilities until such time as a replacement is found.

**Item 8.01. Other Events**

As described above, the Company has terminated for cause the employment of Christopher L. Finazzo, its former Executive Vice-President and Chief Merchandising Officer.

As described above, the Company has determined that Mr. Finazzo failed to disclose personal ownership interests in certain corporate affiliates of South Bay Apparel, Inc., a significant vendor of the Company, and has also served as an officer of certain of these entities. The Company believes Mr. Finazzo has held certain of these interests and positions since 1998. South Bay has been a vendor to the Company since 1996, providing apparel products including women's and men's graphic tee shirts, fleece and other tops. At least one affiliate of South Bay involved in this matter has received orders from the Company aggregating approximately $2.4 million in 2004, approximately $1 million in 2005 and approximately $630,000 year to date.

**Signature**

Pursuant to the requirements of the Securities Exchange Act of 1934, as amended, the Registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

Aeropostale, Inc.

Date: November 8, 2006

By:   /s/ Michael J. Cunningham
Name: Michael J. Cunningham
Executive Vice President — Chief
Financial Officer

**Item 9.01. Financial Statements and Exhibits.**

(d)

Exhibit 99.1.   Aeropostale, Inc. Press Release, dated November 8, 2006.

Exhibit 99.2.   Employment Agreement, dated as of February 1, 2004, between Christopher L. Finazzo and Aeropostale, Inc. (incorporated by reference to Exhibit 10.20 to Registrant's Form 10-K filed with the Securities and Exchange Commission on April 14, 2004.)

# Exhibit 2

**Excerpts from
Aeropostale Form 10-K filed April 2007**

**Filed in *SEC v. Finazzo* as Exhibit 2 to
Application for Order to Show Cause
(February 27, 2008)**

# UNITED STATES SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

# Form 10-K

(Mark One)

☑ **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**
**For the Fiscal Year Ended February 3, 2007**

or

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**Commission File Number: 001-31314**

# AÉROPOSTALE, INC.

*(Exact name of registrant as specified in its charter)*

| | |
|---|---|
| **Delaware** | **No. 31-1443880** |
| *(State or other jurisdiction of incorporation or organization)* | *(I.R.S. Employer Identification No.)* |
| **112 West 34th Street, 22nd floor** | **10120** |
| **New York, NY** | *(Zip Code)* |
| *(Address of principal executive offices)* | |

**Registrant's telephone number, including area code:**
**(646) 485-5398**

**Securities registered pursuant to Section 12(b) of the Act:**

| Title of Each Class | Name of Each Exchange on Which Registered |
|---|---|
| Common Stock, $0.01 par value | New York Stock Exchange |

**Securities registered pursuant to Section 12(g) of the Act: None**

Indicate by check mark whether the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act. Yes ☑  No ☐

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or 15(d) of the Act. Yes ☐  No ☑

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months, and (2) has been subject to the filing requirements for at least the past 90 days. Yes ☑  No ☐

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, or a non-accelerated filer (as defined in Rule 12b-2 of the Act).

Large accelerated filer ☑   Accelerated filer ☐   Non-accelerated filer ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act). Yes ☐  No ☑

The aggregate market value of voting stock held by non-affiliates of the registrant as of July 29, 2006 was $1,472,814,247.

51,654,517 shares of Common Stock were outstanding at March 21, 2007.

## AÉROPOSTALE, INC.

### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

recognition and measurement of a tax position taken or expected to be taken in a tax return. FIN 48 also provides guidance on de-recognition, classification interest and penalties, accounting in interim periods, disclosures and transition. FIN 48 was effective for fiscal years beginning after December 15, 2006. We are currently evaluating the impact that the adoption of FIN 48 will have on our consolidated financial statements.

In March 2005, the FASB issued Interpretation No. 47, *"Accounting for Conditional Asset Retirement Obligations"*, or "FIN 47," which clarifies that the term "conditional asset retirement obligation" as used in FASB statement No. 143, *"Accounting for Asset Retirement Obligations"*. Conditional asset retirement obligation refers to a legal obligation to perform an asset retirement activity in which the timing and/or method of settlement are conditional on a future event that may or may not be within the control of the entity. An entity is required to recognize a liability for the fair value of a conditional asset retirement obligation if the fair value of the liability can be reasonably estimated. FIN 47 is effective for fiscal years ending after December 15, 2005. The adoption of FIN 47 unfavorably impacted net earnings by $0.2 million for the year ended January 28, 2006. We were uncertain of the timing of payment for the asset retirement obligations, therefore a liability was not previously recognized in the consolidated financial statements. The adoption of FIN 47 did not have a material impact on our consolidated financial statements.

### 2. Common Stock Split

In April 2004, we completed a three-for-two stock split on all shares of our common stock that was affected in the form of a stock dividend. All prior period share and per share amounts presented in this report have been restated to give retroactive recognition to the common stock split.

### 3. Short-Term Investments

Short-term investments consist of auction rate debt and preferred stock securities. Auction rate securities are term securities earning income at a rate that is periodically reset, typically within 35 days, to reflect current market conditions through an auction process. These securities are classified as "available-for-sale" securities under the provisions of SFAS No. 115, *Accounting for Certain Investments in Debt and Equity Securities.* Accordingly, these short-term investments are recorded at fair-value, with any related unrealized gains and losses included as a separate component of stockholders' equity, net of tax. Realized gains and losses and investment income are included in earnings. As of February 3, 2007, the auction rate debt securities had contractual ultimate maturities ranging from 2022 through 2040.

### 4. Supplier Risk Concentration

Three suppliers in the aggregate constituted approximately 30% of our purchases in fiscal 2006, approximately 33% in fiscal 2005 and approximately 35% in fiscal 2004. In addition, in fiscal 2006, approximately 64% of our merchandise was directly sourced from our top 10 suppliers, and one agent sourced approximately 19% of our merchandise. The loss of any of these sources could adversely impact our ability to operate our business. We will cease doing business with South Bay Apparel Inc., one of our largest suppliers of graphic T-shirts and fleece, in July 2007 (see note 5 for a further discussion). We are in the process of replacing this business with new vendors and through our existing vendor base.

### 5. Other Matters

On November 8, 2006, we announced that Christopher L. Finazzo, who had been our Executive Vice President and Chief Merchandising Officer, had been terminated for cause, effective immediately, based upon information uncovered by management and after an independent investigation was conducted at the direction, and under the

37

## AÉROPOSTALE, INC.

### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

supervision, of a special committee of our Board of Directors. The investigation, being carried out by our outside legal counsel and a third-party investigation firm, revealed that Mr. Finazzo:

- concealed from management and our Board of Directors, and failed to disclose in corporate disclosure documents, his personal ownership interests in, and officer positions of, certain corporate entities affiliated with one of our primary vendors at the time, South Bay Apparel, Inc.,

- without the knowledge or authorization of our management, executed a corporate Guaranty Agreement in March 1999 that, had it been enforceable, would have obligated us to guarantee any payments due from South Bay Apparel, Inc. to Tricot Richelieu, Inc., an apparel manufacturer and vendor to South Bay Apparel, Inc., and

- failed to disclose unauthorized business relationships and transactions between immediate and extended family members of Mr. Finazzo and certain other of our vendors.

These activities, and their concealment, constituted numerous instances of conflicts of interest that were in breach of, among other things, our Code of Business Conduct and Ethics, as well as numerous violations of Mr. Finazzo's employment agreement.

South Bay Apparel, Inc. had been a vendor to us since 1996, providing apparel products including women's and men's graphic tee shirts, fleece and other tops. At least one affiliate of South Bay Apparel, Inc. involved in this matter has received orders from us aggregating approximately $0.6 million during fiscal 2006, approximately $1.0 million during fiscal 2005 and approximately $2.4 million during fiscal 2004.

Our management and our Board of Directors had no prior knowledge of any of these unauthorized activities by Mr. Finazzo, including the unauthorized Guaranty Agreement discussed above. On December 5, 2006, we entered into a Confirmatory Termination and Revocation Agreement with South Bay Apparel, Inc. and Tricot Richelieu, Inc., whereby all parties agreed that the Guaranty Agreement was thereby and has been permanently, irrevocably and absolutely terminated, revoked and expired in all respects. Therefore, the Guaranty Agreement was not recorded in the accompanying consolidated financial statements.

Also on December 5, 2006, we entered into an agreement with South Bay Apparel, Inc. and Douglas Dey, South Bay Apparel, Inc.'s President, whereby the parties agreed to resolve certain outstanding matters between them. As such, South Bay Apparel, Inc. agreed to pay us $8.0 million, representing (i) a concession of $7.1 million by South Bay Apparel, Inc. and Mr. Dey concerning prior purchases of merchandise by us, which was reflected as a reduction in the cost of merchandise in fiscal 2006, and (ii) reimbursement by South Bay Apparel, Inc. of $0.9 million, which offset professional fees that we incurred associated with the negotiation of the Agreement and the investigation of the underlying facts surrounding this Agreement. In addition, South Bay Apparel, Inc. and Mr. Dey agreed to a reduction in the price of merchandise sold to us to a price that we believe represents fair value, based on costs of comparable merchandise. We have agreed to continue purchasing merchandise from South Bay Apparel, Inc. through July 2, 2007, the date this agreement terminates. As of February 3, 2007, there was approximately $16.2 million in Aeropostale inventory remaining at South Bay Apparel, Inc.

Due to the numerous undisclosed conflicts of interests discussed above, we determined that transactions initiated or authorized by Mr. Finazzo, during his employment with us, with the above mentioned related parties cannot be presumed to have been carried out on an arm's-length basis, as the requisite conditions of competitive, free-market dealings may not have existed. However, we believe that our historical consolidated financial statements were fairly stated in all material respects. In addition, we believe that our historical trend of earnings would not have been materially impacted by any of these items.

# Exhibit 3

**Mr. Finazzo's Memorandum of Law
in Opposition to the [Commission's]
Motion to Enforce Subpoena**

**Filed in *SEC v. Finazzo* on March 19, 2008**

CARTER LEDYARD & MILBURN LLP
Robert J.A. Zito
2 Wall Street
New York, NY 10005
Phone:  (212) 238-8610
Fax:      (212) 732-3232
*Attorneys for Respondent Christopher Finazzo*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------x

SECURITIES AND EXCHANGE  COMMISSION,

                      Applicant,

        - against -

CHRISTOPHER FINAZZO and SOUTH BAY
APPAREL, INC.

                    Respondents.

------------------------------------------------------------------x

                               :

                               :

                               :

                               :

**MISC. M-18-304**

## MR. FINAZZO'S MEMORANDUM OF LAW IN OPPOSITION TO THE STAFF'S MOTION TO ENFORCE SUBPOENA

6289207.1

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................... 1

STATEMENT OF FACTS .......................................................................................... 1

ARGUMENT .............................................................................................................. 7

POINT I      DECISION ON THE STAFF'S MOTION TO ENFORCE THE SUBPOENA
             SHOULD BE HELD IN ABEYANCE UNTIL LIMITED DISCOVERY OF
             RELEVANT DOCUMENTS AND TESTIMONY NECESSARY FOR MR.
             FINAZZO TO DEFEND THIS MATTER IS COMPLETED ............................... 7

POINT II     THE STAFF'S MOTION TO ENFORCE THE SUBPOENA SHOULD BE
             DENIED BECAUSE THE SUBPOENA IS BASED ON INFORMATION
             TAINTED BY A VIOLATION OF THE ATTORNEY-CLIENT PRIVILEGE... 11

             A.    The Attorney Siegel Email and the Attached FFA Document Are
                   Protected by the Attorney-Client Privilege ................................................. 11

             B.    Mr. Finazzo Did Not Waive His Attorney-Client Privilege .................... 13

             C.    Aéropostale's Attorneys Violated Their Professional Obligations
                   Under DR 1-102(A)(5) and the Formal Ethics Opinions Thereunder ...... 15

             D.    Because of the Breach of the Attorney-Client Privilege, the
                   Commission Is Precluded from Relying on Any Information
                   Derived from the Tainted Evidence ........................................................... 17

             E.    The Commission Cannot Distance Itself from Aéropostale's
                   Violation of the Attorney-Client Privileged ............................................. 20

CONCLUSION .......................................................................................................... 25

# TABLE OF AUTHORITIES

## FEDERAL CASES

*In re Asia Global Crossing Ltd.*, 322 B.R. 247 (S.D.N.Y. 2005) ..................9, 13, 14, 15

*Caplan v. American Baby, Inc.*, 582 F.Supp. 869 (S.D.N.Y. 1984) ...................8

*Church of Scientology v. United States*, 506 U.S. 9 (1992)................17

*Maloney v. Sisters of Charity Hospital*, 165 F.R.D. 26 (W.D.N.Y. 1995) ........12

*RNR Enterprises, Inc. v. SEC*, 122 F.3d 93 (2d Cir. 1997)............9, 10

*Richards v. Jain*, 168 F.Supp.2d 1195 (W.D. Wash. 2001)...........16, 18

*Roberts-Gordon, LLC v. Superior Radiant Products, Ltd.*, 85 F.Supp.2d 202
(W.D.N.Y. 2000) ..................7

*SEC v. Dresser Industrial, Inc.*, 628 F.2d 1368 (D.C. Cir. 1980) ................9, 10

*SEC v. Forma*, 177 F.R.D. 516 (S.D.N.Y. 1987) ...................19, 20

*SEC v. OKC Corp.*, 474 F.Supp. 1031 (N.D. Tex 1979) ................19, 20

*In Re Shell Oil Refinery*, 143 F.R.D. 105 (E.D. La. 1992) ................11

*Skinner v. Railway Labor Exec. Association*, 489 U.S. 602 (1989) .................24

*United States v. Davis*, 482 F.2d 893 (9th Cir.1973).................25

*United States v. Haynes*, 216 F.3d 789 (9th Cir. 2000) .................17

*United States v. Lin Lyn Trading, Ltd.*, 925 F.Supp. 1507 (D. Utah 1996) ............22

*United States v. Longo*, 70 F.Supp.2d 225 (W.D.N.Y. 1999).................17, 20, 23, 24

*United States v. Morrison*, 449 U.S. 361 (1981) ................18

*United States v. Powell*, 379 U.S. 48 (1964) ................13

*United States v. Ross*, 32 F.3d 1411 (9th Cir.1994).................24, 25

*United States v. Schwimmer*, 892 F.2d 237 (2d Cir. 1989)...........11, 12

*United States v. Singer*, 785 F.2d 228 (8th Cir. 1986).................17

*United States v. Stein*, 440 F.Supp.2d 315 (S.D.N.Y. 2006) ............................................23

*United States v. Ziegler*, 474 F.3d 1184 (9th Cir. 2006)................................................13, 15

*Upjohn Co. v. United States*, 449 U.S. 383 (1981) ......................................................11, 12

## STATE CASES

*In re Beiny*, 129 A.D.2d 126 (1st Dep't 1987)............................................................17, 19

*Galison v. Greenberg,* 5 Misc.3d 1025(A), 799 N.Y.S.2d 160 (Sup. Ct. N.Y. Co. 2004) .....................................................................................................................16

*Lipin v. Bender*, 84 N.Y.2d 564 (1994) ..........................................................................18

*Manuf. & Traders Trust*, 132 A.D.2d, 392 (4th Dep't 1987) ...........................................17

*In re Marketing Invest. Corp.*, 80 S.W.3d 44 (Ct. App. Tex. 1998).................................18

*Rossi v. Blue Cross & Blue Shield of Greater New York*, 73 N.Y.2d 588 (1989) .............12

*Spectrum System International Corp. v. Chemical Bank*, 78 N.Y.2d 371 (1991) .......12, 17

*Surgical Design Corp. v. Correa*, 21 A.D.3d 409 (2d Dep't 2005)...................................17

## DOCKETED CASES

*America Express v. Accu-Weather, Inc.*, No. 91 Civ. 6485, 1996 WL 346388 (June 25, 1996 S.D.N.Y.).............................................................................................16

*Curto v. Medical World Commc'n, Inc.*, No. 03CV6327, 2006 WL 1318387 (E.D.N.Y. May 15, 2006) ...................................................................................13

*Dubied Machine Co. v. Vermont Knitting Co., Inc.*, No. 85 Civ. 8610, 1991 WL 84511 (S.D.N.Y. May 14, 1991)................................................................................7

*Long v. Marriberi America Corp.*, 2006 WL2998671 (S.D.N.Y. 2006) ...........................14

*McGann v. Travelers Prop. Casualty Corp. Welfare Benefit Plan*, No. 06 Civ. 527, 2007 WL 2769500 (E.D.N.Y. Sept. 21, 2007) ......................................................7

*Rowell v. United States*, No. 89 Civ. 8418, 1991 WL 120361(S.D.N.Y. June 21, 1991) .............................................................................................................................7

*Scott v. Beth Israel Medical Center*, 2007 WL 305335 (Sup. Ct. N.Y. County, Oct. 17, 2007) ................................................................................................14

*United States v. SAE Civil Construction, Inc.*, No. 4 CV 95-3058, 1996 WL 148521 (D. Neb. Jan. 29, 1996) ...............................................................16

## MISCELLANEOUS

Ass'n of the Bar of the City of N.Y. Comm. on Prof. & Jud. Ethics, Op. No. 2003-04 (Dec. 2003, reissued Apr. 9, 2004) ...........................................16, 17

N.Y. County Lawyers' Ass'n Comm. on Prof. Ethics, Op. No. 730 (July 19, 2002) .................................................................................................16

Respondent Christopher L. Finazzo ("Mr. Finazzo") respectfully submits this Memorandum of Law in opposition to the motion by the staff (the "Staff") of the Securities and Exchange Commission (the "Commission") to enforce administrative subpoenas for documents and testimony.

## PRELIMINARY STATEMENT

This Memorandum of Law addresses what is likely an issue of first impression: Whether the Staff can perpetuate the breach of the attorney-client privilege and the misappropriation of attorney-client privileged information by obtaining information regarding certain transactions when lawyers, acting pursuant to the Commission's bidding,[1] previously misappropriated attorney-client privileged information regarding the same transactions, and who acting contrary to their ethical and professional obligations regarding the handling of privileged information, disseminated the substance of the privileged information to the Staff.  By this Memorandum of Law, and the Complaint for Declaratory and Injunctive Relief filed in Finazzo v. SEC, 08 CV 2176 (RJS), Mr. Finazzo seeks to restore his attorney-client privilege *status quo ante.*

## STATEMENT OF FACTS

On August 24, 2006, when Mr. Finazzo was still employed by Aéropostale, Inc. ("Aéropostale" or "the Company"), his personal lawyer, Angela Siegel ("Attorney Siegel"), sent an email to Mr. Finazzo at his Aéropostale email address (the "Attorney Siegel Email," attached as Exhibit A to the Declaration of Robert J.A. Zito ("Zito Decl.")).  Attorney Siegel, a trusts and estates lawyer, was then representing Mr. Finazzo in matters of his estate planning.

---

[1]  In light of official government policy enshrined in documents such as the Thompson (now, McNulty) Memorandum and the Seaboard Report that encourages and rewards corporate self-policing and voluntary disclosure of purported wrongdoing, internal investigators are acting under the impetus of government compulsion.

The Attorney Siegel Email was sent from an address clearly identified as belonging to an attorney: "lawoffice@angelasiegel.com." The closing lines indicated that it was written by "Angela Siegel, Esq., Law Office of Angela Siegel," as did the following statement:

> *****PRIVILEGE AND CONFIDENTIALITY NOTICE*****
> The information contained in this e-mail is confidential and may be protected by the attorney-client privilege and/or work product doctrine. It is intended for the use of the named recipient only. If you have received this communication in error, please notify the sender immediately by reply to this e-mail or by telephone.

Attorney Siegel attached to her email a Word document titled "Finazzo Family Assets" (the "FFA Document") that she had prepared based upon confidential information given to her by Mr. Finazzo during meetings held as part of her estate planning advice to Mr. Finazzo. The document contains a list of Mr. Finazzo's assets, including interests in various business entities. The language of the Attorney Siegel Email clearly indicated that Mr. Finazzo communicated the information in the FFA Document to Attorney Siegel for the sole purpose of seeking legal advice related to estate planning.

During September 2006, Aéropostale undertook an internal investigation that focused on whether hotel expenses during an Aéropostale conference in Las Vegas earlier that year had been properly charged to the company. The investigation had nothing to do with Mr. Finazzo. The investigation was conducted by Aéropostale's outside counsel, KMR, who in turn retained the services of Kroll to assist in the investigation. While reviewing emails in connection with their investigation, Kroll investigators — supervised by KMR attorneys — found, opened, and read the confidential and privileged Attorney Siegel Email and attachment that had been sent to Mr. Finazzo.

Upon discovery of the Attorney Siegel Email, neither Kroll, KMR, nor Aéropostale lawyers notified Attorney Siegel that they had stumbled upon her privileged communication. Nor did they notify Mr. Finazzo that his privileged email had been opened. Furthermore, they

6293742.4

- 2 -

took no steps to segregate and protect the privileged email from further unauthorized disclosure.
Rather, they kept their discovery secret from both the sender, Attorney Siegel, and the recipient,
Mr. Finazzo, while they discussed among themselves the Attorney Siegel Email, its privileged
contents, and their plan of action vis-à-vis Mr. Finazzo. Aéropostale eventually used the
Attorney Siegel as the sole basis on which to terminate Mr. Finazzo's employment.

On November 7, 2006, Edward M. Slezak, Esq., Aéropostale's General Counsel, and
Julian Geiger, Aéropostale's President and CEO, called Mr. Finazzo into an unscheduled
meeting. Mr. Finazzo was given no notice or the opportunity to consult with an attorney.
Messrs. Slezak and Geiger showed Mr. Finazzo the FFA Document (but not the email to which it
had been attached) and asked him about his interests in the business entities listed therein. They
did not reveal that they had obtained the information through a privileged communication
between Mr. Finazzo and his attorney. Messrs. Slezak and Geiger then told him that he had
breached his employment agreement and was being fired for so-called "conflicts of interests."
Messrs. Slezak and Geiger handed Mr. Finazzo a copy of a press release that was to be issued on
the following day, and Kroll investigators ushered Mr. Finazzo to the door.

On November 8, 2006, Aéropostale issued a press release stating that Mr. Finazzo was
fired because of his ownership interest in the business entities listed on the FFA Document
attached to the Attorney Siegel Email, including that he "concealed personal ownership interests
in, and served as an officer of, entities affiliated with one of the Company's primary vendors,
South Bay Apparel, Inc." Aéropostale subsequently issued 8-K and 10-K statements containing
much the same information as the press release. Aéropostale's auditor for its annual disclosure
statements was Deloitte & Touche LLP ("Deloitte"), which purportedly reviewed relevant
material which Aéropostale provided to it prior to the public filing.

During the week of June 25, 2007, Mr. Finazzo's counsel, Carter Ledyard & Milburn LLP ("CLM"), for the first time obtained copies of the Attorney Siegel Email and the FFA Document from Attorney Siegel.  Until that time, Mr. Finazzo and CLM did not know that the Attorney Siegel Email was the source of the information that Aéropostale had used as the basis to terminate Mr. Finazzo's employment and make its public statements about Mr. Finazzo.  Nor did they know that Aéropostale's attorneys had continuously concealed their discovery and use of the Attorney Siegel Email and FFA Document, contrary to their ethical obligations.

On June 29, 2007, having learned of the privileged nature of the documents, CLM wrote to KMR, demanding that it take corrective action including (a) cease and desist from any further invasions of Mr. Finazzo's privileges; (b) return to CLM all copies of all privileged documents in the possession, custody and/or control of Aéropostale and KMR; (c) permanently delete or otherwise destroy all electronic, digital or other non-tangible copies or records of all privileged documents; (d) rescind all action taken by Aéropostale as a result of the breach of the Privileges and otherwise restore Mr. Finazzo and his Privileges status quo ante.  Aéropostale and KMR refused to take any such action.

On January 10, 2008, the Commission issued a Formal Order of Investigation relating to Mr. Finazzo's employment with Aéropostale.  The Staff then served Mr. Finazzo with a Subpoena dated January 16, 2008 (attached as Exhibit 4 to the Staff's Order to Show Cause), seeking documents and testimony relating to the entities listed in the FFA Document.

On January 16, 2008, Robert J.A. Zito, Esq. of CLM wrote separately to Aéropostale and KMR, notifying them that Mr. Finazzo had received a Subpoena, and advising them that all e-mails exchanged between Mr. Finazzo and his attorneys, regardless of whether such communications took place through Aéropostale's e-mail system, and all information derived

from the privileged communications, "are either protected under the attorney-client privilege and/or the attorney work product doctrine and/or contain information that is derived from privileged sources," and that therefore no documents should be produced.

On January 25, 2008, Mr. Zito, sent a letter to the Staff responding to the Subpoena (attached as Exhibit 7 to the Staff's Order to Show Cause). The letter explained the Company's and KMR's misconduct and advised the Staff to seek judicial approval before proceeding with its investigation. Between January 28 and January 31, 2008, the parties exchanged letters regarding compliance with the subpoena. See Staff's Order to Show Cause, Exh. 8-10.

On February 27, 2008, the Staff filed the instant Motion to Enforce the Subpoena and Order to Show Cause, and on February 29, 2008, the parties appeared before the Hon. Lawrence M. McKenna. Mr. Finazzo's counsel told the Court and the Staff that Mr. Finazzo intended to issue discovery subpoenas in connection with the evidentiary hearings in these matters. The Staff did not object or in any way suggest that Mr. Finazzo would not be entitled to issue such subpoenas. Judge McKenna then set down a briefing schedule and put the case over for hearing for March 20, before the Hon. Harold Baer, Jr. On March 4, 2008, Mr. Finazzo filed in the Southern District of New York a Complaint for Injunctive and Declaratory Relief (attached as Exhibit B to Zito Decl.). Finazzo v. SEC, 08 CV 2176. The case was assigned to Hon. Richard J. Sullivan.

Mr. Finazzo does not possess critical information about central issues surrounding Aéropostale's internal investigation which led to the review of the Attorney Siegel email, Aéropostale's practices of reviewing its employees' emails, or how Aéropostale's and its counsel handled the Attorney Siegel Email once it was reviewed, including whether the Attorney Siegel Email or the substance of the information contained in such email was provided to the Staff.

Accordingly, on March 4 and 5, 2008, Mr. Finazzo's counsel issued four subpoenas with respect to the instant action.  The subpoenas were issued on Aéropostale, KMR, Kroll and Deloitte (collectively, the "Subpoenaed Parties") (attached as Exhibits C, D, E and F to the Zito Decl.). Counsel for Mr. Finazzo duly served the Staff with notice of the deposition and also provided the Staff with courtesy copies of the subpoenas via email.  See Zito Decl. ¶ 4.

On March 6, 2008, the Staff wrote to the Court, with a copy to counsel for the Subpoenaed Parties, objecting to Mr. Finazzo's alleged "improper attempt to conduct discovery." (attached as Exhibit G to the Zito Decl.).

On March 10 and 11, 2008, the Subpoenaed Parties objected to the subpoenas and refused to produce documents.  (attached as Exhibits H, I and J to the Zito Decl.).  Each recipient cited to the Staff's March 6, 2008 letter as one of the reasons it refused to produce documents or a witness for testimony.  See Zito Decl., Exhs. H and I.  Thus, the Staff's March 6, 2008 letter directly impeded Mr. Finazzo's ability to gather necessary documents in order to fully respond to the instant enforcement motion brought by the Staff.

On March 17, 2008, Mr. Zito sent a letter to the Court, requesting deferral of the Court's decision on the Staff's Motion to Enforce the Subpoena pending the limited discovery requested in the subpoenas issued to the Subpoenaed Parties (attached as Exhibit K to the Zito Decl.).

On the same date, the Staff responded to the letter from Mr. Zito to the Court, opposing Mr. Finazzo's request for deferral (attached as Exhibit L to the Zito Decl.).

## POINT I

## THE STAFF'S MOTION SHOULD BE HELD IN ABEYANCE UNTIL DISCOVERY NECESSARY FOR MR. FINAZZO TO DEFEND THIS MATTER IS COMPLETED

After the Staff filed its motion to enforce the Subpoenas, Mr. Finazzo served four discovery subpoenas on non-parties to produce key documents and testimony regarding disputed factual matters.  In short order, the Staff wrote a letter to the Court with a copy to all subpoenaed parties raising objections to the subpoenas, and the non-parties — understandably not wishing to offend the Staff — have now all acceded to the Staff's wishes and withheld documents and testimony.  Thus, the Staff has blocked the production of the key information necessary for Mr. Finazzo to argue in opposition to the Staff's motion.  Accordingly, any decision on the instant motion should be deferred until discovery can be completed.

Courts routinely defer decisions on motions pending discovery where facts necessary to the determination of those motions are disputed by the parties.  See, e.g., Roberts-Gordon, LLC v. Superior Radiant Prods., Ltd., 85 F.Supp.2d 202 (W.D.N.Y. 2000) (deferring decision on motion to dismiss pending limited discovery on jurisdictional issues); Rowell v. United States, No. 89 Civ. 8418, 1991 WL 120361 (S.D.N.Y. June 21, 1991) (deferring decision on motion for summary judgment pending limited discovery); Dubied Mach. Co. v. Vermont Knitting Co., Inc., No. 85 Civ. 8610, 1991 WL 84511 (S.D.N.Y. May 14, 1991) (holding motion to dismiss in abeyance pending limited discovery on jurisdictional issues).  This is especially true where a party has "demonstrated good cause" to conduct discovery on a limited issue, or where the court finds that the request for discovery is "reasonable."  McGann v. Travelers Prop. Cas. Corp. Welfare Benefit Plan, No. 06 Civ. 527, 2007 WL 2769500, at * 10 (E.D.N.Y. Sept. 21, 2007) (denying summary judgment motions without prejudice pending limited discovery); see also Caplan v. American Baby, Inc., 582 F.Supp. 869, 871 (S.D.N.Y. 1984) (same).

6293742.4

- 7 -

Here, good cause exists for the Court to defer its decision on the Staff's Motion to Enforce the Subpoena pending limited discovery, and Mr. Finazzo's discovery request is clearly reasonable in light of the undetermined issues of fact that are crucial to the Court's determination of the Motion to Enforce. The documents and information requested of the Subpoenaed Parties are necessary to allow Mr. Finazzo to present evidence with respect to these factual issues.

For example, the Staff objects to the Subpoenaed Parties being called on to produce "[a]ll documents provided to the [Commission] concerning Aéropostale and Finazzo." See Zito Decl., Exh. G. These documents are crucial to determine whether the Staff has reviewed any of the tainted documents. See Staff's Memo of Law, pp. 4–5. As discussed in Section II below, the Staff clearly could not rely directly on such material for its investigation, and proof that it has done so would prove fatal to its action here. As also discussed below, whether Aéropostale acted, in essence, as an agent for the Commission is critical to determining the legal issues here. Thus, for Mr. Finazzo to demonstrate to the Court that materials protected by the attorney-client privilege were improperly provided to the Staff, he must be permitted to discover what materials were in fact provided to the Staff.

Likewise, the subpoenaed documents and testimony are critical to establish that the attorney-client privilege applied to the Attorney Siegel Email, and to rebut the Staff's (and Aéropostale's) claim that Mr. Finazzo may have waived the privilege through "use of his employer's computer system." See Staff's Memo of Law, p. 14 n.3. In determining whether emails transmitted on an employer's computer system waives the attorney-client privilege, New York courts consider a number factors (discussed further in Section II) including the employer's policies and compliance systems for reviewing email. See In re Asia Global Crossing Ltd., 322 B.R. 247, 257 (S.D.N.Y. 2005). In order for Mr. Finazzo to demonstrate that he did not waive

his attorney-client privilege as to the Attorney Siegel Email, he must be permitted discovery on relevant factual issues surrounding Aéropostale's email system and the disclosure of the Attorney Siegel Email. Thus, the document requests to the Subpoenaed Parties seek information regarding these facts, such as documents concerning the Attorney Siegel Email, Aéropostale's 2006 Internal Investigation, and any practice or procedure by Aéropostale for the examination, inspection, or review of employee emails.

The cases cited by the Staff in its letter to the Court on March 17, 2008 confirm that the decision to reserve decision on a motion to enforce a subpoena pending limited discovery is a matter of discretion for the court. See Zito Decl., Exh. L (citing RNR Enterprises, Inc. v. SEC, 122 F.3d 93, 97 (2d Cir. 1997); SEC v. Dresser Indus., Inc., 628 F.2d 1368, 1388 (D.C. Cir. 1980)). These cases do not, however, counsel against the Court exercising its discretion to reserve decision pending limited discovery. In RNR Enterprises, the Second Circuit held that the lower court had not abused its discretion when it denied the plaintiff's discovery request because the subpoena enforcement action was "not an adversarial proceeding *against*" the plaintiff. 122 F.3d at 97. In that case, however, the Staff had not yet issued a formal order authorizing an investigation against the plaintiff. Here, the Commission has issued a formal order of investigation against Mr. Finazzo and has repeatedly made it clear that they are investigating whether or not he acted in violation of the federal securities laws. Moreover, in the same paragraph cited selectively by the Staff, the court made it clear that it also based its ruling on the fact that it was "unclear how [the plaintiff] would have used the information [sought in his request for discovery]." Id. In this case, it is quite clear that the documents and information sought from the Subpoenaed Parties are crucial to Mr. Finazzo's ability to demonstrate that the

Staff's investigation is based on information derived from a breach of his attorney-client privilege.

Likewise, in SEC v. Dresser, the court noted that "the precise nature of [the defendant's] desired discovery is not clear," — although the defendant apparently sought to obtain information from the SEC regarding, among other things, whether the Staff had been acting in "good faith" — and expressed concern about "transform[ing] subpoena enforcement proceedings into exhaustive inquisitions into the practices of the regulatory agencies." 628 F.2d at 1388. Thus, the court held that "[d]iscovery should be permitted only where the respondent is able to distinguish himself from the class of the ordinary respondent, by citing special circumstances that raise doubts about the agency's good faith." Id. (internal citation, quotation marks, and brackets omitted). In the instant case, however, Mr. Finazzo has not attempted to subpoena the Staff and is not seeking to gain information regarding whether the Staff has been acting in "good faith." Rather, Mr. Finazzo seeks limited discovery from third parties in order to establish certain factual issues that are necessary for the Court to make a determination on the Motion to Enforce the Subpoena. This limited discovery does not pose a danger of transforming this proceeding in to an "exhaustive inquisition[] into the practices of the regulatory agencies." The Dresser court explicitly recognized that, "discovery may be available in some subpoena enforcement proceedings where the circumstances indicate that further information is necessary for the courts to discharge their duty." Id. This case presents just such circumstances.

The documents and information requested in the subpoenas issued to the Subpoenaed Parties are crucial in establishing the factual issues relevant to the Asia Global factors. Therefore, the Court should reserve decision on the Motion to Enforce the Subpoena until the Subpoenaed Parties comply with the subpoenas served upon them.

**POINT II**

**THE MOTION TO ENFORCE THE SUBPOENA SHOULD BE DENIED BECAUSE THE SUBPOENA IS BASED ON INFORMATION TAINTED BY A VIOLATION OF THE ATTORNEY-CLIENT PRIVILEGE**

Should the Court decline to hold in abeyance its decision on the Motion to Enforce the Subpoena pending limited discovery, it should exercise its supervisory powers and deny the Motion to Enforce outright because the Staff 's investigation is based on tainted evidence. See In Re Shell Oil Refinery, 143 F.R.D. 105, 108 (E.D. La. 1992) (federal courts are "obliged to take measures against unethical conduct occurring in connection with any proceeding before it.") (citing Musicus v. Westinghouse Electric Corp. 621 F.2d 742 (5th Cir. 1980)).

The Attorney Siegel Email is an attorney-client communication that never should have been divulged. The Staff's reliance on the tainted information renders the purpose of its inquiry illegitimate within the Staff's authority to seek such information. See United States v. Powell, 379 U.S. 48, 57-58 (1964). Accordingly, the Staff's Motion to Enforce the Subpoena should be denied.

**A.    The Attorney Siegel Email and the Attached FFA Document Are Protected by the Attorney-Client Privilege**

The attorney-client privilege is "the oldest rule of privilege known to common law" and the "most sacred." Upjohn Co. v. United States, 449 U.S. 383, 389 (1981); United States v. Schwimmer, 892 F.2d 237, 243 (2d Cir. 1989). The right of clients to consult in confidence with lawyers is "essential to preservation of liberty against a powerful government" and "[w]ithout the attorney-client privilege, that right and many other rights belonging to those accused of crime would in large part be rendered meaningless." Schwimmer, 892 F.2d at 243. To obtain useful legal advice, Respondent must be able to talk to his lawyers candidly without any fear that what Respondent says to his lawyers will be transmitted to the government. See Upjohn Co., 449 U.S.

at 389 (the attorney-client privilege is designed to "encourage full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and administration of justice," and "recognizes that sound legal advice or advocacy serves public ends and that such advice or advocacy depends upon the lawyer being fully informed by the client.").

In order to claim the attorney-client privilege, a party must show that:

(1) the asserted holder of the privilege is or sought to become a client; (2) the person to whom the communication was made (a) is a member of the bar of a court, or his [or her] subordinate and (b) in connection with this communication is acting as a lawyer; (3) the communication relates to a fact of which the attorney was informed (a) by his [or her] client (b) without the presence of strangers, (c) for the purpose of securing primarily either (i) an opinion of law or (ii) legal services or (iii) assistance in some legal proceeding, and not (d) for the purpose of committing a crime or tort; and (4) the privilege has been (a) claimed and (b) not waived by the client.

Maloney v. Sisters of Charity Hospital, 165 F.R.D. 26, 29 (W.D.N.Y. 1995).

It is clear that the Attorney Siegel Email and the attached FFA Document comprise a confidential communication under these standards. The email was sent by Attorney Siegel, a member of the bar, to her actual client, Mr. Finazzo. The email was Mr. Finazzo's personal tax and estate information, and this "for the purpose of facilitating the rendition of legal advice." Spectrum Sys. Int'l Corp. v. Chem. Bank, 78 N.Y.2d 371, 378 (1991); Rossi v. Blue Cross & Blue Shield of Greater New York, 73 N.Y.2d 588, 593 (1989); see also CPLR § 4548 (the attorney-client privilege attaches to email communications as well as more traditional methods). Furthermore, the communication was made directly between the attorney and her client, without the presence of any direct third-party, and the email related to proper legal services (i.e. tax and estate planning). Indeed, even a cursory examination of the Attorney Siegel and the attached FFA Document reveals that Attorney Siegel intended them to be treated as privileged. Thus, on their face, they are unequivocally protected by the attorney-client privilege.

**B.    Mr. Finazzo Did Not Waive His Attorney-Client Privilege**

There is also no valid claim that Mr. Finazzo waived the attorney-client privileged by receiving the email at his work.  The attorney-client privilege applies to work emails, despite the employer's email policy, where the employee still has an objectively reasonable belief that the communication will remain private.  Curto v. Med. World Commc'n, Inc., No. 03CV6327, 2006 WL 1318387 (E.D.N.Y. May 15, 2006); Asia Global, 322 B.R. 247; see also United States v. Ziegler, 474 F.3d 1184 (9th Cir. 2006) (holding that employee had objectively reasonable belief in privacy of information stored on work computer in private office, despite company policy of monitoring corporate computers).  In determining whether the employee's belief in the privacy of his email communications is objectively reasonable, New York courts will consider:  (1) whether the employer maintains a policy banning personal and other objectionable use, (2) whether the employer monitors its employee's computers and emails, (3) whether third parties have the right of access to the computers or emails, and (4) whether the employee was aware of the use and monitoring policies.  Asia Global, 322 B.R. at 257.

Here, although Aéropostale had an email policy that stated that it *may* monitor emails, the policy did not prohibit Mr. Finazzo's personal use of the email system.[2]  In other words, the Company permitted its employee to use its email system for purposes other than Aéropostale's business.  More importantly, Aéropostale did not have a practice of actually reviewing its employees' emails.  In fact, there does not appear to have been any other instance in the company's history where an employee's emails had been reviewed by the Company, let alone confiscated, concealed and used as a basis for a legal claim against the employee.

---

[2] As noted in Point I, above, further discovery should be permitted to allow Mr. Finazzo an opportunity to develop the factual record involving this and other points.

Moreover, the Attorney Siegel Email was not sent by Mr. Finazzo, but rather by Attorney Siegel who was completely unaware of and not bound by Aéropostale's email policy at the time she sent it. She therefore could not have possibly waived Mr. Finazzo's privilege by sending him an unsolicited email attaching a confidential document. She also took every reasonable step to ensure the protection of the privilege. Not only did Attorney Siegel include a confidentiality notice on the email, but the body of the email confirmed that the communication concerned confidential legal advice sought by Mr. Finazzo and that the attached document had been prepared by Attorney Siegel in furtherance of that advice. Under the circumstances, Mr. Finazzo had an objectively reasonable belief that the Attorney Siegel Email would remain confidential and thus he did not waive the privilege. See Asia Global, 322 B.R. at 261.

The recent cases of Long v. Marriberi America Corp., 2006 WL2998671 (S.D.N.Y. 2006) and Scott v. Beth Israel Medical Center, 2007 WL 305335 (Sup. Ct. N.Y. County, Oct. 17, 2007) do not compel a contrary result. Although the courts in Long and Scott both held that the plaintiffs in those cases had waived their attorney-client privilege with respect to work emails, the facts of those cases differ significantly from those here. First, the employers' counsel in Long and Scott immediately segregated the privileged documents and alerted the employees' counsel of their possession of the documents. The parties then sought immediate judicial review of the privilege issue. This is in stark contrast to Aéropostale's and KMR's continued use and concealment of the Attorney Siegel Email and the FFA Document. Second, the employees in Long and Scott had corresponded over company email on numerous occasions over a lengthy period of time, and sometimes with several attorneys. Here, Attorney Siegel sent the Attorney Siegel Email and the FAA Document without Mr. Finazzo's solicitation, knowledge or consent. This was the first and only instance that Attorney Siegel communicated with Mr. Finazzo

through his work email. Finally, the employers' email policies in <u>Long</u> and <u>Scott</u> prohibited personal use of their email system. Aéropostale's does not. Thus, <u>Long</u> and <u>Scott</u> are inapposite.

Indeed, the facts of the instant case more closely parallel those of <u>Ziegler</u>, 474 F.3d 1184, where the court ordered the suppression of information harvested from an employee's computer by members of his employer's IT staff. Although the court declined to rule on whether or not the employee would have had a reasonable expectation of privacy in his work computer if it were located in a public area, it found that he certainly did have a reasonable expectation of privacy in that computer when located in his private office. <u>Id.</u> at 1190. <u>Ziegler</u> nicely illustrates that an employee may have an objectively reasonable expectation that his employer will not enter his office in order to cull information from his work computer, despite an acknowledged "corporate policy of monitoring the corporate computers." <u>Id.</u> As in Ziegler, Mr. Finazzo's employer entered his private office in order to obtain information from Mr. Finazzo's computer. Since the Attorney Siegel Email and attached FFA Document were located in a computer in Mr. Finazzo's private office, he had an objectively reasonable belief that they would remain private, and the holdings of <u>Curto</u> and <u>Asia Global</u> therefore apply.

## C.    Aéropostale's Attorneys Violated Their Professional Obligations Under DR 1-102(A)(5) and the Formal Ethics Opinions Thereunder

An attorney has strict and clearly delineated professional obligations that are triggered by access to information that is intended to be privileged. It is hornbook law that when an attorney encounters a document that, on its face, appears to be privileged, he or she *must* stop reading the document and notify the sender immediately. <u>Am. Express v. Accu-Weather, Inc.</u>, No. 91 Civ. 6485, 1996 WL 346388, at *2 (June 25, 1996 S.D.N.Y.), <u>Galison v. Greenberg</u>, 5 Misc.3d 1025(A), 799 N.Y.S.2d 160 (Sup. Ct. N.Y. Co. 2004); <u>see also</u> Ass'n of the Bar of the City of

N.Y. Comm. on Prof. & Jud. Ethics, Op. No. 2003-04 (Dec. 2003, reissued Apr. 9, 2004); N.Y.

County Lawyers' Ass'n Comm. on Prof. Ethics, Op. No. 730 (July 19, 2002).

An attorney's ethical responsibilities upon receipt of materials protected by the attorney-

client privilege are clearly defined:

> A lawyer has ethical obligations upon receipt of inadvertently disclosed privileged
> information. If a lawyer receives information which the lawyer knows or believes
> was not intended for the lawyer and contains secrets, confidences or other
> privileged matter, the lawyer, upon recognition of same, shall, without further
> review or other use thereof, notify the sender and (insofar as it shall have been in
> written or other tangible form) abide by sender's instructions regarding return or
> destruction of the information.

N.Y. County Lawyers' Ass'n Comm. on Prof. Ethics, Op. No. 730; see Galison, 5 Misc.3d

1025(A), at *2.

Attorney Siegel's privileged communication was explicitly intended for Mr. Finazzo

alone and no one else. Yet, at no time, did Aéropostale's attorneys or anyone acting on their

behalf,[3] ever inform Attorney Siegel that they had intercepted her privileged communication, as

they were duty bound to do. Indeed, not only did Aéropostale's attorneys fail in their

professional obligations to inform Attorney Siegel and to cease reviewing the email, but they

reviewed the email, opened the attached Word document, and then affirmatively (and

improperly) used the privileged information against Mr. Finazzo to fire him, issue a press release

announcing his termination, and make its subsequent 8-K filing with the SEC.

Their ethical obligations required, at a minimum, that the Aéropostale lawyers not open

the email attachment and inform Attorney Siegel that they had her apparently privileged email.

---

[3] Attorneys bear responsibility for ensuring that any non-lawyers involved in the review of documents are aware of
this obligation, and notify the supervising attorney if the review uncovers documents that appear on their face to be
privileged. Richards v. Jain, 168 F.Supp.2d 1195, 1200–02 (W.D. Wash. 2001). Breaches of the attorney-client
privilege by non-lawyers working with an attorney are imputed to that attorney. Id.; see also United States v. SAE
Civil Constr., Inc., No. 4 CV 95-3058, 1996 WL 148521, at *4 (D. Neb. Jan. 29, 1996) ("It is of little importance
that the harborer of the confidential information in the present case is not an attorney or a member of a firm's non-
attorney support staff.").

They did neither. Regardless of whether Aéropostale's attorneys believed that the privilege had

been waived, they were obliged to comply with such ethical requirements and allow the privilege

issue to be decided by a court of law. See Ass'n of the Bar of the City of N.Y., Op. No. 2003-04.

### D.  Because of the Breach of the Attorney-Client Privilege, the Commission Is Precluded from Relying on Any Information Derived from the Tainted Evidence

Confidential attorney-client communications are protected from disclosure and

inadmissible as evidence. CPLR §§ 3101(b), 4503(a); Spectrum Sys, 78 N.Y.2d at 377; see also

Surgical Design Corp. v. Correa, 21 A.D.3d 409, 410 (2d Dep't 2005); Manuf. & Traders Trust,

132 A.D.2d, 392 398 (4th Dep't 1987). This includes not only the privileged documents

themselves, but all documents and other evidence that cannot be shown to have been "obtained

from an independently developed, unrelated, non-privileged, unsuppressed source." In re Beiny,

129 A.D.2d 126,142 (1st Dep't 1987); see United States v. Longo, 70 F.Supp. 2d 225, 264

(W.D.N.Y. 1999) ("Where a violation of the attorney-client privilege is demonstrated, the

remedy for such a violation is the suppression of evidence derived from the privileged

communication.).

When privileged information is improperly or inadvertently disclosed to the government,

courts will attempt to restore the party whose privilege has been violated to the *status quo ante*,

including ordering 1) destruction or return of all privileged documents; 2) suppression of all

evidence obtained directly or indirectly from the privileged disclosures; and/or 3)

disqualification of government counsel who have been exposed to the privileged information.

See generally, Church of Scientology v. United States, 506 U.S. 9, 13 (1992); United States v.

Haynes, 216 F.3d 789 (9th Cir. 2000); United States v. Singer, 785 F.2d 228 (8th Cir. 1986).

When government agents have been exposed to information protected by the attorney-client

privilege, the basic approach taken by courts has been "to identify and then neutralize the taint

by tailoring relief appropriate in the circumstances to assure the defendant the effective

assistance of counsel and a fair trial." United States v. Morrison, 449 U.S. 361, 365 (1981).

An attorneys' failure to adhere to this obligation has resulted in the dismissal of a client's

entire case. See Lipin v. Bender, 84 N.Y.2d 564 (1994). In other cases, attorneys tainted by

such breaches of the attorney-client privilege have been disqualified from further participation in

the underlying litigation. See Richards v. Jain, 168 F.Supp.2d 1195, 1200, 1205 (W.D. Wash.

2001); In re Marketing Invest. Corp., 80 S.W.3d 44, 51–52 (Ct. App. Tex. 1998); Beiny, 129

A.D.2d at141–42.

Here, it cannot be disputed seriously that the Aéropostale attorneys failed to heed their

ethical mandates: They completely failed to notify Attorney Siegel, the sender of the documents,

and instead improperly continued to review the privileged documents and to use the privileged

information contained in such documents as the basis to fire Mr. Finazzo, issue a press release to

that effect, and make such disclosures in its 8-K filing. Regardless of whether the Staff obtained

the privileged documents themselves or simply received information derived from the breach of

those privileged documents, the Commission's investigation clearly stemmed from information

gathered in breach of Mr. Finazzo's attorney-client privilege.

Given these *prima facie* violations of the ethical standards, and the ensuing taint on the

Commission's investigation, the Commission should be precluded from relying on any

information derived directly or indirectly from the Attorney Siegel Email. But for the wrongful

actions of the Company and its lawyers, Mr. Finazzo would have proceeded with his scheduled

retirement with the benefit of a significant compensation package. There would have been no

press release or public filings relating to Mr. Finazzo's firing and no investigation, formal or

informal, would have been commenced by the Commission. The genesis of this entire matter is

6293742.4                                    - 18 -

the Company's belief that the Attorney Siegel Email and its attached FFA Document, evidenced

a so-called "conflict of interest" by Mr. Finazzo. Had KMR, Kroll and Aeropostalé lawyers

complied with their legal and ethical obligations to segregate the email, notify Ms. Siegel and,

upon her request, return the email unread, the chain of events that led to the Subpoena would not

have begun.

Notably, the Staff should have first halted its investigation and sought judicial approval

of before securing any documents from any party that were derived from a violation of the

attorney-client privilege. As the Southern District of New York held,

> [I]t is possible for an agency to break the attorney-client privilege and then secure
> a ruling validating its action. However, their course has two pitfalls. First, if the
> agency is wrong and the violation of the privilege is found to be improper, the
> agency risks suppression of all evidence attributable to the breach, not merely the
> direct testimony of the attorney. Second, the need for collateral litigation expends
> recourses and delays resolution of the case.
> Two alternative courses would avoid these privileges. The agency can, of course,
> seek judicial approval before seeking to breach the attorney-client privilege. See
> First Federal, 110 F.R.D. at 566 (disclosure of privileged information should
> ordinarily occur under court supervision). A less onerous safeguard would be to
> instruct the client to obtain advice of an attorney not under investigation.

SEC v. Forma, 177 F.R.D. 516, 526-27 (S.D.N.Y. 1987). Of course, it is now too late for the

Staff to engage in either alternative suggested in Forma. The Staff has already sought documents

from other entities based on the privileged information, and cannot now instruct recipients to

obtain "advice of an attorney." Accordingly, the Staff's Motion should be denied.

Also instructive is SEC v. OKC Corp., 474 F. Supp. 1031, 1040 (N.D. Tex 1979), aff'd

sub nom OKC Corp. v. Williams 614 F. 2d 58 (5th Cir. 1980), where, in the face of a

corporation's claim of breach of attorney-client privilege by virtue of an inadvertent disclosure

by a single director of a confidential report, the Commission agreed to hold its investigation in

abeyance pending a determination by the district court concerning the use of a confidential

report. In its letter of January 31, 2008 and its subsequent Memo of Law, the Staff has suggested

that OKC affirms its right to base subpoenas on privileged information where they received such information from private third parties.  Unlike KMR and Aéropostale, however, the OKC director who disclosed the confidential report possessed it, in the first instance, rightfully.  The question before the OKC court involved the disclosure of confidential information by a rightful possessor of that information.  By contrast, the issue in the instant case is one of unauthorized disclosure by a wrongful possessor *ab initio*.  Under such circumstances, improperly obtained attorney-client communications and all information derived directly or indirectly from the initial disclosure must be suppressed.  See, e.g. United States v. Lin Lyn Trading, Ltd., 925 F. Supp. 1507, 1517 (D. Utah 1996) aff'd in part, rev'd in part and remanded 149 F. 3d 1112 (10th Cir 1998) (affirming suppression); Longo 70 F. Supp. 2d at 264 (citing Forma).

Thus, the proper remedy here for the violation of the attorney-client communication is a denial of Staff's motion and subsequent quashing of the subpoena.

### E.    The Commission Cannot Distance Itself from Aéropostale's Violation of the Attorney-Client Privileged

The Staff claims that even if there were a violation of the attorney-client privilege, the wrongful act does not taint its investigation since a third party (Aéropostale), rather than the government, is the alleged violator.  See Commission's Memo of Law, p. 15 (stating that "[i]n this matter, there was no government intrusion into Finazzo's privilege," and that "[t]here is no deterrent effect in suppressing the fruits of a third party's violation").  As discussed above, the fact that a government agent did not open and read the privileged email does not end the inquiry because the Commission investigation is still tainted.

The Staff's "clean hands" defense also fails to withstand scrutiny, for the additional reason that the Commission is complicit in the corporate investigation that Aéropostale engaged in which led to the violation of the attorney-client privilege here.

6293742.4                                          - 20 -

The federal government exhorts public companies to conduct the type of sweeping investigations that Aéropostale conducted here, with full knowledge that the corporation will, among other things, review the private emails of the employees that the Commission and other government entities could not themselves review.  Indeed, the government's exhortations that public companies investigate and disclose the results of such investigations to the government turns companies like Aéropostale into thinly veiled government agents.

The government's entreaty urging companies to investigate and disclose can be found in the Department of Justice ("DOJ")'s "Thompson Memorandum" and the subsequent revision, promulgated December, 2006, known as the "McNulty Memorandum."[4] These memoranda discuss factors that the DOJ considers in deciding whether to criminally prosecute a corporation. The text of the directive which appears to have inspired Aéropostale's investigation here, and which discovery would confirm, is the same in both documents:

> Charging a Corporation: Corporate Compliance Programs
> A. General Principle: Compliance programs are established by corporate management to prevent and to detect misconduct and to ensure that corporate activities are conducted in accordance with all applicable criminal and civil laws, regulations, and rules. **The Department encourages such corporate self-policing, including voluntary disclosures to the government of any problems that a corporation discovers on its own.**

(emphasis added).

In the so-called "Seaboard Report" issued in 2001, the Commission adopted the DOJ's policies of the Thompson Memorandum and specifically encouraged corporations to conduct their own internal investigations.[5] Listed as thirteen separate factors, the Seaboard Report

---

[4]  See http://www.usdoj.gov/dag/cftf/corporate_guidelines.htm (Thompson Memorandum); http://www.usdoj.gov/dag/speeches/2006/mcnulty_memo.pdf (McNulty Memorandum).

[5]  See Report of Investigation Pursuant to Section 21(a) of the Securities Exchange Act of 1934 and Commission Statement on the Relationship and Cooperation to Agency Enforcement Decisions, Exchange Act Release No. 44,969, Accounting and Auditing Enforcement Release No. 1,470 (Oct. 23, 2001), at http://www.sec.gov/litigation/investreport/34-44969.htm.

identifies four broad measures of a company's cooperation: (1) self-policing prior to discovery of misconduct (i.e., the existence of effective compliance procedures); (2) thorough review and self-reporting of misconduct upon discovery to regulators; (3) remediation (including dismissing or appropriately disciplining wrongdoers, compensating those adversely affected, and instituting internal controls and procedures to prevent recurrence); and (4) cooperation with law enforcement authorities.  As discovery would likely confirm, Aéropostale was following these directives when conducting the investigation which led to the improper review of the Attorney Siegel Email.[6]

The Commission has threatened corporations to comply with these polices and install employee compliance programs or suffer the consequences.  For example, in 2001, Stephen Cutler, then director of enforcement for SEC, said in a speech that the SEC "will look to the company's actions both before and after discovery of misconduct, including the rigor of its compliance and/or internal audit program and the tone set by senior management."  Cutler added:  "If you start thinking about the [Seaboard] 21(a) Report only after you receive a subpoena, you're too late."[7]

Corporations, including Aéropostale, follow the directives in the Thompson and McNulty Memoranda, the Seaboard Report and other public statements.  See, e.g., United States v. Stein, 440 F.Supp.2d 315, 319 (S.D.N.Y. 2006) ("In the words of its chief legal officer, KPMG did everything it could 'to be able to say at the right time and with the right audience, we're in full

---

[6]  In addition, on January 4, 2006, the SEC issued a supplemental statement, known as the "McAfee/Applix Statement," which confirmed that when deciding whether and to what extent to impose civil penalties against a corporation, the SEC will consider the presence or lack of remedial steps by the corporation; and the extent of cooperation with the SEC and other law enforcement.  See SEC, Statement of the Securities and Exchange Commission Concerning Financial Penalties (Jan. 4, 2006), at http:// www.sec.gov/news/press/2006-4.htm.

[7]  Stephen M. Cutler, Director of Enforcement, U.S. Sec. and Exch. Comm'n, Remarks Before the Investment Company Institute, Securities Law Developments Conference (Dec. 6, 2001), available at http://

compliance with the Thompson Memorandum.'"").  Chastened by the federal government's threat of sanctions or prosecution, and the indictment and subsequent demise of accounting firm Arthur Andersen, corporations now follow these government directives in order to avoid a similar fate.

Thus, based on these federal policies, Aéropostale and other public companies utilize corporate "compliance programs" which include review of employees' personal emails.  Given the nature of modern work life, where employees routinely use their work email for private confidential communications with spouses, attorneys, doctors, psychotherapists, and others, the Department of Justice and Commission directives amount to a systematic encouragement of employers to violate their employees' privacy rights.  Having encouraged such conduct, the Commission now pretends to sit back and await for the corporations to "self report," allegedly protected from the misdeeds of the corporations.

The Staff's position in this litigation is clearly disingenuous.  It is only because of the federal policies that the corporations undertake to review private employee emails.  The connection between the federal government's policies and corporate compliance programs renders Aéropostale's actions here "state action."

Determining whether an allegedly "private" party acts as a government agent in a search depends upon whether there is "government knowledge and acquiescence in the search, and whether the private searcher intended to assist law enforcement as opposed simply to achieve his own ends."  Longo, 70 F.Supp.2d at 259 (citations omitted).  A private party's action can be construed as government conduct if "the circumstances demonstrate the government explicitly or implicitly instigated the search."  Id. (emphasis added).  Here, both factors are met since the Commission has knowledge and approval of the compliance programs, since it encourages such

---

actions, and since corporations take such actions for the sake of the federal government regulatory bodies.

In other arenas, courts have held that private actions taken as a result of government directives or policies constitute state action and implicate the Fourth Amendment.    For instance, in Skinner v. Railway Labor Exec. Ass'n, 489 U.S. 602 (1989), the Supreme Court reviewed regulations issued by the Federal Railroad Administration which authorized and in some cases required, testing by private railway companies of employees' blood, urine and breath for the presence of drug and alcohol.    The Supreme Court held that the Fourth Amendment analysis applied to the searches conducted by the private employers because it was pursuant to the federal regulations.    The Court reasoned:

> Whether a private party should be deemed an agent or instrument of the Government for Fourth Amendment purposes necessarily turns on the degree of the Government's participation in the private party's activities, ... a question that can only be resolved "in light of all the circumstances," .... **The fact that the Government has not compelled a private party to perform a search does not, by itself, establish that the search is a private one.** Here, specific features of the regulations combine to convince us that the Government did more than adopt a passive position toward the underlying private conduct.

Id. at 614-15 (emphasis added).    Thus, here, as in Skinner the government regulation transformed the facially private conduct into acts by the government.

Along similar lines, in United States v. Ross, 32 F.3d 1411 (9th Cir.1994), the Ninth Circuit held that an airline employee's search of a passenger's luggage constituted state action where the employee conducted the search to conform with the guidelines of the Federal Aviation Administration (FAA).    The court explained that the "government's involvement in promulgating the Federal Aviation Administration guidelines to combat hijacking is so pervasive 'as to bring any search conducted pursuant to that program within the reach of the Fourth Amendment.'" Id. at 1413-14 (quoting United States v. Davis, 482 F.2d 893, 904 (9th

Cir.1973)). The court added: "It makes no difference that the act of opening appellant's briefcase was accomplished by a 'private' airline employee rather than a 'public' official. The search was part of the overall, nationwide anti-hijacking effort, and constituted 'state action' for purposes of the Fourth Amendment." Id. Likewise here, the search of Mr. Finazzo's email was part of a "nationwide ... effort" promulgated by the Commission and the Department of Justice for corporations to review their employee's emails, and "[i]t makes no difference" that a private actor rather than the Staff was the one who reviewed the privileged email.

In sum, the federal governments' policies and directives encouraging corporations to review their employees private communications renders the actions here by Aéropostale "government conduct." Because of the government's connection to the improper search, the evidence obtained and fruits thereof must be suppressed. Accordingly, the Staff's Motion to Enforce the Subpoena should be denied.

## CONCLUSION

For the reasons stated above, the SEC's motion to enforce the subpoena against Mr. Finazzo should be deferred until non-parties comply with the subpoenas. In the alternative, the Court should deny the SEC's motion outright.

Dated: New York, New York
      March 19, 2008

      Of counsel:
      Michael Shapiro
      Kenneth S. Levine
      Laura Anne Reeds

CARTER LEDYARD & MILBURN LLP

By: _____
Robert J. A. Zito
Two Wall Street
New York, NY 10005
212-732-3200
*Attorneys for Respondent*
*Christopher Finazzo*

# Exhibit 4

**Transcript of Hearing before Judge Baer,
held in *SEC v. Finazzo* on March 25, 2008**

83pQsecC

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   SECURITIES AND EXCHANGE
     COMMISSION,
 4
                    Applicant,
 5
             v.                          M 18 304 (HB)
 6
     CHRISTOPHER FINAZZO, SOUTH BAY
 7   APPAREL, INC.,

 8                  Respondent.

 9   ------------------------------x
                                     New York, N.Y.
10                                   March 25, 2008
                                     10:10 a.m.
11
     Before:
12
                    HON. HAROLD BAER, JR.,
13
                                         District Judge
14
                         APPEARANCES
15
     SECURITIES AND EXCHANGE COMMISSION
16        Attorneys for Applicant SEC
     PAUL GIZZI
17   MICHAEL BIRNBAUM

18

19   CARTER, LEDYARD & MILBURN, LLP
          Attorneys for Respondent Finazzo
20   ROBERT J.A. ZITO
     KENNETH S. LEVINE
21   ALAN LEWIS
     LAURA REEDS
22

23

24   CURTIS, MALLET-PREVOST, COLT & MOSLE, LLP
          Attorneys for Respondent South Bay Apparel, Inc.
     T. BARRY KINGHAM
25   PETER BEHMKE
```

83pQsecC

```
 1            (In open court; case called)
 2        MR. GIZZI:  For the plaintiff, or the applicant, I
 3   should say, Securities Exchange Commission, it's Paul Gizzi and
 4   Michael Birnbaum.
 5        THE DEPUTY CLERK:  Respondents?
 6        MR. ZITO:  Carter, Ledyard & Milburn by Robert J. A.
 7   Zito, Alan Lewis, Kenneth Levine and Laura Reeds.
 8        MR. KINGHAM:  For respondent South Bay Apparel, good
 9   morning, your Honor, Barry Kingham and Peter Behmke of Curtis,
10   Mallet-Prevost, Colt & Mosle.
11            (Discussion off the record)
12        THE COURT:  I guess this is the SEC's motion to -- I
13   guess actually it's Finazzo's motion to quash.  Is that right?
14        MR. GIZZI:  Your Honor, Paul Gizzi for the SEC.  We
15   did bring this as an application to enforce administrative
16   subpoenas.  Mr. Finazzo and South Bay have resisted the
17   application, but it is the Commission's application.
18        THE COURT:  Let me hear from Finazzo first anyway.
19        MR. ZITO:  Good morning, your Honor.  Bob Zito from
20   Carter, Ledyard & Milburn.  Your Honor, there's no case which
21   has been cited to this court that stands for the proposition --
22        THE COURT:  By the way, before you start, let me tell
23   you that as is the case in situations where the matter is going
24   to stay in the Southern District, which is not usual, actually,
25   for miscellaneous matters, this one, as you know, was assigned
```

83pQsecC

1. to Judge Sullivan.

2.        Just so the record is perfectly clear, I spoke to

3. Judge Sullivan offering him the opportunity to have the

4. pleasure of your company, and he had just finished a trial.  So

5. while he was amenable to doing it, he was perfectly happy to

6. have Judge McKenna's timetable followed and have it argued

7. here.  So that's why we are gathered together.  OK.  Go ahead.

8.        MR. GIZZI:  Your Honor, if I could, just so that the

9. record is clear, the application before your Honor is SEC

10. against Finazzo.  Mr. Finazzo brought a separate case, which is

11. the case that's assigned to Judge Sullivan seeking declaratory

12. and injunctive relief against the Commission.

13.        THE COURT:  That would not be this case?

14.        MR. GIZZI:  That's correct.

15.        THE COURT:  In other words, this is just a

16. miscellaneous case; it has no summons and complaint attached to

17. it.

18.        MR. GIZZI:  That's correct, your Honor.

19.        MR. ZITO:  Your Honor, we filed an action for

20. declaratory and injunctive relief.  We filed it as a related

21. case to this case.  For whatever reason, the clerk would not

22. recognize the declaratory judgment action as being related to

23. this action.  It's our position, if at all possible, that since

24. they are both related, that the case before Judge Sullivan even

25. be referred to your Honor, as this case was first filed and is

83pQsecC

1    now returnable before your Honor.

2         THE COURT:  But why didn't you bother to explain why

3    this case wasn't related to the earlier one that was filed that

4    went to Judge Sullivan?

5         MR. ZITO:  Your Honor, when we filed our filing sheet

6    that lists are there any related cases, as is indeed our duty,

7    we are required under the rules --

8         THE COURT:  I'm familiar with the cover page.

9         MR. ZITO:  We filed it as a related case and for

10   whatever reason, I can't speak for the clerks of this court,

11   your Honor, the related nature of the case was stricken by the

12   clerk.

13        THE COURT:  So where did it go?

14        MR. ZITO:  It went into the wheel.

15        THE COURT:  And who came out with it?

16        MR. ZITO:  Judge Sullivan.

17        THE COURT:  So, did Judge Sullivan have both?

18        MR. ZITO:  No.  For some reason, they've been

19   bifurcated, your Honor.  It's our view that they should be

20   consolidated in some form for purposes of judicial economy, if

21   nothing else.

22        THE COURT:  Sounds reasonable.  I'm still uncertain --

23   the SEC says that this case is separate from the one in front

24   of Sullivan, and you're telling me your case is also assigned

25   to Sullivan.

83pQsecC

1        MR. ZITO:  Your Honor, the subject matter is

2    identical.

3        THE COURT:  I understand that, but is there another

4    judge in this picture?

5        MR. ZITO:  No.

6        THE COURT:  Aside from McKenna, Baer and Sullivan?  It

7    seems like you've got your money's worth.

8        MR. ZITO:  No, your Honor.

9        THE COURT:  So, I'm still uncertain as to why this

10   isn't in front of Sullivan along with -- and I gather you're

11   also uncertain as to why they're not both in front of Judge

12   Sullivan.

13       MR. ZITO:  Well, we thought, your Honor, they should

14   both be before you because this was the first matter filed and

15   we filed it first -- we could not file our declaratory judgment

16   action until the Commission filed their matter because that

17   gave us then standing.  So, once they did that, it triggered

18   our filing and we were permitted to do so.  Once we did that,

19   again, we tried to file it as a related case.  I believe the

20   custom was, at least at one point some years ago, that when

21   there's a first case that's filed, that the second case

22   automatically gets referred to the first filed case.

23   Unfortunately, your Honor, you're the first filed case.  That's

24   why we tried to have the declaratory judgment action referred

25   to your Honor.

83pQsecC

1          THE COURT:  I'm sure Judge Sullivan would be

2    delighted.

3          (Pause)

4          THE COURT:  My clerk explains that it may well be that

5    the miscellaneous cases don't go through the system, and that

6    that's why it didn't get worked out as you suggested.

7          MR. GIZZI:  That's my understanding, your Honor,

8    because this isn't a summary proceeding to enforce

9    administrative subpoenas.  It went to Part One, and that's why

10   it has the miscellaneous number.

11         THE COURT:  OK.  Let's try and go towards the

12   substance of this.

13         MR. ZITO:  Your Honor, our feeling is that,

14   respectfully, any motion to compel the production or the

15   enforcement of administrative subpoenas at this juncture are

16   very, very premature; the reason being, your Honor, is that

17   there's no case that we've been able to find that says that

18   where there's been an egregious -- and I emphasize the word

19   egregious -- breach, your Honor, of the attorney/client

20   privilege and where the Commission is on notice of the breach

21   of the attorney/client privilege, that it can then either

22   subpoena the privileged information or any information that is

23   derived from the privileged information, your Honor.

24         By way of some factual background --

25         THE COURT:  Well, that's a nice conclusion, but it

83pQsecC

1    doesn't seem to be totally supported, even by this Texas case

2    that you cite, but I think that case really stands for the

3    proposition that the SEC is advancing; that, in fact, it is

4    perfectly proper for the SEC to subpoena these records at this

5    juncture.  And, indeed, you go on to talk about how you would

6    like discovery of your own.  I'm not at all certain why that

7    won't happen in the fullness of time whether or not this

8    subpoena is quashed.  It may be too many questions at the same

9    time.

10        MR. ZITO:  Your Honor, in our view the OKC case, which

11   I believe your Honor is referring to in Texas, is very, very

12   different than the facts and circumstances that we have before

13   the Court.

14        THE COURT:  I thought you cited it.  You know, one of

15   the problems is that I got the SEC's reply late last night or

16   late yesterday afternoon, so I haven't exactly been overwhelmed

17   with time to look at this.  So I'm going to try to let you

18   talk, and I'm not going to ask a lot of questions.  Go ahead

19   and tell me why it's so different.

20        MR. ZITO:  Your Honor, we cited the OKC case with the

21   proposition that as a matter of procedure, it makes sense to

22   make a determination whether or not the documents are

23   privileged and whether or not there are any documents or

24   information that is derived from privileged sources.  In fact,

25   the OKC case goes to great lengths in advising the Commission

83pQsecC

1    that it is better to have those determinations, whether or not

2    the documents are privileged and whether or not the sources

3    come from privileged sources, before the documents are then

4    obtained, otherwise, the investigation runs the risk of being

5    tainted.  And that's what we have here your Honor, taint.

6         By way of some background, my client, your Honor,

7    worked for a company known as Aeropostale.  At that time, he

8    employed a trust and estates attorney by the name of Angela

9    Siegel.

10        THE COURT:  What kind of company is that?

11        MR. ZITO:  It's a retailer, your Honor.  They sell

12   clothing to teens, sort of like the Gap or Abercrombie & Fitch

13   now, Old Navy, those kinds of stores.

14        THE COURT:  Here in New York?

15        MR. ZITO:  They are here in New York, but they're

16   nationwide.  They have about 700 stores nationwide.  They're a

17   mall store, your Honor.

18        So, your Honor, what happens is that Ms. Siegel sends

19   an e-mail to Mr. Finazzo at his office, and the e-mail is on

20   its face from Angela Siegel, Esquire, with a dot com address of

21   law offices of Angela Siegel dot com, and on the face of it,

22   your Honor, it says:  Privileged and confidential.  If you are

23   not the intended recipient of this document, please notify the

24   sender immediately.

25        It couldn't be any more plain in terms of what the

83pQsecC

1    legend says and how it says it.

2        THE COURT:  What the legend says is certainly as you

3    read it, but what gives me some pause is that the argument that

4    the SEC raises -- and, again, I'm not steeped in this, as you

5    hope you guys and gal are -- but doesn't the SEC argue

6    something to the proposition that Finazzo waived any privilege

7    by receiving it in his law office?

8        MR. ZITO:  Your Honor, that's an issue of fact which

9    we'll ultimately have to have a hearing on, and we'll have to

10   get discovery on.

11       THE COURT:  There isn't any question but that he got

12   it there, right?

13       MR. ZITO:  There's no question that he received it

14   there, but there's also not a doubt, your Honor, that the

15   person who is sending it to Mr. Finazzo was a lawyer who is not

16   an employee of the company and who is not bound by the policies

17   of the company, and that the company's policies themselves

18   indeed did not prohibit personal use of the e-mail system nor

19   did they police their system nor did they ever use any e-mails

20   in connection with any other prior instance of misconduct or

21   alleged misconduct.

22       So, your Honor, the case law, if we are to go by Asia

23   Holdings, Asia Holdings stands for the proposition that there

24   must be factual findings regarding what the policy of

25   Aeropostale was, and whether or not that in fact resulted in a

83pQsecC

1    waiver of the attorney/client privilege.  Most of the cases

2    that are referred to by the Commission, your Honor, such as the

3    Scott decision, some of the other recent decisions are very,

4    very different.  Why they're different, your Honor is because

5    it is the employee's e-mail which is being sent out from the

6    company, and the argument has been when the employee is sending

7    an outgoing e-mail, who is bound by the company, it would seem

8    to me, your Honor, you'd get a very, very different result as

9    opposed to an attorney who is trying to communicate with her

10   client and sends an e-mail into the client not knowing about

11   the policy, not being bound by the policy, and indeed, your

12   Honor, the case law is pretty clear that an attorney cannot

13   waive the privilege of the client.  It's the client's

14   privilege; not the attorney's.

15         Your Honor, the most troubling aspect about this case

16   are the ethical violations.  Your Honor, I think it's a matter

17   of hornbook law that if an attorney comes across any

18   information which the attorney believes is privileged and that

19   the attorney reviewing the document or seeing the document does

20   not -- is not the intended recipient of the document, that that

21   attorney must immediately cease and desist.

22         The Ethics Opinion No. 730, your Honor, for the New

23   York County Lawyers Association says the following, your Honor:

24   A lawyer has ethical obligations upon receipt of inadvertently

25   disclosed privileged information.  If a lawyer receives

83pQsecC

1    information which a lawyer knows or believes was not intended

2    for the lawyer and contains secrets, confidences or other

3    privileged matter, the lawyer, upon recognition of same, shall,

4    without further review or other use thereof, notify the sender

5    and, insofar as it shall have been in written or other tangible

6    form, abide by sender instructions regarding return or

7    destruction of the information.  A lawyer has an ethical

8    obligation, your Honor, to preserve this type of secret

9    information.

10           Your Honor, when Aeropostale's lawyers were conducting

11   a so-called internal investigation -- and, your Honor, I want

12   to make a little bit of an aside, because in recent years we've

13   now created some sort of a thing, a being, that Elkin

14   Abramowitz was talking about at the New York City Council of

15   Defense Lawyers the other week, this so-called internal

16   investigation.  Lawyers are essentially now being deputized

17   through the Thompson Memorandum, the McNulty Memorandum,

18   through the Seaboard Report.  They're becoming little deputized

19   people of the government to conduct these internal

20   investigations.

21           So when the Aeropostale's lawyers were conducting this

22   investigation, which, by the way, your Honor, my understanding

23   of the investigation is that it had nothing to do with my

24   client, but they were trying to investigate the CEO in

25   connection with relationships that the CEO of Aeropostale had

83pQsecC

1    with some vendors of the company.  So, as they're stumbling

2    through e-mails, they come across this privileged e-mail.

3    Contrary to their ethical and professional obligations, they

4    don't stop reading it.  The lawyers, your Honor, not only read

5    the document, there's an attached word document to this

6    privileged e-mail.  They review that e-mail.  They don't inform

7    Ms. Siegel at any time that they are in possession of my

8    client's secrets, my client's confidences, as they are

9    duty-bound to do.

10        What they do instead is that they take my client; they

11    pull him in a room.  They confront him with an e-mail

12    attachment that lists certain assets on it, your Honor, and

13    they say, "What about this?"  They say, "You're fired.  We're

14    making a public disclosure.  Here's the press release," and

15    they conceal from him throughout this time, your Honor --

16        THE COURT:  But he really isn't the -- the concern

17    here really is whether the SEC can pursue its investigation,

18    not whether or not your client was fired unjustly.

19        MR. ZITO:  Your Honor, we have to look at the remedy.

20    The remedy is what do we do when we have misappropriated

21    privileged information?  What is the remedy?  Universally all

22    the cases say, your Honor, if there's privileged information

23    that has been misappropriated, you must give it back, and all

24    the sources that came from that information must go back to the

25    sender, must go back from whence it came.

83pQsecC

1          THE COURT:  But the law seems to be relatively clear

2     that with respect to government agency -- well, certainly the

3     SEC is -- the circuit court cases seem to say that all I have

4     to find is that the inquiry is being conducted for a legitimate

5     purpose within the SEC's authority, and the information sought

6     is relevant for that or to that purpose and the information is

7     not within the SEC's possession, and the subpoenas were issued

8     in accordance with the requisite administrative procedures.

9          Now, if that's the law in this circuit, I'm not sure

10    -- as sad as it may be to your client, I'm not sure what I can

11    do for him.

12         MR. ZITO:  Your Honor, there have been cases.  In fact

13    we've cited, I think, some of them in our brief, but there's

14    the Nicita case that's directly on point on the West Coast in

15    California that stands for the proposition, your Honor, that

16    where there is privileged matter or there is a taint of the

17    investigation, that the investigation does not satisfy those

18    factors, your Honor.

19         One of the cases, for example, that did precisely this

20    and where the court held a full evidentiary hearing pursuant to

21    an order to show cause, they stayed an order to show cause.

22    They had a hearing, I believe they had discovery, and they had

23    factual findings.  That case, your Honor, is SEC v. Nicita, and

24    it is cited at 2007 Westlaw 1704585.

25         Your Honor, to answer that question, it seems to me

83pQsecC

```
 1    that as a matter of procedure, I believe your Honor can answer

 2    those questions in the context of this proceeding.  However,

 3    your Honor, if the court feels in any way the questioning this

 4    procedure we have filed a declaratory judgment action which

 5    puts these issues plainly before the Court, and seems to me,

 6    your Honor, that to enforce subpoenas prior to the issue of

 7    privilege and taint are determined is plainly premature and

 8    extremely prejudicial to my client's rights.

 9              THE COURT:  I understand your position.  I'm just not

10    sure -- well, we'll listen to the SEC.  I don't have to be

11    their lawyer.  Anything else you want to tell me about your

12    client?

13              MR. ZITO:  A few things I want to touch upon.  One,

14    it's, again, the remedy that's important here.  The question

15    is, and all the cases say, that when there's privileged

16    information, it's the remedy regardless of who is in possession

17    of it.  By way of an analogy, some of the cases refer to an

18    exclusionary rule or fruit from the poisonous tree argument.  I

19    believe, your Honor -- and this is the case of first

20    impression.  Let me say that right now, your Honor.  I think

21    this is a case of first impression.  But I think that the cases

22    that focus on the constitutional issue and whether it's fruit

23    of the poisonous tree are flawed because this is actually

24    poisonous fruit.

25              Let me explain, your Honor, if I may.  If a police
```

83pQsecC

1    officer makes an improper seizure, goes into a room without a

2    proper warrant, without exigent circumstances and seizes a gun

3    and then takes the gun and presents it to a grand jury and

4    that's used as a basis for an indictment, if the gun was

5    improperly obtained, then the exclusionary rule would apply and

6    the gun would be suppressed.  There's nothing wrong with the

7    gun, your Honor.  It's the manner by which the gun was

8    obtained.  The exclusionary rule seeks to punish people who

9    have breached constitutional rights.

10       However, your Honor, when we're talking about the

11   attorney/client privilege, there's nothing wrong with the

12   manner by which it is obtained.  If there's a finding that this

13   information is privileged, it remains privileged regardless in

14   whose hands it is.  So, therefore, it's not fruit of the

15   poisonous tree, your Honor, it is poisonous fruit.

16       By way of another analogy, your Honor, the cases that

17   are relied upon by the Commission stand for the proposition

18   that where the SEC is innocent in not knowing, the OKC case,

19   for example, they receive information, they receive documents,

20   they don't know at the time they're receiving the documents

21   that it's either privileged or comes from a privileged source,

22   so they use it.  They use it in an investigation.  They use it

23   to lodge charges.  After the fact, someone comes in and says,

24   "Hey, this is privileged information and you can't 2use it."

25   The cases there seem to hold that it's after the fact, if they

83pQsecC

1   were innocent, they had no notice.

2          Here, your Honor, the Commission has been on notice

3   since last August of 2007 that this whole investigation

4   emanates from a breach of the attorney/client privilege and a

5   breach of professional and ethical obligations.

6          Your Honor, while we're talking about ethical

7   obligations, what's frustrating for us is that we have been

8   trying to get the information back.  It's my client's

9   privilege.  He's entitled to all the information that is

10  privileged or which is derived from the privileged information.

11  There was an arbitration with the company.  We sought to

12  subpoena it.  They didn't return the documents.  Pursuant to

13  the Opinion No. 730 of the County Lawyers Association, we sent

14  them a written demand.  They are required to comply with that.

15  And, again, they didn't comply with that.  Again, we issued a

16  subpoena in connection with this proceeding, your Honor, and

17  they didn't comply with it, and they continue not to comply

18  with it.  Your Honor, I respectfully submit that they are in

19  violation of their ethical obligations.

20          Your Honor, the other issue I'd like to turn to is

21  whether or not we could say that there's truly any -- putting

22  aside the remedy, if we focus on whether or not there's any

23  state action being involved here, what we really have to do is

24  look at the Seaboard Report, we have to look at the Thompson

25  Memorandum and we have to look at the KPMG case, your Honor.

83pQsecC

1    The KPMG case was no different than the facts over here.  There

2    the government was telling the company, look, if these guys

3    aren't cooperating, don't pay their fees.  Don't pay their

4    fees.  Judge Kaplan found that to be a constitutional

5    violation.

6        Here, your Honor, the SEC and the Commission is saying

7    directly or indirectly, go out and investigate.  Find out the

8    information.  Find out what it is.  Read the e-mails and tell

9    me what's going on here.

10        This investigation wasn't done in a vacuum, your

11    Honor.  This investigation was purposefully done in order to

12    please the SEC, in order to please the Commission because if

13    they hadn't done it --

14        THE COURT:  Mr. Zito, are you telling me again --

15    again, I want to sort of excuse myself for not having steeped

16    myself in all of these pearls, but are you telling me that the

17    SEC instituted or instigated this investigation?

18        MR. ZITO:  I respectfully submit that but for the

19    Seaboard factors and but for the advent of these kinds of

20    investigations -- and, in fact, your Honor --

21        THE COURT:  This is really a yes-or-no question,

22    Mr. Zito.

23        MR. ZITO:  The answer is yes, your Honor.  If I can

24    quote from Stephen Cutler, who was then the director of the

25    enforcement for the SEC, he said in a speech in 2001, look, the

83pQsecC

```
 1    SEC will look at a company's actions both before and after
 2    discovery of misconduct, including the rigor of its compliance
 3    and the internal audit program, and the tone set by the
 4    management.  Cutler added:  If you start thinking about the
 5    Seaboard 21(a) Report only after you receive a subpoena, you're
 6    too late.
 7         The government requires these investigations to be
 8    done, and I respectfully submit, your Honor, that this
 9    investigation was being done pursuant to the SEC's insistence
10    and request and would constitute state action.  So, I don't
11    think that they can say, well, we knew nothing about this.  In
12    fact, your Honor, I know that there are constant communications
13    between the staff of the Commission and Aeropostale throughout
14    this period, and what we're seeking through discovery is find
15    out from the company, from the lawyers, from the investigator's
16    role what they communicated to the SEC, to see how bad the
17    taint really is.
18         One final point, your Honor, that I would like to
19    make--
20         THE COURT:  I have about a hundred people about to
21    come in here in 20 minutes, so I'd like to be sure that
22    everybody gets a shot.
23         MR. ZITO:  Your Honor, one final point is the notion
24    that a thief cannot convey good title.  The confidence --
25         THE COURT:  I've heard that somewhere before.
```

83pQsecC

1          MR. ZITO:  The confidences of my client was stolen.

2    They were misappropriated by lawyers who had absolutely no

3    right to it, which differentiates this case from all the other

4    cases that the SEC relies upon, because in all the cases that

5    the SEC relies upon, the information that they obtained was not

6    misappropriated; that is to say, that the person who

7    communicated the privileged information was actually in

8    rightful possession of the privilege.  Here, they were in

9    wrongful possession.

10          But more importantly, your Honor, they are on

11   notice -- the old idea of getting good title to real estate

12   applies here in terms of getting good title to information in

13   order to claim, which the Commission is claiming, your Honor,

14   that they are actually BFPs.  In order to claim BFP status,

15   your Honor, you cannot have notice.  So they are on notice of

16   the Angela Siegel e-mail.  They are on notice as we speak, as

17   they have been for the last nine months, that Angela Siegel's

18   e-mail was misappropriated, and they can't continue to either

19   ask for that information or information derived from that

20   information and say that we don't know anything about it and we

21   did not participate.

22          I have nothing further, your Honor.  If you have any

23   questions...

24          THE COURT:  No, I think I have your argument.  Does

25   anybody else, South Bay have something they want to say?

83pQsecC

1          MR. KINGHAM:  If I may, your Honor.  Just very

2     briefly.  South Bay is a manufacturer, a vendor to Aeropostale,

3     which is the company that employed Mr. Finazzo.  South Bay

4     received a subpoena from the Commission seeking documents

5     relating to Mr. Finazzo.  That's what we're doing here.  We

6     were alerted by Mr. Zito to the privilege issue.  We examined

7     his authorities on the privilege issue, understood the facts to

8     be what he has portrayed them to be vis-a-vis the privilege,

9     and took the position with respect to the Commission that we

10    would await a court's determination or an agreement among the

11    parties as to whether or not the documents would be considered

12    privileged as to whether or not there was a taint and as to

13    whether or not we had to produce.

14         So South Bay is not here confusing in a classic sense.

15    South Bay is here ready to produce if necessary and if the

16    court orders us to do so.  We're not here in a frivolous nature

17    because we examined the authorities that Mr. Zito provided,

18    looked up some of our own, and have determined from our

19    standpoint that if there were no violation of the privilege

20    here, there would likely be no investigation and, therefore, no

21    subpoenas.  Because whether the Commission was in league, if

22    you will, with Aeropostale with respect to the investigational

23    company, the Commission has taken the position that it only

24    learned about this because Aeropostale made a public disclosure

25    of the fact that Mr. Finazzo's employment had been terminated,

83pQsecC

1    and they are now examining the circumstances, I guess,

2    surrounding the reasons for the termination of his employment.

3    We wouldn't have had that disclosure without the violation

4    anyway, and that's why we're here awaiting your decision.

5            THE COURT:  I'm not sure I understand.  Do you share

6    that view or do you share Mr. Zito's view that they had nine

7    months or six or eight months' notice before 8-K problem arose?

8

9            MR. KINGHAM:  I don't know the answer to that, your

10   Honor.  Discovery would answer that question.

11           THE COURT:  Mr. Zito thinks he knows the answer.

12           MR. KINGHAM:  Well, he's much closer to the facts than

13   I am, but viewed as someplace between Mr. Zito and the court in

14   terms of knowledge --

15           THE COURT:  I think you're better off in the court.

16           MR. KINGHAM:  But, you know, whether or not the

17   Commission learned about it from a public disclosure or, worse,

18   were involved with Aeropostale from the beginning, the fact is

19   you've got the misuse by Aeropostale and its lawyers of a

20   privileged document which results in a subpoena to my client,

21   and my client is here to respect the privilege of Mr. Finazzo

22   until the court tells us to do otherwise.

23           THE COURT:  All right.  I think it's the SEC's turn to

24   tell me what they think.

25           MR. GIZZI:  Thank you, your Honor.  Just to be clear,

83pQsecC

 1    the information that the Commission is investigating came to

 2    light in Aeropostale's filing in November of 2006.  Additional

 3    information was disclosed in April of 2007.  It was after that

 4    date that the Commission began its investigation.  The

 5    Commission had nothing to do with Aeropostale's internal

 6    investigation, and we've told that to both respondents'

 7    counsel.

 8         And your Honor has correctly stated the standard for

 9    enforcement of the subpoena.  There is no serious dispute that

10    the Commission meets that standard.  Information that a New

11    York Stock Exchange listed public company files publicly,

12    discloses publicly, indicating that one of its top officials

13    had undisclosed relationships with entities that supplied

14    product to that company, it's appropriate for the Commission to

15    investigate.

16         We've subpoenaed Mr. Finazzo in South Bay.  They've

17    refused to comply with the subpoena.  All the court needs to do

18    is to determine whether the Commission is within its authority

19    to investigate, and the court can enforce the subpoenas today.

20         THE COURT:  Well, Mr. Zito suggests that that can't

21    really happen because there are questions of fact that he has

22    to have discovery to understand before he can buy your position

23    or even understand it.  I think his view, and I don't mean to

24    speak for him, is that there was some clandestine plot by the

25    SEC in league with others to look into Mr. Finazzo's finances

83pQsecC

1   long before the 8-K, if that's the document, was filed.  In any

2   event, certainly before November.  Now, I gather you're telling

3   me that that's flat out wrong; that you didn't know anything

4   about Finazzo or, indeed, problems in the company until the

5   filing and/or the firing.

6           MR. GIZZI:  That's correct, your Honor.

7           MR. BIRNBAUM:  Your Honor, just to make the record a

8   bit more clear, when we read for the third or fourth time that

9   Mr. Zito was claiming that, I personally called everybody that

10  had been involved in reviewing anything related to Aeropostale,

11  and each person made clear to me that at no time prior to the

12  second Aeropostale public filing was there any communication

13  whatsoever with Aeropostale.  I think there may have been a bit

14  of confusion when Mr. Zito said nine months, I take it that he

15  meant nine months prior to today.  There's no good faith basis

16  whatsoever that the Commission even spoke with Aeropostale, let

17  alone had any relationship -- clandestine relationship with

18  them before the public information was disclosed.

19          THE COURT:  What's the harm for a little discovery

20  that he suggests he needs?

21          MR. GIZZI:  Well, your Honor, it's clear that what

22  he's trying to do is learn about the Commission's underlying

23  investigation, which is an improper basis for discovery.  He

24  has not yet produced documents.  He has not yet testified.

25  He's asked us who else have you obtained documents for?  You

83pQsecC

1  can see from his discovery request that he's trying to find out

2  who we've obtained documents for and what documents we've

3  obtained.   That's just inappropriate.   The Commission is

4  entitled to conduct its non-public, fact-finding investigation

5  without disclosing information to anybody such as Mr. Finazzo.

6       THE COURT:  Doesn't he have a right to determine

7  whether or not there was some -- your statements and your

8  associates to the contrary, notwithstanding, doesn't he have a

9  right to look behind this and see whether or not this is really

10  either illegal or fruits of some illegal search?

11       MR. GIZZI:  I don't think so, your Honor.  I think it

12  would be nothing more than a fishing expedition.  We have

13  represented that to him.  I'm certain he's learned the same

14  information from Aeropostale.  But it's part of a calculated

15  effort simply to learn as much as possible about the

16  Commission's investigation and to delay this for as long as

17  possible.

18       THE COURT:  You understand his argument that this is a

19  case of first impression?

20       MR. GIZZI:  I understand that he's said that.  I think

21  the notion that -- and the court in the Texas case, OKC,

22  addressed the issue of whether or not, even if there were a

23  violation of an attorney/client privilege, that would not lead

24  to the drastic relief that Mr. Finazzo is seeking to enjoin the

25  Commission's investigation.

83pQsecC

1        It goes beyond Fourth Amendment jurisprudence which

2   talks about suppressing at trial evidence that's obtained as a

3   result of an unreasonable search and seizure.  This is not a

4   constitutional right.  It's the attorney/client communication,

5   and the court in the OKC case concluded that there was no such

6   protection.

7        In any event, again, the whole notion of whatever was

8   done that violated his privilege, if it was, it has nothing to

9   do with the SEC.  The information has been in the public domain

10  for such a long time, if he had an argument, he's waived it.

11  He knew -- Mr. Finazzo knew in November of 2006 that

12  Aeropostale's lawyers had the purportedly privileged document

13  that indicated his outside interest.  He knew in 2006.  They

14  showed him the document.  They asked him about it before they

15  terminated his employment.  He's waited until now -- and

16  there's a case in the Southern District Cassano where the court

17  finds a delay of 12 days, where in fact the Commission waited

18  12 case to request return of a privileged document, that was

19  too long.  Over a year later he's asking for a return of

20  information.  It's too late at this point.  But that is simply

21  irrelevant to the issue because information that is disclosed

22  by a public company, the Commission has to be able to

23  investigate that information.

24        THE COURT:  No matter how they accumulate it.

25        MR. GIZZI:  The Commission didn't do anything wrong to

83pQsecC

1    obtain that information.  It's following up on information that

2    a public company has disclosed that is still to this day out in

3    the public domain.

4         THE COURT:  OK.  Mr. Zito, you want a few last words?

5         MR. ZITO:  If I may, your Honor.  A couple of things:

6    Number one, in terms of discovery, your Honor, one issue could

7    not be clearer.  It is black letter that when there is a claim

8    of privilege on documents, whether it has been an inadvertent

9    disclosure of privileged documents and information, that

10   information, the lawyers who have that information -- I'm

11   talking about lawyers at Aeropostale, I'm talking about lawyers

12   at Katten Muchin, I'm talking about lawyers at Kroll, I'm

13   talking about in-house lawyers at Aeropostale -- all those

14   lawyers are duty-bound to comply with my instructions that they

15   return it to me so I can safeguard it until your Honor or some

16   other court of competent jurisdiction can make a competent

17   determination on that.

18        I've written them.  They've ignored me.  I subpoenaed

19   them.  They've ignored me.  I sent a subpoena in connection

20   with this case, and my understanding is that the SEC told them

21   they didn't have to comply.  This is --

22        MR. BIRNBAUM:  Your Honor, that should just be

23   corrected.  The SEC did no such thing.

24        MR. ZITO:  This is in direct contradiction of my

25   client's rights to have his privileged information be

83pQsecC

1    safeguarded until we know what happened and to whom it was

2    communicated.

3              THE COURT:  Was there some problem about providing his

4    lawyer with this information?

5              MR. GIZZI:  Your Honor, we don't have the privileged

6    information.  We never obtained the documents, and Mr. Finazzo

7    hasn't produced any documents.  Neither has South Bay.

8              MR. ZITO:  Your Honor, in terms of the taint, we don't

9    know what was communicated to the SEC.  We're having hearsay

10   representations to the court at this point.  What we'd like to

11   put Aeropostale and all the other people under oath, and, your

12   Honor, I'm probably sure that they didn't disclose the Angela

13   Siegel e-mail, but I am sure that the contents of that Angela

14   Siegel e-mail are contained in memoranda and that they've been

15   disseminated throughout the orders and everywhere else.

16             I want to say, your Honor, it's a little bit -- it's a

17   little bit sharp to claim, well, I read something in a public

18   disclosure and that's all I'm relying on, when in fact, your

19   Honor, that public disclosure is derived from a

20   misappropriation of the attorney/client privileged information.

21             THE COURT:  But eventually after one iteration after

22   another, it's very difficult, as a judge in this circuit said

23   in an opinion affirming a case of mine, to put the genie back

24   in the bottle.

25             MR. ZITO:  Your Honor, the way it's done is to try and

83pQsecC

1    restore the person to the status quo end.  If your Honor finds

2    that there was an ethical obligation, and, your Honor, I

3    respectfully submit, that this was an egregious ethical

4    operation, and but for, your Honor, that ethical violation, we

5    wouldn't be here today.

6            The proper thing to do when a lawyer sees something

7    like this is to notify the other side, don't read it, don't

8    disclose it in 8-K's, don't disclose it to the world saying,

9    look I found this.  This is what Paul Weiss did in the Scott

10   decision.  Paul Weiss came across these kinds of documents.

11   They notified the other side "we have those documents."  Paul

12   wise didn't read the documents, your Honor.  They had a

13   judicial determination.  So to say, your Honor, that we can

14   rely on what's been now spilled milk rewards the wrongdoer for

15   their egregious professional obligations and their violations

16   thereof.

17           THE COURT:  All right, gentlemen, I will quickly

18   resolve this, but for the moment we'll reserve decision.

19           (Adjourned)

20

21

22

23

24

25

# Exhibit 5

**Opinion and Order by Hon. Harold Baer, Jr.**

**Filed in *SEC v. Finazzo* on March 27, 2008**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------x
                         :

SECURITIES AND EXCHANGE COMMISSION,     :
                         :

              Applicant,          :

                         :     **Misc. Action No. 18-304 (HB)**

       - against -            :

                         :     **OPINION & ORDER**

CHRISTOPHER FINAZZO and          :
SOUTH BAY APPAREL, INC.,           :

                         :

            Respondents.      :

                         :
---------------------------------------------------------------x

**Hon. HAROLD BAER, JR., Part I Judge:**

The Securities and Exchange Commission (the "Commission") has applied to this Court to enforce administrative subpoenas issued to respondents Christopher Finazzo ("Finazzo") and South Bay Apparel, Inc. ("South Bay") in connection with the Commission's non-public investigation, *In the Matter of Aéropostale, Inc.* (the "Aéropostale Investigation"). At the argument on March 25, 2008, Finazzo urged this Court to deny the Commission's application outright or, alternatively, to hold the Commission's application in abeyance while Finazzo conducts discovery in connection with an alleged violation by third parties of his attorney-client privilege. South Bay is essentially ready to comply but awaits this opinion and order. For the reasons set forth below, the Commission's application is GRANTED and the Respondents are hereby ORDERED to comply with the subpoenas issued to them by the Commission staff in the Aéropostale Investigation.

## I. FACTUAL BACKGROUND

On August 24, 2006, while Finazzo was still employed by Aéropostale, Inc. ("Aéropostale") as Executive Vice President and Chief Merchandising Officer, his estate planning lawyer, Angela Siegel ("Siegel"), sent him an email at his Aéropostale email address (the "Attorney Siegel Email"). Finazzo's Mem. in Opp'n to Staff's Mot. to Enforce Subpoena (Mar. 19, 2008) ("Finazzo Mem.") 1; *see* Decl. of Robert J. A. Zito (Mar. 19, 2008) ("Zito Decl.") Ex. A. The Attorney Siegel Email was clearly from a lawyer and contained a standard "Privilege and Confidentiality Notice." Siegel attached to her email a Word document titled "Finazzo Family Assets" that contained a list of Finazzo's and his family's interests in various

business entities, including South Bay, one of Aéropostale's largest vendors. Finazzo Mem. 2.

During September 2006 Aéropostale undertook an internal investigation, which Finazzo claims had nothing to do with him, of certain business expenses. *Id.* In the course of this inquiry, investigators from Kroll, an outside firm retained by Aéropostale's counsel, Katten Muchin Rosenman LLP ("KMR"), found, opened and read the Attorney Siegel Email and its attachment on Finazzo's work computer. *Id.* Kroll revealed the email and attachment to KMR and Aéropostale, but no one told Finazzo. *Id.* at 3. Ultimately, Aéropostale terminated Finazzo's employment "for cause" because Finazzo had not disclosed to the company his or his family's ownership interests in South Bay and perhaps other entities listed on the Attorney Siegel Email attachment. *Id.*

On November 8, 2006, Aéropostale issued a press release and filed with the Commission a Form 8-K that announced it had terminated Finazzo's employment for cause because the company's internal investigation

> revealed that Mr. Finazzo had concealed personal ownership interests in, and served as an officer of, entities affiliated with one of [Aéropostale's] largest vendors, South Bay Apparel, Inc. These activities by Mr. Finazzo and their concealment, constitute conflicts of interest in breach of the Company's Code of Business Ethics, and violations of Mr. Finazzo's employment agreement.

Decl. of Michael D. Birnbaum (Feb. 25, 2008) ("Birnbaum Decl.") Ex. 1. On April 2, 2007, Aéropostale issued its Annual Report for the fiscal year ended February 3, 2007, in which it elaborated on Finazzo's undisclosed conflicts of interest and added that he had executed, without the company's knowledge, a corporate Guaranty Agreement that, had it been enforceable, would have obligated Aéropostale to guarantee any payments due from South Bay to a third-party manufacturer. Birnbaum Decl. Ex. 2.

After reviewing Aéropostale's 10-K disclosure, the Commission issued a Formal Order on January 10, 2008, directing Commission staff to conduct a private investigation of Aéropostale to determine whether any persons or entities had violated the securities laws. Birnbaum Decl. ¶ 4. Pursuant to the Formal Order, on January 16 and 17, 2008, an officer of the Commission served subpoenas on Finazzo (the "Finazzo Subpoena"), calling for the production of documents and testimony, and on South Bay (the "South Bay Subpoena"), seeking the production of documents. Birnbaum Decl. Exs. 4, 5. Both Finazzo and South Bay have expressly refused to comply with the subpoenas. Birnbaum Decl. ¶ 7. On February 27, 2008, the SEC filed the instant application to enforce the Finazzo and South Bay Subpoenas.

2

On March 4, 2008, Finazzo filed a declaratory action against the Commission seeking to enjoin its investigation. *Finazzo v. SEC*, No. 08 Civ. 2176 (S.D.N.Y.) (J. Sullivan). On March 4 and 5, 2008, Finazzo served subpoenas on four nonparties for documents and depositions: (1) Aéropostale, (2) KMR, (3) Kroll, and (4) Deloitte & Touche LLP ("Deloitte"), Aéropostale's auditor, each of which has objected to the subpoena. Zito Decl. Exs. C-F.

## II. STANDARD OF REVIEW

Section 21(c) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78u(c), authorizes the Commission to seek an order from this Court compelling respondents to comply with the subpoenas. "The courts' role in a proceeding to enforce an administrative subpoena is extremely limited." *RNR Enters., Inc. v. SEC*, 122 F.3d 93, 96 (2d Cir. 1997) (quoting *In re McVane*, 44 F.3d 1127, 1135 (2d Cir. 1995)). To have its subpoenas enforced, the Commission "must show (1) that the investigation will be conducted pursuant to a legitimate purpose, (2) that the inquiry may be relevant to the purpose, (3) that the information sought is not already within the Commission's possession, and (4) that the administrative steps required . . . have been followed . . . ." *Id.* (quoting *United States v. Powell*, 379 U.S. 48, 57-58 (1964)). "An affidavit from a government official is sufficient to establish a prima facie showing that these requirements have been met." *Id.* at 97 (quoting *McVane*, 44 F.3d at 1136).

A respondent who seeks to defeat enforcement of a Commission subpoena bears the burden of demonstrating that the subpoena is unreasonable or was issued in bad faith or for an "improper purpose," or that compliance would be *"unnecessarily* burdensome." *Id.* at 97 (quoting *SEC v. Brigadoon Scotch Distrib. Co.*, 480 F.2d 1047, 1056 (2d Cir. 1973), *cert. denied*, 415 U.S. 915 (1974)).

## III. DISCUSSION

The Declaration of Michael D. Birnbaum ("Birnbaum"), an attorney in the Commission's Enforcement Division, and its exhibits are sufficient to establish a *prima facie* showing that the Commission has met the subpoena enforcement requirements. First, the Aéropostale investigation is conducted pursuant to a legitimate purpose, to determine whether any individual or entity violated the securities laws in connection with Aéropostale's failure to disclose in its public filings Finazzo's and his family's interests in and dealings with certain of its vendors, including South Bay. Decl. of Birnbaum (Feb. 25, 2008) ("Birnbaum Decl.") ¶ 3. Section 21(a)(1) of the Exchange Act, 15 U.S.C. § 78u(a)(1), expressly authorizes the Commission to investigate suspected violations of the Exchange Act and the rules thereunder. Second, the

3

Finazzo and South Bay Subpoenas are relevant to the investigation's legitimate purpose because they request information about Finazzo's relationships and dealings with South Bay. Birnbaum Decl. ¶¶ 5-6, Exs. 4, 5. Neither respondent has objected to the subpoenas on the ground that the information sought is irrelevant. Third, the Commission does not possess the information sought from Finazzo and South Bay, Birnbaum Decl. ¶¶ 7, 13, 20. Fourth, the Commission followed the required administrative steps because an officer designated by the Commission issued the subpoenas, which were properly served. Birnbaum Decl. ¶¶ 4, 8, 16.

Because the Commission has made a *prima facie* showing that the subpoenas should be enforced, Finazzo and South Bay bear the burden of demonstrating that the subpoenas are unreasonable or issued in bad faith or for an improper purpose, or that compliance would be unnecessarily burdensome. Finazzo appears to assert that the subpoenas were issued in bad faith or for an improper purpose. His sole argument is that the alleged violations of attorney-client privilege by Aéropostale, KMR and Kroll "tainted" the Commission's investigation.[1] Finazzo reasons that if Aéropostale, KMR and Kroll had not violated the attorney-client privilege by reading and acting upon the Attorney Siegel Email and attachment, Aéropostale would not have fired him or disclosed his related-party transactions and the Commission would not have commenced its investigation or issued the subpoenas.

No party cites a case in this Circuit, and there appears to be none, that has decided the validity of an administrative subpoena issued by an agency in response to public disclosures founded on allegedly privileged information. Indeed, Finazzo suggests his argument raises a question of first impression. Given the courts' "extremely limited role" in proceedings to enforce administrative subpoenas and the burden borne by Finazzo, I find that Finazzo has not shown that the Finazzo or South Bay Subpoenas were issued in bad faith or for an improper purpose.

Several cases upon which Finazzo relies involved situations where a party sought to obtain privileged information or to admit privileged information into evidence. *See Surgical Design Corp. v. Correa*, 21 A.D.3d 409, 410 (N.Y. App. Div. 2005) (suppression of attorney-client privileged documents); *Manuf. & Traders Trust*, 132 A.D.2d 392, 398 (N.Y. App. Div. 1987) (protective order covering attorney-client privileged documents); *United States v. Longo*, 70 F. Supp. 2d 225, 266 (W.D.N.Y. 1999) (no evidence of privilege violation where party only

---

[1] That the alleged violations of attorney-client privilege "tainted" the Commission's investigation is also the gravamen of Finazzo's declaratory action before Judge Sullivan.

speculated that Government agents may have provided prosecutor with apparently non-privileged information that they obtained through knowledge of privileged communication); *SEC v. Forma*, 177 F.R.D. 516, 526-27 (S.D.N.Y. 1987) (discussing alternative approaches when Commission breaks attorney-client privilege); *In re Asia Global Crossing, Ltd.*, 322 B.R. 247, 253 (Bankr. S.D.N.Y. 2005) (trustee in bankruptcy proceeding sought documents that may have been subject to attorney-client privilege). Finazzo points to other case law showing that the proper remedy of a breach of attorney-client privilege is to restore the injured party as close as possible to the *status quo ante*. *See, e.g., Church of Scientology v. United States*, 506 U.S. 9, 13 (1992).

Here, however, the Commission expressly seeks *non-privileged* information in the Finazzo and South Bay Subpoenas.[2] On January 28, 2008, Birnbaum, on behalf of the Commission, sent a letter to Finazzo's counsel explaining that "the Commission does not seek privileged material but, rather, seeks non-privileged documents along with a description of any materials withheld on the basis of any privilege" and requesting "non-privileged documents and a privilege log" and for Finazzo to "testify regarding non-privileged matters." Birnbaum Decl. ¶ 10, Ex. 8. On February 4, 2008, Birnbaum sent a letter to South Bay's counsel to clarify that the Commission did not expect South Bay to produce privileged documents, but did "expect that South Bay will produce all non-privileged, responsive documents." *Id.* ¶ 19, Ex. 14.

Finazzo further argues that, even if the Finazzo and South Bay Subpoenas seek only non-privileged information, that information would be suppressed as evidence under a "fruit of the poisonous tree" doctrine. First, the admission or suppression of evidence is not before the Court in this subpoena enforcement proceeding. Second, Finazzo has not cited any authority that would preclude the Commission from relying on the non-privileged information sought by the Finazzo and South Bay Subpoenas. *In re Beiny*, 129 A.D.2d 126, 141 (N.Y. App. Div. 1987), upon which Finazzo relies, is distinguishable on its facts because it involved "willful disregard of procedural rules, deceit, and the covert acquisition of otherwise unobtainable privileged material" by attorneys in a trust accounting proceeding. The court suppressed the privileged material and disqualified the attorneys because in light of the extent of privileged information it would be "virtually impossible . . . to keep the tainted information which [the attorneys] possess[] from surreptitiously finding its way back into the proceeding." *Id.* at 142.

---

[2] Moreover, the Commission claims it does not possess the purportedly privileged Attorney Siegel Email and attachment. Commission's Reply Mem. (Mar. 24, 2008) 5.

5

In *In re Shell Oil Refinery*, 143 F.R.D. 105, 107-08 (E.D. La. 1992), another case cited by Finazzo, a plaintiff circumvented the normal discovery process by surreptitiously and inappropriately obtaining the defendant's proprietary documents from one of defendant's employees without the defendant's knowledge. The court, however, expressly permitted plaintiff to use documents that were "publicly available." *Id.* at 109. Here, the Commission has followed proper subpoena procedures and seeks non-privileged information stemming from Aéropostale's public disclosures.

*SEC v. OKC Corp.*, 474 F. Supp. 1031, 1039 (N.D. Tex. 1979), upon which Finazzo relies, actually supports the SEC's position. In that case, the respondent argued that the Commission's subpoena was unenforceable because the Commission had used a confidential report prepared by the respondent's outside counsel to further its investigation. The respondent argued that the Commission, "by using the report as a basis for developing independent, unprivileged evidence, will effectively undermine that privilege." *Id.* The court nevertheless enforced the Commission's subpoena, distinguishing between (1) improper *government* intrusion into one's privilege and (2) improper intrusion by a *private party* working without government cooperation. *Id.* at 1039-40. Here, the Commission did not intrude into Finazzo's privilege, or Aéropostale's internal investigation, where the allegedly privileged document surfaced, occurred prior to the disclosures that triggered the Commission's investigation. *See also United States v. Bonnell*, 483 F. Supp. 1070, 1079, 1081 (D. Minn. 1979), (holding that "respondents may not resist production of unprivileged evidence [to the IRS] on the ground that the summons is based on work product" and observing that "the IRS is conducting an investigation, not introducing evidence at a trial" and "[a]dministrative agencies have broad powers to gather information . . . regardless of whether the information collected would be admissible at trial").

Therefore, because the Commission is not seeking privileged information and is merely conducting an investigation, not introducing evidence at trial, Finazzo has not shown that the Court should refuse to enforce the Finazzo and South Bay Subpoenas. This Court need not decide whether the Attorney Siegel Email was privileged or whether Finazzo waived the privilege by receiving the email at his Aéropostale email address. It thus would serve no purpose to hold the Commission's application in abeyance while Finazzo engages in limited discovery to determine whether the Attorney Siegel Email is privileged, or whether the Commission has received privileged documents from other sources. Such discovery would be irrelevant to this subpoena enforcement proceeding.

6

Finally, Finazzo's argument that "the Commission is complicit in the corporate investigation that Aéropostale engaged in which led to the violation of the attorney-client privilege" is unsupported. *See* Finazzo Mem. at 20. It is undisputed that the Commission publicly encourages corporations to engage in self-regulation and to disclose any unlawful conduct uncovered by internal investigations. It is something else to allege that the Commission encourages, or condones, internal corporate investigations that violate an employee's attorney-client privilege.

## IV. CONCLUSION

Therefore, for the foregoing reasons, the Commission's application is GRANTED and the Respondents are hereby ORDERED to comply with the subpoenas issued to them by the Commission staff in the Commission's nonpublic investigation *In the Matter of Aéropostale, Inc.* (Internal File No. NY-7802), and to do so within ten days from the date hereof.

**IT IS SO ORDERED.**
**New York, New York**
March 26, 2008

U.S.D.J.

# Exhibit 6

**Opinion and Order by Hon. Kimba M. Wood**

**Filed in *SEC v. Finazzo* on April 9, 2008**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------X

SECURITIES AND EXCHANGE
    COMMISSION,

              Applicant,

    -against-

CHRISTOPHER FINAZZO, and
    SOUTH BAY APPAREL, INC.,

           Respondents.

------------------------------------X

M18-304 (KMW)

<u>OPINION AND ORDER</u>

KIMBA M. WOOD, U.S.D.J.:

    Respondent Christopher Finazzo ("Respondent") moves, pursuant to Federal Rule of Civil Procedure 62(c), for a stay of an Order, dated March 26, 2008, issued by Judge Harold Baer, Jr., ordering him to comply with an administrative subpoena issued by the Securities and Exchange Commission ("SEC"). Finazzo requests that Judge Baer's March 26, 2008 Order be stayed pending appeal of the order to the Second Circuit. The SEC opposes the motion. In accordance with the Court's Order in this case, dated April 8, 2008, and for the reasons set forth below, the motion is denied.

**BACKGROUND**

    A more detailed description of the facts underlying this motion are set forth in Judge Baer's March 26, 2008 Order (the "March 26 Order"), familiarity with which is assumed.

    On August 24, 2004, while Respondent was still employed by Aeropostale, Inc., as Chief Merchandising Officer and Executive

1

Vice President, his estate planning lawyer, Angela Siegel, sent
him an email at his work email address, attaching a Word document
titled "Finazzo Family Assets" (the "Siegel email").  The Word
document contained a list of Respondent's and his family's
interests in various business entities, including South Bay
Apparel, Inc., one of Aeropostale's largest vendors at the time.

In September 2006, Aeropostale performed an internal
investigation into certain of its business expenses.  In the
course of the investigation, the outside investigators retained
by Aeropostale found, opened, and read the Siegel email.  The
Siegel email was then disclosed to Aeropostale, and Respondent
was subsequently terminated for cause based partially on the
information contained in the Siegel email and attachment.

On November 8, 2006, and April 2, 2007, Aeropostale filed
its Form 8-K and Form 10-K, respectively.  (Birnbaum Decl. Exs. 1
& 2.)  In these public disclosures, Aeropostale disclosed that
Respondent had (1) concealed personal ownership interests in, and
service as an officer of, entities affiliated with South Bay, (2)
without authorization, executed a corporate guaranty agreement on
behalf of South Bay, and (3) failed to disclose unauthorized
business relationships and transactions between his immediate and
extended family members and certain of Aeropostale's other
vendors.  (Opp'n 2-3.)

Upon learning of these disclosures, the SEC commenced a

2

nonpublic investigation into Aeropostale (the "Aeropostale Investigation"). (Opp'n 3.) On January 10, 2008, the SEC issued an Order Directing Private Investigation and Designating Officers to Take Testimony in the Aeropostale Investigation (the "Formal Order"). (Birnbaum Decl. 4.) Pursuant to the Formal Order, the SEC issued a subpoena to Respondent on January 16, 2008, directing him to produce non-privileged documents relevant to the investigation, and calling him to testify on a certain date (the "Finazzo subpoena"). (Birnbaum Decl. Exs. 4.) Respondent communicated to the SEC that he would not comply with the Finazzo subpoena absent a court order.

On February 27, 2008, the SEC filed an order to show cause seeking enforcement of the Finazzo subpoena. (Opp'n 4.) On March 26, 2008, Judge Baer, sitting Part I, ruled in favor of the SEC, and ordered Respondent to comply with the Finazzo subpoena by April 9, 2008. (Zito Decl. Ex. A.) On April 2, 2008, Respondent filed this motion for a stay of the March 26 Order pending appeal.

**DISCUSSION**

Respondent moves for a stay pending appeal pursuant to Rule 62(c). Fed. R. Civ. P. 62(c) (2008). In determining whether to grant a stay under Rule 62(c), the Court must consider (1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits, (2) whether the applicant will

3

be irreparably injured absent a stay, (3) whether issuance of the stay will substantially prejudice the other parties interested in the proceeding, and (4) the public interest. <u>In re World Trade Center Disaster Site Litig.</u>, 503 F.3d 167, 170 (2d Cir. 2007). The standard for granting a stay pending appeal is flexible, in that a weak showing on one factor may be counterbalanced by a strong showing on others. <u>Mohammed v. Reno</u>, 309 F.3d 95, 101 (2d Cir. 2002). However, the "burden of establishing a favorable balance of these factors is a heavy one and more commonly stay requests will be denied." <u>Barcia v. Sitkin</u>, No. 79 Civ. 5831, 2004 WL 691390, at *1 (S.D.N.Y. Mar. 31, 2004).

Upon consideration of the stay factors, the Court concludes that a stay of the March 26 Order pending appeal is unwarranted.

## I. RESPONDENT HAS FAILED TO DEMONSTRATE A LIKELIHOOD OF SUCCESS ON THE MERITS.

With respect to the likelihood of success on the merits factor, the Second Circuit has held that "[t]he necessary 'level' or 'degree' of possibility of success will vary according to the court's assessment of the other [stay] factors." <u>Mohammed</u>, 309 F.3d at 101 (quoting <u>Washington Metro. Area Transit Comm'n v. Holiday Tours</u>, 559 F.2d 841, 843 (D.C. Cir. 1977)). In particular, "[t]he probability of success that must be demonstrated is inversely proportional to the amount of irreparable injury [respondent] will suffer absent the stay." <u>Michigan Coalition of Radioactive Material Users, Inc. v.</u>

4

Griepentrog, 945 F.2d 150, 153 (6th Cir. 1991) (citation omitted); see also Ofosu v. McElroy, 98 F.3d 694, 703 (2d Cir. 1996) (noting that the four stay factors must be "weigh[ed]" against one another).

In this case, Respondent seeks to prevent enforcement of the Finazzo subpoena. A person seeking to prevent enforcement of an SEC subpoena bears the burden of demonstrating that the subpoena is unreasonable, issued in bad faith or for an "improper purpose," or that compliance would be "unnecessarily burdensome." RNR Enters., Inc. v. SEC, 122 F.3d 93, 97 (2d Cir. 1997) (quoting SEC v. Brigadoon Scotch Distrib. Co., 480 F.2d 1047, 1056 (2d Cir. 1973)). Here, Respondent argues that the Finazzo subpoena was issued in bad faith or for an improper purpose because it was issued pursuant to an investigation triggered by purportedly privileged information contained in the Siegel email, which was obtained and then disclosed to the SEC by Aeropostale in violation of the privilege.[1] Although the precise issue raised by Respondent is one of first impression in the Second Circuit, the Court concludes that Respondent is unlikely to satisfy his burden of showing that the Finazzo subpoena was issued in bad faith or for an improper purpose.

In SEC v. OKC Corp., 474 F. Supp. 1031 (N.D. Tex. 1979), a

---

[1] In analyzing this factor, the Court assumes arguendo that the Siegel email and its contents are in fact protected by the attorney-client privilege.

5

case with facts similar to the instant case, respondent argued that an SEC subpoena was unenforceable because it was prepared using a privileged report that was disclosed to the SEC by another private party in violation of the privilege. The court enforced the subpoena over respondent's objections, observing that precluding the SEC from using the report would not deter future violations of the privilege. Id. at 1039. The court elaborated that because the SEC "innocently learn[ed]" of the privileged report from a private actor, the only conduct to be deterred is the disclosure of privileged information by private actors to the government. Id. However, because private actors generally do not share the government's law enforcement goals, a rule precluding "innocent" government agencies from using such information in enforcement proceedings would not deter private actors from disclosing the privileged information in violation of the privilege. Id. at 1039-40 (citing Elkins v. United States, 364 U.S. 206, 222 (1960)). Thus, the "marginal effectiveness of denying use to an innocent agency [of] reports produced not by a state [actor] but by a private citizen is not justified."[2] Id.

---

[2] Respondent argues that SEC v. OKC Corp. is inapplicable to this case because the private actor in OKC Corp. rightfully possessed the privileged information, whereas Aeropostale wrongfully possessed the Siegel email. (Zito Decl. Ex. D at 20.) Respondent's distinction misses the point. As described above, OKC Corp. found that a rule excluding wrongfully disclosed information from enforcement proceedings would not deter private actors from disclosing that information to the government in violation of the privilege, because private actors do not share the government's interest in using that information for law enforcement purposes. OKC Corp., 474 F. Supp. at

6

at 1040.

In <u>United States v. Bonnell</u>, 483 F. Supp. 1070 (D. Minn. 1979), respondent similarly sought to resist an IRS summons on the ground that the summons was based on work product that was wrongfully disclosed to the IRS by another private party. The court rejected respondent's argument, reasoning that (1) an exclusionary rule precluding the use of fruits of work product is unwarranted in this setting because the IRS was conducting an administrative investigation, and not a criminal trial, <u>id.</u> at 1079-80, (2) an administrative investigation, such the one being conducted by the IRS in that case, is similar to a grand jury proceeding, and investigators in both types of proceedings have broad authority to use information derived from evidence obtained in violation of individual privacy rights, <u>id.</u> at 1080-81 (citing <u>United States v. Calandra</u>, 414 U.S. 338, 353-55 (1974)), and (3) precluding the IRS from using information derived from wrongfully obtained evidence would impose a substantial cost on the public interest by hampering the IRS' ability to collect relevant evidence, while only marginally advancing the goals of the work product doctrine, <u>id.</u> at 1081-82 (citing <u>OKC Corp.</u>, 474 F. Supp. at 1040).

---

1039.  Thus, whether a private actor rightfully or wrongfully possessed the privileged material before disclosing it to the government is irrelevant - precluding the government from using the privileged material for law enforcement purposes would not deter that private actor from violating the privilege in the first instance.

7

In light of this authority, and given the Court's "extremely limited" role in proceedings to enforce administrative subpoenas, RNR Enters., Inc., 122 F.3d at 96, the Court concludes that Respondent is unlikely to prove that the subpoena was issued in bad faith or for an improper purposes. Therefore, Respondent has failed to show a likelihood of success on the merits.[3]

## II. RESPONDENT WOULD NOT SUFFER IRREPARABLE INJURY ABSENT A STAY OF JUDGE BAER'S ORDER PENDING APPEAL.

Respondent argues that absent the stay he would be irreparably injured because compliance with the Finazzo subpoena would (1) moot his appeal, and (2) obligate him to produce documents that he contends he has no duty to produce. Respondent's arguments are unavailing.[4]

First, even if he is forced to comply with the Finazzo subpoena, Respondent's appeal of the March 26 Order would not be moot. See, e.g., Church of Scientology v. United States, 506

---

[3] Respondent argues that because the merits issue presents a question of first impression in the Second Circuit, the likelihood of success on the merits factor tips in his favor. (Mem. Law 5-6.) However, the cases Respondent cites for this proposition hold only that a court may issue a stay pending appeal when it has ruled on an "admittedly difficult legal question, and when the equities of the case suggest that the status quo should be maintained." Barcia, 2004 WL 691390, at *2 (emphasis added). Thus, the novelty of the legal issue on the merits is not dispositive of the likelihood of success on the merits factor.

[4] To the extent that Respondent is arguing that absent a stay he would be forced to produce privileged documents, this argument is flawed. (Mem. Law 3-4.) The SEC has made clear that it seeks only non-privileged documents in its subpoena. (Opp'n 7; Birnbaum Decl. Ex. 4.)

8

U.S. 9, 12-13 (1992) (holding that respondent forced to comply with an IRS subpoena still had the right to appeal the order ordering his compliance); FDIC v. Garner, 126 F.3d 1138, 1142 (9th Cir. 1997) (finding that appellate court may still hear appeal even though the district court refused to grant a stay pending appeal of an order enforcing compliance with administrative subpoenas, because the appellate court could compel the return of any improperly obtained documents).

Second, the compelled production of non-privileged documents in response to an administrative subpoena does not constitute irreparable injury warranting a stay pending appeal. See, e.g., United States v. Diversified Group, Inc., No. M18-304, 2002 WL 31812701, at *1 (S.D.N.Y. Dec. 13, 2002) (finding no irreparable injury where respondent claimed he would be forced to comply with an IRS summons, because an appeals court could fashion "some form of meaningful relief" should it decide to reverse the enforcement of the summons) (quoting Church of Scientology, 506 U.S. at 12); see also United States v. Sweet, No. 80-5046, 1980 WL 4702, at *1 (5th Cir. Jan. 31, 1980) (stating that "the alleged injury is not irreparable for nothing contained herein, of course, constitutes a ruling concerning the admissibility or inadmissibility in evidence of any documents that may be produced pursuant to the summons or of any evidence that might be discovered as a result of their production"); United States v. Bright, No. 07-00311,

9

2008 WL 351215, at *3 (D. Haw. Feb. 7, 2008) ("The mere requirement to produce documents while an appeal is pending does not constitute sufficient harm to warrant a stay.").

Therefore, the Court finds that Respondent would not suffer irreparable injury absent a stay pending appeal.[5]

## III. THE PREJUDICE TO THE OTHER PARTY FACTOR IS EQUIVOCAL.

The SEC contends that a stay on the March 26 Order pending appeal would prejudice their investigation because they would be precluded from obtaining and using the information requested by the Finazzo subpoena. (Opp'n 9-10.) To the extent that the requested information is essential to the continued progress of the Aeropostale Investigation, a stay of enforcement of the March 26 Order may constitute substantial prejudice to the SEC. See, e.g., United States v. Judicial Watch, Inc., 241 F. Supp. 2d 15, 18 (D.D.C. 2003) (noting that a stay of enforcement pending appeal may halt the progress of an administrative investigation, and therefore prejudice the government agency).

However, the SEC has not indicated that the requested

---

[5] Respondent cites a number of cases holding that the compelled production of documents constitutes irreparable injury. See, e.g., First City, Texas-Houston, N.A. v. Rafidain Bank, 131 F. Supp. 2d 540, 543 (S.D.N.Y. 2001); Providence Journal Co. v. FBI, 595 F.2d 889, 890 (1st Cir. 1979); Maine v. U.S. Dep't of Interior, No. Civ. 00-122-B-C, 2001 WL 98373 (D. Me. Feb. 5, 2001); E.E.O.C. v. Quad/Graphics, Inc., 875 F. Supp. 558, 560 (E.D. Wis. 1995). However, these cases offer only conclusory statements on the issue of irreparable injury, and do not address the persuasive analysis in the cases the Court cites above, holding that compelled disclosure pursuant to an administrative subpoena does not constitute irreparable injury for purposes of a stay pending appeal.

10

information is in fact essential to the progress of the
Aeropostale investigation, suggesting that it may be possible for
the SEC to pursue its investigation without immediate access to
the requested information.  In that regard, mere delay in
receiving the information requested does not constitute
substantial prejudice.  See, e.g., E.E.O.C. v. Quad/Graphics,
Inc., 875 F. Supp. 558, 560 (E.D. Wis. 1995) (finding that "a
delay in [a government agency's] receipt of information that it
requested" does not constitute "substantial harm").

Given the uncertainty regarding the SEC's need for the
requested information, the Court finds the prejudice to other
parties factor equivocal.

IV.  **RESPONDENT HAS FAILED TO DEMONSTRATE THAT THE PUBLIC
INTEREST IS BETTER SERVED BY GRANTING A STAY PENDING APPEAL.**

Respondent argues that the public interest factor weighs in
favor of a stay because "[t]he misappropriation of privileged
information and attorneys' breaches of professional obligations
in connection with such misappropriation are undeniably matters
of grave public concern."  (Reply 7.)  However, granting a stay
in this case would not advance the public's interest in the
attorney-client privilege because (1) compliance with the Finazzo
subpoena would not require Respondent to disclose any privileged
communications, and (2) as the court in OKC Corp. reasoned,
preventing an innocent government agency from using information
derived from otherwise privileged communications is not an

11

effective deterrent against future violations of the privilege,
OKC Corp., 474 F. Supp. at 1039-40.

Although Respondent has failed to demonstrate that a stay
pending appeal would serve the public interest, the Court
observes that there is a significant public interest in allowing
government agencies, like the SEC, to enforce federal securities
laws. Bright, 2008 WL 351215, at *3 (observing that in actions
brought by federal agencies, "the government's interest is in
large part presumed to be the public interest") (citing United
States v. Rural Elec. Convenience Cooperative Co., 922 F.2d 429,
440 (7th Cir. 1991)). The Court therefore finds that the public
interest factor does not weigh in favor of granting the requested
stay pending appeal.

              *     *     *     *     *

The Court concludes that, on balance, the stay factors weigh
against granting Respondent's request for a stay of the March 26
Order pending appeal. Respondent has failed to show a strong
likelihood of success on the merits, that he would suffer
irreparable injury absent a stay, and that the public interest
favors granting a stay. Although it is unclear whether the SEC
would suffer substantial prejudice upon imposition of a stay,
Respondent's weak showing on the other three factors persuades
the Court that a stay pending appeal is unwarranted in this case.

                         12

**CONCLUSION**

For the reasons set forth above, the Court finds that a stay of the March 26 Order pending appeal is unwarranted. Accordingly, Respondent's motion is denied, except that the Court hereby stays enforcement of the March 26 Order until April 15, 2008, in order to provide Respondent the opportunity to make his stay application to the Second Circuit.

SO ORDERED.

Dated:    New York, New York
          April __9__, 2008

_Kimba M. Wood_
Kimba M. Wood
United States District Judge
Part One

13