Robert J.A. Zito
Kenneth S. Levine
Laura Anne Reeds
CARTER LEDYARD & MILBURN LLP
2 Wall Street
New York, New York 10005
(212) 732-3200
*Attorneys for Plaintiff Christopher L. Finazzo*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------X

CHRISTOPHER L. FINAZZO,                                  :       Index No. 08-cv-02176 (RS)
                                                        :
                                    Plaintiffs          :
                                                        :       **DECLARATION OF LAURA**
                        v.                              :       **ANNE REEDS IN OPPOSITION**
                                                        :       **TO DEFENDANT'S MOTION**
SECURITIES AND EXCHANGE                                 :       **TO DISMISS**
COMMISSION,                                             :
                                                        :
                                    Defendant.          :
                                                        :
                                                        :
                                                        :
---------------------------------------------------------------X

        LAURA ANNE REEDS hereby declares, under penalty of perjury, that the

following is true and correct:

        1.      I am an associate at the law firm of Carter Ledyard & Milburn LLP, located at 2

Wall Street, New York, New York 10005, which represent Plaintiff Christopher L. Finazzo in

the above-captioned action. I submit this declaration in opposition to Defendant's Motion to

Dismiss.

        2.      Attached hereto as Exhibit A is a true and correct copy of the Complaint for

Declaratory and Injunctive Relief, filed in this Court on March 4, 2008.

        3.      Attached hereto as Exhibit B is a true and correct copy of the Memorandum of

Law in Support of Securities and Exchange Commission's Application for an Order to Show

Cause and For an Order Requiring Obedience to Subpoenas, dated February 27, 2008, in the related case, <u>Securities and Exchange Commission v. Christopher Finazzo and South Bay Apparel, Inc.</u>, No. M18-304 (S.D.N.Y.).

4.      Attached hereto as Exhibit C is a true and correct copy of the Order of Judge Harold Baer, Jr., issued on March 26, 2008 in the related case, <u>Securities and Exchange Commission v. Christopher Finazzo and South Bay Apparel, Inc.</u>, No. M18-304 (S.D.N.Y.).


Executed on June 13, 2008.

LAURA ANNE REEDS

6341414.1

# Exhibit A

JUDGE SULLIVAN

Robert J.A. Zito
Michael Shapiro
Alan S. Lewis
Kenneth S. Levine
Laura Anne Reeds

CARTER LEDYARD & MILBURN LLP
2 Wall Street
New York, NY 10005
Tel: (212) 732-3200
Fax: (212) 732-3232
*Attorneys for Plaintiff Christopher Finazzo*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK



08 CV 02176

RECEIVED
MAR 0 4 2008
U.S.D.C. S.D.N.Y.
CASHIERS

------------------------------------------------X

CHRISTOPHER L. FINAZZO,

                      Plaintiff,

      - against -

SECURITIES AND EXCHANGE
COMMISSION,

                      Defendant.

------------------------------------------------X

**COMPLAINT FOR
DECLARATORY
AND INJUNCTIVE RELIEF**

       Plaintiff, Christopher L. Finazzo, by his attorneys, Carter Ledyard & Milburn LLP, as

and for his Complaint against the defendant respectfully alleges, based upon information and

belief, as follows:

### PRELIMINARY STATEMENT

       1.    This lawsuit challenges the misappropriation of privileged communications

between plaintiff, Christopher L. Finazzo, and his attorney, the subsequent use and disclosure of

such information in public disclosures, and the use of such information as the basis of an

investigation by the defendant, the Securities and Exchange Commission.

6277204.5

### JURISDICTION AND VENUE

2.    This case presents a federal question within this Court's jurisdiction under 28 U.S.C. § 1331. The Court also has jurisdiction under the Administrative Procedures Act, 5 U.S.C. § 702. The Court has authority to grant declaratory relief pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201 et seq. The Court has authority to grant injunctive relief pursuant to Rule 65 of the Federal Rules of Civil Procedure. Venue is proper in this district under 28 U.S.C. § 1391(e).

### PARTIES

3.    Plaintiff, Christopher L. Finazzo ("Mr. Finazzo") is a citizen of the State of New York.

4.    Defendant, the Securities and Exchange Commission (the "Commission") is an agency of the United States government.

### FACTUAL ALLEGATIONS

5.    From February 1, 2004 to November 7, 2006, Mr. Finazzo was employed by Aéropostale, Inc. ("Aéropostale" or "the Company"), a publicly traded clothing design company. During this time, Mr. Finazzo became Aéropostale's Executive Vice President and Chief Merchandizing Officer. Mr. Finazzo was also employed for many years by Aéropostale's predecessor entities in interest.

6.    Under Mr. Finazzo's leadership, the Company was transformed from what had been a failing division of Macy's to a hugely successful, independent public company. Between 1996 and 2007, Aéropostale grew from approximately 80 to over 700 stores, its annual sales increased from less than $124 million to $1.4 billion, and its profits surged from $17 million to $455 million.

62772045                                    - 2 -

7.    On August 24, 2006, when Mr. Finazzo was still employed by Aéropostale, his personal lawyer, Angela Siegel ("Attorney Siegel"), sent an email to Mr. Finazzo at his Aéropostale email address (the "Attorney Siegel Email"). Attorney Siegel, a trusts and estates lawyer, was then representing Mr. Finazzo in the context of his estate planning.

8.    The Attorney Siegel Email, its contents and attachment, was sent from an address clearly identified as belonging to an attorney: "lawoffice@angelasiegel.com." The closing lines indicated that it was written by "Angela Siegel, Esq., Law Office of Angela Siegel," and the following statement also appears on the email:

> ***** PRIVILEGE AND CONFIDENTIALITY NOTICE *****
> The information contained in this e-mail is confidential and may be protected by the attorney-client privilege and/or work product doctrine. It is intended for the use of the named recipient only. **If you have received this communication in error, please notify the sender immediately by reply to this e-mail or by telephone.**

(emphasis added).

9.    Attorney Siegel attached to her email a Word document titled "Finazzo Family Assets" (the "FFA Document") that she had prepared based upon confidential information given to her by Mr. Finazzo during meetings held as part of her estate planning advice to Mr. Finazzo. The document consists of a list of Mr. Finazzo's assets, including interests in various business entities. The language of the Attorney Siegel Email, its contents and attachment, clearly indicated that Mr. Finazzo communicated the information on the FFA Document to Attorney Siegel for the sole purpose of seeking legal advice.

10.    During September 2006, Aéropostale undertook an internal investigation that focused on whether hotel expenses during an Aéropostale conference in Las Vegas earlier that year had been properly charged to the Company. The investigation had nothing to do with Mr. Finazzo. The investigation was supervised by Aéropostale's outside counsel, Katten Muchin

Rosenman LLP ("KMR"), which, in turn, retained the services of Kroll, Inc. ("Kroll"), a

subsidiary of Marsh & McLennan Companies, Inc., to assist in the investigation.

11.    While reviewing emails in connection with their investigation, Kroll investigators,

supervised by KMR attorneys, found, opened, and read the confidential and privileged Attorney

Siegel Email, its contents and attachment, that had been sent to Mr. Finazzo.

12.    N.Y. County Lawyers' Ass'n Comm. on Prof. Ethics, Op. No. 730 (July 19, 2002)

("Opinion 730") states:

> A lawyer has ethical obligations upon receipt of inadvertently
> disclosed privileged information. If a lawyer receives information
> which the lawyer knows or believes was not intended for the lawyer
> and contains secrets, confidences or other privileged matter, the
> lawyer, upon recognition of same, shall, without further review or
> other use thereof, notify the sender and (insofar as it shall have been
> in written or other tangible form) abide by sender's instructions
> regarding return or destruction of the information.

13.    Upon discovery of the Attorney Siegel Email, its contents and attachment, neither

Kroll, KMR, nor Aéropostale lawyers notified Attorney Siegel that they had stumbled upon her

privileged communication and, as a result, failed to comply with their ethical obligations. Nor

did they notify Mr. Finazzo that his privileged email had been opened. Furthermore, they took

no steps to segregate and protect the privileged email from further unauthorized dissemination.

Rather, they kept their discovery secret from both the sender, Attorney Siegel, and the recipient,

Mr. Finazzo, while they conferred and discussed among themselves about the email, its

privileged contents, and their plan of action vis-à-vis Mr. Finazzo.

14.    The Attorney Siegel Email, its contents and attachment, contained information

about Mr. Finazzo's financial interests which Aéropostale contends should have been disclosed

internally at the Company. Aéropostale eventually used the Attorney Siegel Email, its contents

and attachment, as the sole basis on which to terminate Mr. Finazzo's employment.

15.    On November 7, 2006, Edward M. Slezak, Esq., Aéropostale's General Counsel, and Julian Geiger, Aéropostale's President and CEO, called Mr. Finazzo into an unscheduled meeting. Mr. Finazzo was given no notice or the opportunity to consult with an attorney. Messrs. Slezak and Geiger showed Mr. Finazzo the FFA Document and asked him about his interests in the business entities listed on the FFA Document. They concealed that they had obtained the information through privileged communications between Mr. Finazzo and his attorney. Messrs. Slezak and Geiger then told him that he had breached his employment agreement and was being fired for alleged conflicts of interests.

16.    On November 8, 2006, Aéropostale issued a press release stating that Mr. Finazzo was fired because of his ownership interest in business entities listed on the FFA Document (and attached to the Attorney Siegel Email):

> Aéropostale (NYSE: ARO) . . . Mr. Finazzo concealed personal ownership interests in, and served as an officer of, entities affiliated with one of the Company's primary vendors, South Bay Apparel, Inc. These activities, and their concealment, constitute conflicts of interest in breach of the Company's Code of Business Conduct and Ethics and violations of Mr. Finazzo's employment agreement.

17.    During the week of June 25, 2007, Mr. Finazzo's counsel, Carter Ledyard & Milburn LLP ("CL&M"), for the first time obtained copies of the Attorney Siegel Email and the FFA Document from Attorney Siegel. Until then, CL&M did not know that the Attorney Siegel Email, its contents and attachment, was the source of the information that Aéropostale had used as the basis to terminate Mr. Finazzo's employment and to make its public statements about Mr. Finazzo. Mr. Finazzo and CL&M also did not know that Aéropostale's attorneys had continuously concealed such fact contrary to their ethical obligations.

18.    On June 29, 2007, upon review of the Attorney Siegel Email and the attached

FFA Document, CL&M sent a written demand to KMR that they take the following corrective

actions:

1.    Cease and desist from any further invasions of Mr. Finazzo's statutory and common law privileges, including without limitation, his attorney-client and attorney work-product privileges (the "Privileges");

2.    Return to us all copies of all privileged documents, including their attachments, including without limitation, the Attorney Siegel Email and its attached FFA Document, and any other documents or parts thereof that contain privileged information taken or extracted from the privileged documents (collectively, the "Privileged Documents") in the possession, custody and/or control of the Aéropostale Parties;

3.    Permanently delete or otherwise destroy all electronic, digital or other non-tangible copies or records of all Privileged Documents in the possession, custody and/or control of the Aéropostale Parties;

4.    Provide a certificate addressed to us, as counsel for Mr. Finazzo, signed by a senior officer of Aéropostale confirming that the actions described in Items 2 and 3 above have been accomplished;

5.    Take such other actions necessary to safeguard Mr. Finazzo's Privileges; and

6.    Rescind all action taken by the Aéropostale Parties as a result of the breach of the Privileges and otherwise restore Mr. Finazzo and his Privileges *status quo ante*.

19.    Aéropostale and KMR refused to take any such actions at that time, and continue

to refuse to take any such actions to this day.

20.    On January 10, 2008, the Commission issued a formal Order of Investigation

relating to Mr. Finazzo's employment with Aéropostale. The Commission proceeded to serve

Mr. Finazzo with an administrative subpoena dated January 16, 2008 (the "Subpoena," attached

as Exhibit A), seeking documents and testimony relating to entities listed in the FFA Document.

21.    On January 16, 2008, CL&M wrote to Aéropostale, notifying it that Mr. Finazzo

had received a subpoena, and advising it that all emails exchanged between Mr. Finazzo and his

attorneys, regardless of whether such communications took place through Aéropostale's email system, and all information derived from the privileged communications, "are either protected under the attorney-client privilege and/or the attorney work product doctrine and/or contain information that is derived from privileged sources," and that therefore no documents should be produced.

22.     On January 25, 2008, CL&M sent a letter to the Commission responding to the Subpoena (attached hereto as Exhibit B).  The letter explained the Company's and KMR's misconduct and, with legal citations, advised the Commission to seek judicial approval before proceeding with its investigation.  The letter explained:

> But for the wrongful actions of the Company and its lawyers, Mr. Finazzo would have proceeded with his scheduled retirement with the benefit of a significant compensation package.  There would have been no 8-Ks filed relating to Mr. Finazzo's firing and no investigation, formal or informal, would have been commenced by the U.S. Securities & Exchange Commission ("Commission").  The genesis of this entire matter is the Company's belief that the Attorney Siegel Email and its attached FFA Document, evidenced a so-called "conflict of interest" by Mr. Finazzo.  Had KMR and Kroll (and by extension, the Company, as principal responsible for its agents' actions) complied with their legal and ethical obligations to segregate the email, notify Ms. Siegel and, upon her request, return the email unread, the chain of events that led to the Subpoena would not have begun.  Without the email, there would have been no suspicion of a conflict of interest, no firing, no 8-K filing, no request for a formal investigation order and no subpoena.

23.     The letter also concluded:

> The Commission's investigation is solely the result of its receipt of purloined and tainted attorney-client privileged information, not from an innocent recipient, but from lawyers who have definite and affirmative obligations when coming into receipt of such privileged information.  Indeed, the legal staff at the Commission have these same obligations, to segregate the communication, notify the attorney/sender and, upon request, to return the information.  If the legal staff seeks to proceed in some other fashion they may do so only after seeking the imprimatur of a court.

## LEGAL FRAMEWORK

24.    Aéropostale's, KMR's and Kroll's actions in reviewing and then disclosing the privileged Attorney Siegel Email, its contents and attachment, were improper.  Accordingly, all information derived from that violation of the attorney-client communication must be suppressed.

25.    The Attorney Siegel Email, its contents and attachment, comprise a confidential communication "for the purpose of facilitating the rendition of legal advice." Spectrum Sys. Int'l Corp. v. Chem. Bank, 78 N.Y.2d 371, 378 (1991); Rossi v. Blue Cross & Blue Shield of Greater New York, 73 N.Y.2d 588, 593 (1989); see also CPLR § 4548 (the attorney-client privilege attaches to email communications as well as more traditional methods).

26.    The attorney-client privilege applies to work emails, even where an employee has accepted his employer's email policy, where the employee still has an objectively reasonable belief that the communication will remain private. Curto v. Med. World Commc'n, Inc., No. 03CV6327, 2006 WL 1318387 (E.D.N.Y. May 15, 2006); In re Asia Global Crossing Ltd., 322 B.R. 247 (S.D.N.Y. 2005).  In determining whether the employee's belief is objectively reasonable, New York courts will consider: (1) whether the employer maintains a policy banning personal and other objectionable use, (2) whether the employer monitors its employee's computers and emails, (3) whether third parties have the right of access to the computers or emails, and (4) whether the employee was aware of the use and monitoring policies. See Asia Global Crossing, 322 B.R. at 257.

27.    Here, although Aéropostale had an email policy that stated that it may monitor emails and Mr. Finazzo may have been aware of the policy, the policy did not prohibit his personal use of the email system.  The company permitted its employee to use its email system

for purposes other than Aéropostale's business. Aéropostale also did not have a practice of actually reviewing its employees' emails. Moreover, the Attorney Siegel Email, its contents and attachment, was not sent by Mr. Finazzo, but rather by Ms. Siegel who was completely unaware of Aéropostale's email policy at the time she sent it. She therefore could not have possibly waived Mr. Finazzo's privilege by sending him an unsolicited email attaching a confidential document.

28.     When an attorney encounters a document that, on its face, appears to be privileged, he or she must stop reading the document and notify the sender immediately. Am. Express v. Accu-Weather, Inc., No. 91 Civ. 6485, 1996 WL 346388, at *2 (June 25, 1996 S.D.N.Y.), Galison v. Greenberg, 5 Misc.3d 1025(A), 799 N.Y.S.2d 160 (Sup. Ct. N.Y. Co. 2004); Ass'n of the Bar of the City of N.Y. Comm. on Prof. & Jud. Ethics, Op. no. 2003-04 (Dec. 2003, reissued Apr. 9, 2004) ("Opinion 2003-04"); N.Y. County Lawyers' Ass'n Comm. on Prof. Ethics, Op. No. 730 (July 19, 2002) ("Opinion 730").

29.     But for the wrongful review of the Attorney Siegel Email, its contents and attachment, the privileged FFA Document would not have been disclosed, and would not have led to an investigation by the Commission. The Commission is prohibited from relying on the improper information in performing its own investigation. Rather, Mr. Finazzo must be returned to the *status quo ante*.

30.     It is black-letter law that confidential attorney-client communications are protected from disclosure and inadmissible as evidence. CPLR §§ 3101(b), 4503(a); Spectrum Sys. Int'l, 78 N.Y.2d at 377; see also Surgical Design Corp. v. Correa, 21 A.D.3d 409, 410 (2d Dep't 2005); Manuf. & Traders Trust Co. v. Servotronics, Inc., 132 A.D.2d 392, 398 (4th Dep't 1987). When inadvertently disclosed, such communications must be suppressed and expunged.

This includes not only the privileged documents themselves, but all documents and other evidence that cannot be shown to have been "obtained from an independently developed, unrelated, non-privileged, unsuppressed source." In re Beiny, 129 A.D.2d 126, 142 (1st Dep't 1987); see United States v. Longo, 70 F.Supp. 2d 225, 264 (W.D.N.Y. 1999) ("Where a violation of the attorney-client privilege is demonstrated, the remedy for such a violation is the suppression of evidence derived from the privileged communication.").

31.     Where attorneys for an opposing party have actually made use of privileged documents, exclusion of the evidence will be insufficient to ameliorate prejudice, and disqualification of tainted counsel is appropriate to return the parties to the *status quo ante*. Richards v. Jain, 168 F.Supp.2d 1195, 1205 (W.D. Wash. 2001); In re Marketing Invest. Corp., 80 S.W.3d 4451–52 (Ct. App. Tex. 1998); Beiny, 129 A.D.2d at 141–42; see also Hull v. Celanese Corp., 513 F.2d 568, 571 (S.D.N.Y. 1975) ("In the disqualification situation, any doubt is to be resolved in favor of disqualification.").

### Count I
### (For Declaratory Relief)

32.     Mr. Finazzo repeats and re-alleges all of the allegations set forth in paragraphs 5 through 31 as though fully set forth herein.

33.     That the Attorney Siegel Email, its contents and attachment, were a privileged attorney-client communication.

34.     That neither Aéropostale, nor its outside counsel KMR, had the right to review the Attorney Siegel Email, its contents and attachment, because of its obviously privileged nature.

35.     That Aéropostale lawyers and KMR violated their professional obligations by disclosing the Attorney Siegel Email, its contents and attachment.

36.    That the Commission's investigation based on those public statements is improper because the basis for the investigation is misappropriated privileged information and breaches by attorneys of their professional obligations.

37.    That because the Commission investigation is based on tainted information, the Commission Subpoena served on him is improper and should be quashed.

38.    Aéropostale, KMR and the Commission contend that the Attorney Siegel Email, its contents and attachment, was not a protected attorney-client communication, apparently because it was sent to Mr. Finazzo on Aéropostale's corporate server.

39.    The Commission contends that its investigation is valid because it is not based directly on privileged information, and it cannot be held responsible for the possible violations of third parties.

40.    By reason of the foregoing, a justiciable controversy exists, and Plaintiff seeks a judicial determination, pursuant to 28 U.S.C. § 2201(a) as to whether: (a) the Attorney Siegel Email, its contents and attachment, was a communication protected under the attorney-client privilege; (b) KMR breached its professional responsibilities by reviewing the Attorney Siegel Email, its contents and attachment, without a judicial determination that the information contained therein was not privileged; (c) KMR breached its professional responsibilities by not informing Attorney Siegel of the received communication; (d) KMR breached its professional responsibilities by using the information contained in the Attorney Siegel Email, its contents and attachment, in filings with the Commission; (e) but for the conduct of KMR, the defendant would have been unaware of the information that is the basis of its investigation; and (f) the Commission is prohibited from using information that was obtained directly or indirectly from any privileged sources.

## Count II
### (For Injunctive Relief)

41.     Mr. Finazzo repeats and re-alleges all of the allegations set forth in paragraphs 5 through 31 as though fully set forth herein.

42.     That the Commission's current investigation and the Staff involved with that investigation have been so tainted by exposure to material protected by the attorney-client privilege that simply disallowing receipt of privileged material into evidence will be insufficient to return Mr. Finazzo to the *status quo ante*.

43.     That all subpoenas issued by the Commission pursuant to its formal Order of Investigation are tainted by the breach of Mr. Finazzo's attorney-client privilege and must be quashed.

44.     That furthermore, the only remedy that would sufficiently ameliorate the prejudice caused by the breach of his attorney-client privilege would be to enjoin the Commission and its Staff from using any information that was obtained directly or indirectly from any privileged sources.

45.     That Mr. Finazzo would suffer irreparable injury if the requested injunctive relief is not granted.

46.     That, by reason of the foregoing, injunctive relief is proper under Rule 65 of the Federal Rules of Civil Procedure.


**WHEREFORE,** Plaintiff demands judgment as follows:

A.      Declaring that the Attorney Siegel Email, its contents and attachment, was a communication protected under the attorney-client privilege;

B.     Declaring that KMR breached its professional responsibilities by reviewing the Attorney Siegel Email, its contents and attachment, without a judicial determination that the information contained therein was not privileged;

C.     Declaring that KMR breached its professional responsibilities by not informing Attorney Siegel of their discovery of the Attorney Siegel Email, its contents and attachment;

D.     Declaring that KMR breached its professional responsibilities by using the information contained in the Attorney Siegel Email, its contents and attachment, in filings with the Securities and Exchange Commission;

E.     Declaring that but for the conduct of KMR, the defendant would have been unaware of the information that is the basis of its investigation;

F.     Declaring that the Commission is unable to use information that was obtained directly or indirectly from any privileged sources;

G.     Enjoining the Commission and its Staff from enforcing the subpoenas issued pursuant to its formal Order of Investigation;

H.     Enjoining the Commission and its Staff permanently from using any information that was obtained directly or indirectly from any privileged sources;

I.     Disqualifying those Commission Staff members who have become tainted by being in possession of information that is either privileged or derived from privileged sources; and

62772045          - 13 -

J.    Granting Mr. Finazzo such other and further relief as this Court may deem just and proper.

CARTER LEDYARD & MILBURN LLP

By _____
Robert J. A. Zito
Michael Shapiro
Alan S. Lewis
Kenneth S. Levine
Laura Anne Reeds
2 Wall Street
New York, NY 10005
Tel: (212) 732-3200
Fax: (212) 732-3232

*Attorneys for Plaintiff Christopher Finazzo*

6277204.5

# EXHIBIT A

1336418.1
1336418.1



# SUBPOENA

# UNITED STATES OF AMERICA
## SECURITIES AND EXCHANGE COMMISSION

### In re Aeropostale, Inc. (NY-7802)

To:   Christopher Finazzo
      49 Chestnut Street
      Garden City, NY 11530-6334

☒   **YOU MUST PRODUCE** everything specified in the Attachment to this subpoena to officers of the Securities and Exchange Commission, at the place, date and time specified below:

February 6, 2008 at 10:00 a.m.

Securities and Exchange Commission
3 World Financial Center
  Suite 400
New York, New York 10281

☒   **YOU MUST TESTIFY** before officers of the Securities and Exchange Commission, at the place, date and time specified below:

February 13, 2008 at 10:00 a.m.

Securities and Exchange Commission
3 World Financial Center
  Suite 400
New York, New York 10281

**FEDERAL LAW REQUIRES YOU TO COMPLY WITH THIS SUBPOENA.**
Failure to comply may subject you to a fine and/or imprisonment.

By: _____   Date:   January 16, 2008
Michael D. Birnbaum
Attorney, Division of Enforcement
(212) 336-0523

I am an officer of the Securities and Exchange Commission authorized to issue subpoenas in this matter. The Securities and Exchange Commission has issued a formal order authorizing this investigation under Section 20(a) of the Securities Act of 1933 and Section 21(a) of the Securities Exchange Act of 1934.

NOTICE TO WITNESS:        If you claim a witness fee or mileage, submit this subpoena with the claim voucher.

**ATTACHMENT A**
**AEROPOSTALE (NY-7802)**

**DOCUMENTS REQUESTED**

1.   Documents sufficient to identify all entities that conducted any business with
     Aeropostale at any time during Your employment at Aeropostale:

     a.   in which You owned any equity stake at any time;

     b.   from which You drew any salary or other compensation at any time;

     c.   that employed You or any immediate family member of yours at any time
          during your employment at Aeropostale; or

     d.   with which You participated in any joint venture or joint ownership of any
          property, whether that venture or ownership was with the entity itself or
          any employee or representative thereof.

2.   For all of the entities identified in response to Request 1 (the "Entities"),
     documents sufficient to identify:

     a.   Your primary contact at the Entity – if the identity of that contact changed
          over time, indicate when that change occurred;

     b.   all compensation paid directly or indirectly to You from any Entity,
          including, without limitation, the nature of such compensation, dates on
          which such compensation was paid, and the service for which such
          compensation was awarded; and

     c.   all property owned jointly or otherwise in combination by You and any
          Entity or employee thereof.

3.   All employment contracts or compensation agreements with any Entity.

4.   All communications between You and any Entity or representative thereof.

5.   All communications between You and any immediate family member concerning
     actual or contemplated business involving Aeropostale.

6.   Documents sufficient to identify all compensation You received from Aeropostale
     from your first employment at the Company to the present, including, without
     limitation, any stock options and pension or other retirement benefits You
     received or are entitled to receive.

7.   Tax returns filed in Your name for years 1999 through 2006 and tax returns for
     any entity You owned or controlled at any time from 1999 through 2006,
     including any drafts thereof.

8.  All documents relating to Aeropostale's policies or procedures concerning disclosure of Aeropostale employees' or executives' personal interests in other entities, whether affiliated or unaffiliated with Aeropostale.

9.  All documents relating to any disclosure You made to Aeropostale concerning Your interest in any entity other than Aeropostale, whether affiliated or unaffiliated with the Company.

10. Documents sufficient to identify any bank or brokerage accounts You have held since the inception of Your employment at Aeropostale.

11. Documents sufficient to identify any transaction in which You participated involving Aeropostale stock, including, without limitation, any purchase or sale of, or compensation awarded to you in the form of, Company stock, options or related financial product.

## DEFINITIONS

1.    The term "document" means all records and other tangible forms of expression including, without limitation, originals, drafts or finished versions, or annotated or nonconforming copies, however created, produced or stored (manually, mechanically, electronically or otherwise), and by whomever prepared, produced, sent, dated or received, including, without limitation, books, papers, work papers, files, permanent files, personnel files, notes, review notes, confirmations, accounts statements, correspondence, memoranda, reports, records, journals, registers, analyses, plans, manuals, policies, ledger sheets, schedules, invoices, telegrams, faxes, telexes, wires, electronic mail messages, telephone logs, telephone messages, message slips, minutes, notes or records or transcriptions of conversations or communications or meetings, tape recordings, disks, and other electronic media, microfilm, microfiche, storage devices, press releases, contracts, agreements, calendars, date books, appointment books, diaries, notices, bank statements, summaries, wire transfers, checks, invoices, drafts for money, bills, billing files, and records of payment.

2.    "Aeropostale, Inc." or "Aeropostale" shall mean and refer to Aeropostale, Inc. and all predecessors, successors, officers, directors, employees, agents, accountants, and attorneys of the foregoing, including any aliases, code names, or trade or business names used by any of the foregoing.

3.    "You" or "Your" shall refer to Christopher Finazzo and any individual or entity working on Christopher Finazzo's behalf.

4.    The term "concerning" means relating to, referring to, describing, reflecting, evidencing, or constituting.

5.    The term "communications" means the transmittal of information (in the form of facts, ideas, inquiries or otherwise).

6.    The connectives "and" and "or" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of the discovery request all responses that might otherwise be construed to be outside of its scope.

7.    The use of the singular form of any word includes the plural and vice versa.

## INSTRUCTIONS

1.    Please provide a cover letter that describes the documents being produced pursuant to each request number. Each document requested is to be produced in its entirety, including all non-identical copies and drafts, without abbreviation, expurgation, or redaction.

2.    Each request shall be answered fully unless it is subject to a good faith objection, in which event the reason for your objection shall be stated in detail. If an objection pertains to only a portion of a request, or a word, or phrase, or clause contained within a request, you are required to state your objection to that portion only, and to respond to the remainder of the request.

3.    If any document sought is withheld on grounds of privilege: (i) identify each such document, including, without limitation, the date, subject matter, present custodian, author or preparer, and each person to whom the substance of the document was communicated, in whole or in part; (ii) state the nature of the privilege asserted, and all facts upon which that assertion is based; and (iii) indicate the number of the request to which the document or thing is responsive. If a document is withheld on grounds of

attorney-client privilege, also state the identity of the attorney and client involved; the date when the attorney was retained; the duration of the retention; and the general subject matter of the retention.

4.   The request for production of documents embodied herein shall be deemed continuing and impose upon you the obligation to promptly supplement and amend your production.

5.   Unless otherwise specified, the time period covered by this request is the date of your first employment with Aeropostale, Inc. through the present.

# EXHIBIT B

1336418.1
1336418.1

# CARTER LEDYARD & MILBURN LLP
### Counselors at Law

Robert J.A. Zito
Partner

Direct Dial: 212-238-8768
E-mail: zito@clm.com

2 Wall Street
New York, NY 10005-2072

Tel (212) 732-3200
Fax (212) 732-3232

701 8th Street, N.W., Suite 410
Washington, DC 20001-3893
(202) 898-1515

570 Lexington Avenue
New York, NY 10022-6856
(212) 371-2720

January 25, 2008

**BY EMAIL & REGULAR MAIL**

Michael D. Birnbaum, Esq.
Staff Attorney
U.S. Securities and Exchange Commission
3 World Financial Center, Suite 4300
New York, NY 10281-1022

Re:    Aéropostale, Inc. (NY - 7802)

Dear Mr. Birnbaum:

We represent Mr. Christopher Finazzo in connection with his termination by Aéropostale, Inc. ("Aéropostale" or the "Company") as well as in relation to your January 16, 2008 subpoena (the "Subpoena"). We write to request that you withdraw the Subpoena because it, and the investigation from which it emanates, had its genesis in an improperly obtained and disclosed privileged attorney-client communications. As will be explained in greater detail below, lawyers in New York have specific ethical and legal obligations that arise when they come into possession of attorney-client privileged material. The failure to abide by those obligations and indeed, deliberate violation of requisite duties, including improper disclosure, fatally taints that which flows from the violation.

As you may know, Mr. Finazzo's employment was abruptly terminated after many years of service for alleged "conflicts of interest" purportedly arising out of business interests Mr. Finazzo allegedly had in affiliates of a vendor for the Company. Mr. Finazzo was fired on November 8, 2006, about two months before his scheduled retirement. Mr. Finazzo is not currently employed by a public company.

In brief, during the summer of 2006, Kroll private investigators, under the supervision of Aéropostale's outside lawyers, Katten Muchin Rosenman LLP ("KMR"), were conducting an investigation that had nothing to do with Mr. Finazzo. In the course of that investigation, Aéropostale searched Mr. Finazzo's computer and reviewed his emails, which were not only unrelated to the investigation then being conducted, but, far more importantly, some of which were protected by Mr. Finazzo's attorney-client privilege.

6217707.3

Michael D. Birnbaum, Esq.
January 25, 2008
Page 2

Because the Subpoena issues from an investigation built entirely on information Aéropostale initially discovered through the invasion of Mr. Finazzo's attorney-client privilege, the Subpoena should be withdrawn.

A.     Aéropostale's Intentional Violation Of Mr. Finazzo's Attorney-Client Privilege

On August 24, 2006, a date when Mr. Finazzo was still employed by Aéropostale, his personal lawyer, Angela Siegel ("Attorney Siegel"), sent an email to Mr. Finazzo at his Aéropostale email address (the "Attorney Siegel Email"). Attorney Siegel, a trusts and estates lawyer, was then representing Mr. Finazzo in the context of his estate planning. The Attorney Siegel Email was not a response to a specific email or other communication from Mr. Finazzo.

The Attorney Siegel Email was sent from an address clearly identified as belonging to an attorney: "lawoffice@angelasiegel.com." Additionally, the closing lines indicated that it was written by "Angela Siegel, Esq., Law Office of Angela Siegel."

Further still, the following explicit warning appears on the face of the email:

*****PRIVILEGE AND CONFIDENTIALITY NOTICE*****

The information contained in this e-mail is confidential and may be protected by the attorney-client privilege and/or work product doctrine. It is intended for the use of the named recipient only. *If you have received this communication in error, please notify the sender immediately by reply to this e-mail or by telephone.*

(Emphasis supplied.)

Attorney Siegel attached to her email a Word document titled "Finazzo Family Assets" (the "FFA Document") that she had prepared based upon confidential information given to her by Mr. Finazzo during meetings held as part of her estate planning advice to Mr. Finazzo. The document consists of a list of Mr. Finazzo's assets, including interests in various business entities. The language of the Attorney Siegel Email clearly indicated that Mr. Finazzo communicated the information on the FFA Document to Attorney Siegel for the sole purpose of seeking legal advice.

Kroll, KMR and Aéropostale personnel, upon discovery of the Attorney Siegel email, failed to stop reviewing its obviously privileged contents.[1] Instead, they not only reviewed the privileged information, but then used it as the sole basis on which to terminate Mr. Finazzo's employment.

---

[1] Prior to the investigation that led Aéropostale to review Mr. Finazzo's (and several other Aéropostale employees) emails, Aéropostale had never before conducted a company-wide review of its employees' emails.

62177073

Michael D. Birnbaum, Esq.
January 25, 2008
Page 3

On November 7, 2006, Edward M. Slezak, Esq., Aéropostale's General Counsel, and Julian Geiger, Aéropostale's President and CEO, suddenly called Mr. Finazzo into an unplanned meeting prior to which Mr. Finazzo had received no opportunity to consult with an attorney (or prior notice of any kind) and confronted him with the FFA Document. Messrs. Slezak and Geiger asked Mr. Finazzo about his interests in the business entities listed on the FFA Document without telling him that it was obtained by opening the privileged Attorney Siegel Email and then told him that he had breached his employment agreement (the "Agreement") and was being fired for alleged "conflicts of interests." Messrs. Slezak and Geiger handed Mr. Finazzo a copy of a press release announcing Mr. Finazzo's termination that they said would be issued on the following day. Kroll investigators then ushered Mr. Finazzo to the door.

During the week of June 25, 2007, Mr. Finazzo's counsel, Carter Ledyard & Milburn LLP ("CLM") for the first time obtained copies of the Attorney Siegel Email and the FFA Document from Attorney Siegel. Until then, Mr. Finazzo and his counsel did not know that the Attorney Siegel Email was the source of the information that Aéropostale had used as its basis to terminate Mr. Finazzo's employment and Aéropostale's attorneys continuously concealed such fact contrary to their ethical obligations.

On June 29, 2007, upon seeing the obviously privileged nature of the documents, we sent a written demand to KMR that they take the following corrective action:

1.  Cease and desist from any further invasions of Mr. Finazzo's statutory and common law privileges, including, without limitation, his attorney-client and attorney work product privileges (the "Privileges");

2.  Return to us all copies of all privileged documents, including their attachments, including without limitation, the Attorney Siegel Email and its attached FFA Document, and any other documents or parts thereof that contain privileged information taken or extracted from the privileged documents (collectively, the "Privileged Documents") in the possession, custody and/or control of the Aéropostale Parties;

3.  Permanently delete or otherwise destroy all electronic, digital or other non-tangible copies or records of all Privileged Documents in the possession, custody and/or control of the Aéropostale Parties;

4.  Provide a certificate addressed to us, as counsel for Mr. Finazzo, signed by a senior officer of Aéropostale confirming that the actions described in Items 2 and 3 above have been accomplished;

5.  Take such other actions necessary to safeguard Mr. Finazzo's Privileges; and

6217707.3

Michael D. Birnbaum, Esq.
January 25, 2008
Page 4

6.  Rescind all action taken by the Aéropostale Parties as a result of the breach of the Privileges and otherwise restore Mr. Finazzo and his Privileges *status quo ante*.

**B.    The Attorney Siegel Email And Its Attached FFA Document Are Unequivocally Privileged Under The Attorney-Client Privilege**

It should be abundantly clear that the Attorney Siegel Email and the attached FFA Document comprise a confidential communication sent by Attorney Siegel to Mr. Finazzo "for the purpose of facilitating the rendition of legal advice." Spectrum Sys. Int'l Corp. v. Chem. Bank, 78 N.Y.2d 371, 378 (1991); Rossi v. Blue Cross & Blue Shield of Greater New York, 73 N.Y.2d 588, 593 (1989); see also CPLR § 4548 (the attorney-client privilege attaches to email communications as well as more traditional methods). Indeed, even a cursory examination of the Attorney Siegel and the attached FFA Document reveals that Attorney Siegel intended them to be treated as privileged. Therefore, these documents are unequivocally protected by the attorney-client privilege.

**C.    Aéropostale's Attorneys Violated Their Professional Obligations Under Dr 1-102(A)(5) And The Formal Ethics Opinions Thereunder**

An attorney has strict and clearly delineated professional obligations that are triggered by access to information that is intended to be privileged. It is hornbook law that when an attorney encounters a document that, on its face, appears to be privileged, he or she *must* stop reading the document and notify the sender immediately. Am. Express v. Accu-Weather, Inc., No. 91 Civ. 6485, 1996 WL 346388, at *2 (June 25, 1996 S.D.N.Y.), Galison, 2004 WL 2848123 at *2; see also Ass'n of the Bar of the City of N.Y. Comm. on Prof. & Jud. Ethics, Op. No. 2003-04 (Dec. 2003, reissued Apr. 9, 2004) ("Opinion 2003-04"); N.Y. County Lawyers' Ass'n Comm. on Prof. Ethics, Op. No. 730 (July 19, 2002) ("Opinion 730").

As Opinion 730 states:

> A lawyer has ethical obligations upon receipt of inadvertently disclosed privileged information. If a lawyer receives information which the lawyer knows or believes was not intended for the lawyer and contains secrets, confidences or other privileged matter, the lawyer, upon recognition of same, shall, without further review or other use thereof, notify the sender and (insofar as it shall have been in written or other tangible form) abide by sender's instructions regarding return or destruction of the information.

Opinion 2003-04 provides identical direction. Justice Cahn of the Commercial Division of the New York County Supreme Court has held that these duties are mandatory in a litigation context. See Galison v. Greenberg, 5 Misc.3d 1025(A), 799 N.Y.S.2d 160 (Sup. Ct. N.Y. Co. 2004).

6217707.3

Michael D. Birnbaum, Esq.
January 25, 2008
Page 5

Attorney Siegel's privileged communication was explicitly intended for Mr. Finazzo alone and no one else. Yet, at no time, did Aéropostale's attorneys or anyone acting on their behalf,[2] ever inform Attorney Siegel that they had intercepted her privileged communication, as they were duty bound to do. Indeed, not only did Aéropostale's attorneys fail in their professional obligations to inform Attorney Siegel and to cease reviewing the email, but they reviewed the email, opened the attached Word document, and then affirmatively (and improperly) used the privileged information against Mr. Finazzo to fire him.

Opinion 730 required, at a minimum, that the Aéropostale lawyers not open the email attachment ("without further review") and inform Attorney Siegel that they had her email ("notify the sender"). They did neither. Regardless of whether Aéropostale's attorneys believed that the privilege had been waived, they were obliged to comply with such ethical requirements and raise the privilege issue later. See Ass'n of the Bar of the City of N.Y., Op. No. 2003-04. Remarkably, however, Aéropostale's attorneys continue to this day to decline to comply with their ethical obligations.

Here, it cannot be disputed seriously that the Aéropostale attorneys failed to heed their ethical mandates: They completely failed to notify Attorney Siegel, the sender of the documents, and instead improperly continued to review the privileged documents and to use the privileged information contained in such documents as the basis to fire Mr. Finazzo. Given these *prima facie* violations of the ethical standards, the only question is to determine the appropriate remedy for such egregious violations in the context of the Subpoena, addressed in Section E, below.

**D.     Mr. Finazzo Did Not Waive His Attorney-Client Privilege**

The attorney-client privilege applies to work emails, even where an employee has accepted his employer's email policy, where the employee still has an objectively reasonable belief that the communication will remain private. Curto v. Med. World Commc'n, Inc., No. 03CV6327, 2006 WL 1318387 (E.D.N.Y. May 15, 2006); In re Asia Global Crossing Ltd., 322 B.R. 247 (S.D.N.Y. 2005). In determining whether the employee's belief is objectively reasonable, New York courts will consider: (1) whether the employer maintains a policy banning personal and other objectionable use, (2) whether the employer monitors its employee's computers and emails, (3) whether third parties have the right of access to the computers or emails, and (4) whether the employee was aware of the use and monitoring policies. See Asia, 322 B.R. at 257.

---

[2] Attorneys bear responsibility for ensuring that any non-lawyers involved in the review of documents that were sent or received are aware of this obligation, and notify the supervising attorney if the review uncovers documents that appear on their face to be privileged. Richards v. Jain, 168 F.Supp.2d 1195, 1200–02 (W.D. Wash. 2001). Breaches of the attorney-client privilege by non-lawyers working with an attorney are imputed to that attorney. Id.; see also United States v. SAE Civil Constr., Inc., No. 4 CV 95-3058, 1996 WL 148521, at *4 (D. Neb. Jan. 29, 1996) ("It is of little importance that the harborer of the confidential information in the present case is not an attorney or a member of a firm's non-attorney support staff.").

6217707.3

Michael D. Birnbaum, Esq.
January 25, 2008
Page 6

Here, although Aéropostale had an email policy that stated that it *may* monitor emails, the policy did not prohibit Mr. Finazzo's personal use of the email system. In other words, the Company permitted its employee to use its email system for purposes other than Aéropostale's business. More importantly, Aéropostale did not have a practice of actually reviewing its employees' emails. In fact, we are unaware of any other instance in the Company's history where an employee's emails had been reviewed by the Company, let alone confiscated, concealed and used as a basis for a legal claim against the employee.

Moreover, the Attorney Siegel Email was not sent by Mr. Finazzo, but rather by Attorney Siegel who was completely unaware of and not bound by Aéropostale's email policy at the time she sent it. She therefore could not have possibly waived Mr. Finazzo's privilege by sending him an unsolicited email attaching a confidential document. She also took every reasonable step to ensure the protection of the privilege. Not only did Attorney Siegel include a confidentiality notice on the email, but the body of the email confirmed that the communication concerned confidential legal advice sought by Mr. Finazzo and that the attached document had been prepared by Attorney Siegel in furtherance of that advice. Under the circumstances, Mr. Finazzo had an objectively reasonable belief that the Attorney Siegel Email would remain confidential and thus he did not waive the privilege. See Asia, 322 B.R. at 261.

The recent cases of Long v. Marriberi America Corp., 2006 WL2998671 (SDNY 2006) and Scott v. Beth Israel Medical Center, 2007 WL 305335 (Sup. Ct. N.Y. County, Oct. 17, 2007) do not compel a contrary result. Both Long and Scott are readily distinguishable.

Although the courts in Long and Scott both held that the plaintiffs in those cases had waived their attorney-client privilege with respect to work emails, the facts of those cases differ significantly from the facts here. First, the employers' counsel in Long and Scott immediately segregated the privileged documents and alerted the employees' counsel of their possession of the documents. The parties then sought immediate judicial review of, and decision on, the privilege issue. This is in stark contrast to Aéropostale's and KMR's continued use and concealment of the Attorney Siegel Email and the FFA Document. Second, the employees in Long and Scott had corresponded over company email on numerous occasions over a lengthy period of time, and sometimes with several attorneys. Here, Attorney Siegel sent the Attorney Siegel Email and the FAA Document without Mr. Finazzo's solicitation, knowledge and consent. This was the first and only instance that Attorney Siegel communicated with Mr. Finazzo through his work email. Finally, the employers' email policies in Long and Scott prohibited personal use of their email system. Aéropostale's does not. Thus, Long and Scott are inapposite.

62177073

Michael D. Birnbaum, Esq.
January 25, 2008
Page 7

**E.    The Subpoena Should Be Withdrawn Because Of The Sec's Receipt And Affirmative Use Of The Information Obtained By Aéropostale As Its Lawyer From Their Knowing Breach Of Mr. Finazzo's Attorney-Client Privilege**

But for the wrongful actions of the Company and its lawyers, Mr. Finazzo would have proceeded with his scheduled retirement with the benefit of a significant compensation package. There would have been no 8-Ks filed relating to Mr. Finazzo's firing and no investigation, formal or informal, would have been commenced by the U.S. Securities & Exchange Commission ("Commission"). The genesis of this entire matter is the Company's belief that the Attorney Siegel Email and its attached FFA Document, evidenced a so-called "conflict of interest" by Mr. Finazzo. Had KMR and Kroll (and by extension, the Company, as principal responsible for its agents' actions) complied with their legal and ethical obligations to segregate the email, notify Ms. Siegel and, upon her request, return the email unread, the chain of events that led to the Subpoena would not have begun. Without the email, there would have been no suspicion of a conflict of interest, no firing, no 8-K filing, no request for a formal investigation order and no subpoena.

As has been held by the Southern District of New York,

> [I]t is possible for an agency to break the attorney-client privilege and then secure a ruling validating is action. However, their course has two pitfalls. First, if the agency is wrong and the violation of the privilege is found to be improper, the agency risks suppression of all evidence attributable to the breach, not merely the direct testimony of the attorney. Second, the need for collateral litigation expends recourses and delays resolution of the case.
>
> Two alternative courses would avoid these privileges. The agency can, of course, seek judicial approval before seeking to breach the attorney-client privilege, See First Federal, 110 FRD at 566 (disclosure of privileged information should ordinarily occur under court supervision). A less onerous safeguard would be to instruct the client to obtain advice of an attorney not under investigation.

SEC v. Forma 177 FRD 516, 526-7 (SDNY 1987). Of course, the second alternative suggested in Forma is inapplicable to the matter at hand. Accordingly, as wisely explained in Forma, the Subpoena herein should be withdrawn and the Commission, if so advised, should seek judicial approval before any re-issuance.

Also instructive is SEC v. OKC Corp., 474 F. Supp. 1031, 1040 (N.D. Tex 1979), aff'd sub nom OKC Corp. v. Williams 614 F. 2d 58 (5th Cir. 1980), where, in the face of a corporation's claim of breach of attorney-client privilege by virtue of an inadvertent disclosure

Michael D. Birnbaum, Esq.
January 25, 2008
Page 8

by a single director of a confidential report, the Commission agreed to hold its investigation in abeyance pending a determination by the district court concerning the use of the confidential report. Unlike KMR and Aéropostale, the OKC director who disclosed the confidential report, possessed it, in the first instance, rightfully. The question before the court, to which the matter was properly committed, was unauthorized disclosure by a rightful possessor. By contrast, should the Commission act prudently and seek judicial authorization for a subpoena, the issue will be one of unauthorized disclosure by a wrongful possessor *ab initio*. Under such circumstance, it is our view, after a survey of applicable case law, that a court will order that both the improperly obtained attorney-client communication and all information derived, directly or indirectly, from the initial disclosure, be suppressed. See, e.g. U.S. v. Lin Lyn Trading, Ltd., 925 F. Supp. 1507, 1517 (D. Utah 1996) aff'd in part, rev'd in part and remanded 149 F. 3d 1112 (10th Cir 1998) (affirming suppression); U.S. v. Longo 70 F. Supp. 2d 255, 264 (W.D. N.Y 1999) (citing Forma).

**F.      The Dispute Between Aéropostale And Mr. Finazzo Was A Private Matter Which Was Amicably Resolved Via A Confidential Settlement Agreement**

In addition to the numerous problems arising from the inexcusable breach of Mr. Finazzo's attorney-client privilege, including the unavoidable tainting of the investigation by the Commission, the order of investigation and the Subpoena, there is another simple and fundamental reason why the Subpoena should be withdrawn and the investigation closed. The dispute between the Company and Mr. Finazzo was a private one. It did not in any way implicate the Company's financial stability, the value of the stock or any other matters that may be of concern to the investing public and, by extension, to the Commission. If Mr. Finazzo's alleged conflict of interests affected the financial disclosure of the Company, if at all, such were plainly immaterial and certainly did not give rise to a restatement of the Company's financial statements. There was no effect upon the public market for the Company stock.

The Company's concern was that the alleged conflict of interest, that it learned of from the Attorney Siegel Email, may have, in some fashion, caused the Company to have lost money. It was that concern that led the Company to file for arbitration.

As you are probably aware, the parties entered into a negotiated confidential agreement settling all claims to each sides' satisfaction. From the Commission's perspective, the most salient aspect of the settlement should be that it did not result in a Form 8-K filing by the Company. From the Company's standpoint, after due consideration and advice from its securities counsel, a public filing was neither necessary nor required. The settlement with Mr. Finazzo was immaterial to the Company *vis-à-vis* its public reporting obligations.

Under such circumstances, we believe that the staff too should conclude that the dispute between the Company and Mr. Finazzo was private and immaterial to the investing public and

6217707.3

Michael D. Birnbaum, Esq.
January 25, 2008
Page 9

did not implicate any breach of the securities laws. In short, there is simply nothing here that ought to be of interest to the staff.

Without in any way waiving Mr. Finazzo's attorney-client privilege with Attorney Siegel, let us posit a hypothetical scenario to further the analysis. Suppose a multi-billion dollar company, such as Aéropostale, knows that its chief marketing office (the "CMO") has a longstanding personal relationship with the principal shareholder of a major vendor ("the Vendor"). Suppose further that the Company, over the course of many years, has exploited that relationship to achieve very favorable supply contracts with that vendor. Lastly, suppose that the Company also eventually learns that its CMO and the Vendor, as part of their lengthy friendship, have privately invested together in different projects over the course of many years.

The Company reacts by firing the CMO and making an arbitration claim identical to the one made against Mr. Finazzo. After extensive negotiations, the claim is settled with no Form 8-K or other public filing from the Company. Under those circumstances, we respectfully suggest that there is simply no reasonable basis for the staff to believe that a violation of the securities laws has occurred.

**G.    Conclusion**

Aéropostale's invasion of Mr. Finazzo's attorney-client privilege was blatant and inexcusable. But for the invasion of the privilege, Mr. Finazzo's employment would not have been terminated and this proceeding would not have ensued.

Significantly, there is no evidence that the alleged undisclosed "conflicts of interest" materially damaged Aéropostale in any fashion. This is borne out by the Company's settlement with Mr. Finazzo and subsequent absence of any public filing or disclosure. Indeed, quite the contrary, the Company benefited greatly from these relationships and touted them in their initial registration statement and in other disclosures.

Ignoring an attorney's strict ethical obligations to comply with instructions, Aéropostale's attorneys simply refused and continue to refuse to abide by their ethical obligations as of the writing of this letter. As is articulated in the above-referenced ethics opinions, regardless of whether KMR believes that the documents are privileged, they should have complied with such instructions until a determination had been made. Aéropostale's attorneys' intentional, repeated and continuous violations of their professional obligations warrant a withdrawal of the Subpoena and that all evidenced derived from privileged sources be suppressed and expunged and requires that KMR be disqualified from representing Aéropostale.

While the Commission is incapable of restoring Mr. Finazzo to the *status quo ante vis-à-vis* the Company, it may and should do so with regard to its investigation. The Commission's investigation is solely the result of its receipt of purloined and tainted attorney-client privileged

6217707.3

Michael D. Birnbaum, Esq.
January 25, 2008
Page 10

information, not from an innocent recipient, but from lawyers who have definite and affirmative obligations when coming into receipt of such privileged information. Indeed, the legal staff at the Commission have these same obligations, to segregate the communication, notify the attorney/sender and, upon request, to return the information. If the legal staff seeks to proceed in some other fashion they may do so only after seeking the imprimatur of a court. Also, to the extent that the staff has come into possession of such material, in writing, electronic form, orally or otherwise, we respectfully request that it be returned to us and that we be informed if the staff has, in any way, reviewed any attorney-client privileged, or colorably privileged, information. Finally, we respectfully request that you inform us whether the staff presented any information to the Commission that was derived from privileged sources, including without limitation, the Attorney Siegel Email, in connection with the issuance of the order of investigation, dated January 10, 2008.

Sincerely,

Robert J.A. Zito

RJAZ:ma

62177073

# Exhibit B

MARK K. SCHONFELD (MS-2798)
REGIONAL DIRECTOR

Attorney for the Applicant
SECURITIES AND EXCHANGE COMMISSION
New York Regional Office
3 World Financial Center
New York, New York 10281
(212) 336-0077 (Gizzi)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------x
                                                     :
SECURITIES AND EXCHANGE COMMISSION,                  :
                                                     :
                      Applicant,                     :
                                                     :
      -against-                                      :
                                                     :
CHRISTOPHER FINAZZO and                              :
SOUTH BAY APPAREL, INC.,                             :
                                                     :
                      Respondents.                   :
                                                     :
-----------------------------------------------------x

## MEMORANDUM OF LAW IN SUPPORT OF
## SECURITIES AND EXCHANGE COMMISSION'S
## APPLICATION FOR AN ORDER TO SHOW CAUSE AND
## FOR AN ORDER REQUIRING OBEDIENCE TO SUBPOENAS

The Securities and Exchange Commission ("Commission") respectfully submits this

memorandum of law in support of its Application for an Order to Show Cause and for an Order

Requiring Obedience to Subpoenas ("Application"). For the reasons set forth below, and in the

accompanying Declaration of Michael D. Birnbaum ("Birnbaum Decl.") and the Exhibits

thereto, the Commission respectfully requests that the Court enter an order, in the form attached

to the Commission's Application, directing respondents Christopher Finazzo ("Finazzo") and

South Bay Apparel, Inc. ("South Bay") to comply with administrative subpoenas issued to them.

## I. Introduction

The Commission is conducting an investigation entitled In the Matter of Aeropostale, Inc. (Internal File No. NY-7802) (the "Aeropostale Investigation"). The Commission is investigating whether certain persons and entities violated the federal securities laws in connection with specialty retail apparel company Aeropostale, Inc.'s ("Aeropostale") disclosure of certain related-party transactions. In connection with the Aeropostale Investigation, the Commission staff has issued administrative subpoenas to Finazzo and South Bay. Finazzo and South Bay have to date failed to comply with the subpoenas, and they have indicated that they will not comply absent a court order directing them to comply. Accordingly, the Commission has commenced this Application to compel Finazzo's and South Bay's compliance with the subpoenas.

The Commission staff is investigating matters disclosed in Aeropostale's Form 8-K, filed November 8, 2006, and Form 10-K for the year ended February 3, 2007, filed April 2, 2007. In the November 8, 2006 Form 8-K, Aeropostale announced the termination for cause of Finazzo, who had been until that time the company's Executive Vice President and Chief Merchandising Officer. In the Form 8-K, Aeropostale announced that Finazzo had concealed personal ownership interests in, and had served as an officer of, entities affiliated with one of Aeropostale's largest vendors, South Bay. In the Form 10-K for the year ended February 3, 2007, Aeropostale disclosed that Finazzo had, without authorization, executed a corporate guaranty agreement on behalf of South Bay, and that Finazzo had failed to disclose unauthorized business relationships and transactions between his immediate and extended family members and certain of Aeropostale's other vendors.

In connection with the Aeropostale Investigation, the Commission staff issued a

2

subpoena to Finazzo calling for him to produce documents and provide testimony, and issued a subpoena to South Bay calling for it to produce documents. Through the subpoenas, the Commission staff sought information relevant to the Aeropostale Investigation, i.e., whether any individuals or entities affiliated with Aeropostale had violated the federal securities laws by failing properly to disclose Finazzo's and his family's interests in certain of Aeropostale's vendors, most notably South Bay. Although neither Finazzo nor South Bay challenge the relevance of the information sought, both have refused to comply with the subpoenas absent judicial intervention.

As is described more fully below, the documents and testimony called for by the subpoenas are relevant to the Aeropostale Investigation. Further, there is no legitimate basis for Finazzo and South Bay to refuse to comply with the subpoenas.

Through communications with Finazzo's counsel, the Commission staff understands Finazzo's position to be that he need not comply with the subpoena because Aeropostale allegedly improperly intruded upon a privileged communication with his attorney in the course of Aeropostale's own investigation of Finazzo's misconduct. Specifically, in refusing to comply with the subpoena, Finazzo advised the staff that Aeropostale improperly reviewed one of his emails on his work computer that he claims contained a communication with his attorney. Finazzo apparently contends that because the company's allegedly tainted investigation led to a press release that led the Commission to investigate, the Commission's investigation is likewise tainted and cannot proceed. As is explained below, Finazzo's allegations that Aeropostale interfered with his attorney-client privilege have no bearing on Finazzo's obligation to comply with the Commission subpoena issued to him. Moreover, in seeking to secure Finazzo's compliance with the subpoena, the Commission informed Finazzo – repeatedly and

unambiguously – that he need not produce any privileged materials. Finazzo, however, has steadfastly refused to produce even those documents over which he does not assert any privilege and to testify about non-privileged matters because, according to Finazzo, all information sought through the subpoena is "tainted" by Aeropostale's purportedly improper investigation. This is simply not a proper basis for Finazzo to refuse to comply with the Commission subpoena.

South Bay has also refused to comply with the subpoena issued to it. Although South Bay has advised the Commission staff that South Bay "take[s] no position" concerning Finazzo's refusal to comply with the subpoena directed to him, South Bay indicated that it would not produce any documents called for by the Commission's subpoena to South Bay until Finazzo's purported privilege objections were resolved "through judicial proceedings" or otherwise. According to South Bay, Finazzo, through counsel, has advised South Bay that he objected to South Bay's potential compliance with the subpoena.

In light of the appropriateness of the subpoenas, and Finazzo's and South Bay's lack of a legal basis for refusing to comply with the subpoenas, the Commission respectfully requests that the Court issue an order directing Finazzo and South Bay to show cause why they should not be ordered to produce documents responsive to the subpoenas and for Finazzo to appear for investigative testimony, and thereafter issue an order directing Finazzo and South Bay to comply with the subpoenas.

## II. STATEMENT OF FACTS

### A. The Aeropostale Investigation

In November 2006, Aeropostale announced publicly, through a press release included in a Form 8-K filed with the Commission, that the company had terminated the employment of Finazzo, Aeropostale's Executive Vice President and Chief Merchandising Officer, for

concealing personal ownership interests in, and serving as an officer of, certain entities affiliated with one of Aeropostale's largest vendors, South Bay. (Birnbaum Decl. ¶ 3, Ex. 1.)  In April 2007, Aeropostale provided additional details concerning the basis for Finazzo's termination in the company's Form 10-K for the year ended February 3, 2007.  (Id. ¶ 3, Ex. 2.)  In the Form 10-K, Aeropostale disclosed that Finazzo had, without authorization, executed a corporate guaranty agreement on behalf of South Bay, and Finazzo had failed to disclose unauthorized business relationships and transactions between his immediate and extended family members and certain of Aeropostale's other vendors.  (Id.)

Thereafter, the Commission initiated an investigation into whether any individuals or entities had violated the federal securities laws by failing to disclose Finazzo's and his family's relationships with certain of Aeropostale's vendors.  On January 10, 2008, the Commission issued an Order Directing Private Investigation and Designating Officers to Take Testimony (the "Formal Order") pursuant to Section 20(a) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. § 77t(a), and Section 21(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78u(a).  (Birnbaum Decl. ¶ 4.)  Pursuant to Section 19(c) of the Securities Act, 15 U.S.C. § 77s(c), and Section 21(b) of the Exchange Act, 15 U.S.C. § 78u(b), the Formal Order designated certain individuals as officers of the Commission empowered to administer oaths and affirmations, subpoena witnesses, compel their attendance, take evidence, and require the production of any books, papers, correspondence, memoranda, or other records deemed relevant or material to the investigation.  (Birnbaum Decl. ¶ 4.)[1]

Commission staff designated as officers of the Commission in the Formal Order issued

---

[1]    Given the confidential nature of Commission formal orders, the Commission has not included a copy of the Formal Order with this Application.  The Commission stands ready to provide a copy of the Formal Order, but requests that the Court review it *in camera*.

subpoenas to, among others, Finazzo and South Bay in furtherance of the Aeropostale investigation.  (Id. ¶¶ 5-6, Exs. 4, 5.)  Specifically, staff from the Commission's New York Regional Office, acting on behalf of the Commission pursuant to the Formal Order, issued subpoenas to Finazzo and South Bay on January 16, 2008 and January 17, 2008, respectively. (Id.)  The subpoena issued to Finazzo required that he produce documents to the Commission's New York Regional Office on February 6, 2008, and appear for testimony at the Commission's New York Regional Office on February 13, 2008.  (Id. ¶ 8, Ex. 4.)  The subpoena issued to South Bay required that it produce documents to the Commission's New York Regional Office on February 7, 2008.  (Id. ¶ 16, Ex. 5.)

**B.    The Finazzo Subpoena**

On January 16, 2008, the Commission staff contacted counsel for Finazzo to ask whether counsel would accept service of a subpoena on Finazzo's behalf.  Counsel agreed to accept service by email on behalf of Finazzo.  Later the same day, a member of the Commission staff designated as an officer of the Commission in the Formal Order issued a subpoena to Finazzo (the "Finazzo Subpoena") and sent it by email to counsel for Finazzo.  The Finazzo Subpoena called for Finazzo to produce documents to the Commission's New York Regional Office on or before February 6, 2008 and to appear for testimony at the Commission's New York Regional Office on February 13, 2008.  (Id. ¶ 8, Exs. 4, 6.)  At counsel's request, the Commission staff provided Finazzo with a copy of the non-public Formal Order, pursuant to which the Finazzo Subpoena was issued.  (Id. ¶ 4, Ex. 3.)

On January 25, 2008, Finazzo's counsel sent a letter to the Commission staff stating that the Finazzo Subpoena "should be withdrawn" because, according to counsel, the subpoena sought privileged documents and additional information "tainted" by Aeropostale's purported

violation of Finazzo's privilege. Further, counsel wrote that "[i]f the [Commission] legal staff seeks to proceed . . . they may do so only after seeking the imprimatur of a court." (Id. ¶ 9, Ex. 7.) Finazzo did not claim in the January 25 letter (or at any other time) any malfeasance by the Commission staff but, rather, seemed to contend that due to what Finazzo considered an improper review by Aeropostale of a possibly privileged Finazzo document, the Commission's investigation itself was somehow tainted and that production of any and all documents and testimony responsive to the Finazzo Subpoena would serve as a waiver of Finazzo's privilege. (Id.) Accordingly, Finazzo refused to appear for testimony or to produce responsive documents. (Id.)

The staff wrote counsel for Finazzo on January 28, 2008 to seek clarification of Finazzo's position (Id. ¶ 10, Ex. 8.) In the letter, the staff expressly noted that, in subpoenaing Finazzo to produce documents and testify, "the Commission does not seek privileged material but, rather, seeks non-privileged documents along with a description of any materials withheld on the basis of any privilege. We therefore expect Mr. Finazzo to comply with the Subpoena." (Id.) Further, the letter asked counsel to reply by indicating whether Finazzo intended to comply with the Finazzo Subpoena by producing "non-privileged documents and a privilege log and testify[ing] regarding non-privileged matters." (Id.)

On January 29, 2008, Finazzo's counsel sent another letter to the Commission staff that made clear Finazzo's intention to ignore his obligation to testify and produce relevant, non-privileged documents: "If the staff wishes to proceed, it may do so only after the privilege issues, which in this case encompass the entire investigation, have been resolved by a court ruling in a subpoena enforcement action." (Id. ¶ 11, Ex. 9.)

As Finazzo had not provided any legitimate legal basis for refusing to comply with the Finazzo Subpoena, the staff wrote to Finazzo's counsel on January 31, 2008: (i) to remind him of the Commission's authority to conduct the Aeropostale Investigation under Section 20(a) of the Securities Act and Section 21(a) of the Exchange Act, (ii) to remind him of the existence of the Formal Order, which had previously been provided to him, and (iii) to remind him of the unambiguous case law concerning the Commission staff's power to compel the production of documents and testimony. (Id. ¶ 12, Ex. 10.) Further, the staff's January 31 letter "urge[d] that [Finazzo] reconsider [his] position and produce a privilege log reflecting what [he] deem[ed] privileged and produce Mr. Finazzo for testimony and produce for inspection those documents responsive to the [Finazzo] Subpoena that are not privileged." (Id.)

Notwithstanding the Commission's authority to issue the Finazzo subpoena, Finazzo failed to produce documents as called for by the Finazzo Subpoena on February 6, 2008, and failed to appear for testimony as called for by the Finazzo Subpoena on February 13, 2008 (Id. ¶ 13.)

On February 21, 2008, the Commission staff wrote to counsel for Finazzo to inform him that if Finazzo continued to refuse to comply with the Finazzo Subpoena, the Commission intended to file an action in the U.S. District Court seeking to enforce the Finazzo Subpoena. (Id. ¶ 14, Ex. 11.) Finazzo's counsel responded the next day, by voicemail message, reiterating Finazzo's refusal to comply with the Finazzo Subpoena. (Id. ¶ 15.)

**C.    The South Bay Subpoena**

South Bay has also refused to comply with a properly issued subpoena issued in connection with the Aeropostale Investigation. On January 17, 2008, the staff issued a subpoena to South Bay (the "South Bay Subpoena") and sent it by Federal Express to South Bay. (Id. ¶

16, Ex. 5, 12.) The South Bay Subpoena called for South Bay to produce documents to the Commission's New York Regional Office on or before February 7, 2008. (Id.)

On January 31, 2008, counsel for South Bay contacted the Commission staff by telephone, and indicated that South Bay was contemplating whether to comply with the South Bay Subpoena. (Id. ¶ 17.) Counsel explained that he had been contacted by counsel for Finazzo, who objected to South Bay's compliance with the South Bay Subpoena. (Id.)

The next day, on February 1, 2008, South Bay's counsel sent a letter to the Commission staff indicating that South Bay "take[s] no position" regarding Finazzo's objections to the Commission's subpoenas, but that South Bay would "not produce documents pursuant to the subpoena" until Finazzo's dispute with the Commission regarding the subpoenas is resolved. (Id. ¶ 18, Ex. 13.)

On February 4, 2008, the Commission staff sent a letter to South Bay's counsel to make clear that the staff did not expect South Bay to produce privileged documents, but that the staff did "expect that South Bay will produce all non-privileged, responsive documents" as called for by the South Bay Subpoena. (Id. ¶ 19, Ex. 14.) Nevertheless, South Bay did not produce any documents by February 7, 2008, the return date specified on the South Bay Subpoena, and did not request any extension of time to comply with the South Bay Subpoena. (Id. ¶ 20.)

On February 12, 2008, counsel for South Bay sent a letter to the Commission staff stating that South Bay had received a letter from Finazzo's counsel objecting to any production by South Bay, and indicating that South Bay did not intend to comply with the South Bay Subpoena until Finazzo's objections were resolved through judicial proceedings or otherwise. (Id. ¶ 21, Ex. 15.) The staff replied on February 21, 2008 that if South Bay continued to refuse to comply with the South Bay Subpoena, the Commission intended to file an action in the U.S. District

Court seeking to enforce the Finazzo Subpoena. (Id. ¶ 22, Ex. 16.) The next day, South Bay's counsel responded by letter to explain that South Bay had collected documents responsive to the South Bay Subpoena, but South Bay would not comply with the Subpoena until "issues raised by Mr. Finazzo" are resolved. (Id. ¶ 23, Ex. 17.)

## III. ARGUMENT

### A.    The Finazzo and South Bay Subpoenas Should Be Enforced

The Commission is the Congressionally-created agency charged with civil enforcement of the federal securities laws. The Commission issued the Formal Order pursuant to Section 20(a) of the Securities Act, 15 U.S.C. § 77t(a), and Section 21(a) of the Exchange Act, 15 U.S.C. § 78 u(a); and designated officers authorized to issue subpoenas pursuant to Section 19(c) of the Securities Act, 15 U.S.C. § 77s(c), and Section 21(b) of the Exchange Act, 15 U.S.C. § 78u(b).

Section 21(c) of the Exchange Act, 15 U.S.C § 78u(c), authorizes the Commission to seek an order from this Court compelling respondents to comply with the subpoenas.[2] The law is clear that a federal district court must enforce an administrative subpoena if the information sought is "within the authority of the agency, the demand is not too indefinite and the information sought is reasonably relevant." United States v. Morton Salt Co., 338 U.S. 632, 652 (1950). A court need only conclude that: (1) the inquiry is being conducted for a legitimate purpose within the Commission's authority, (2) the information sought is relevant to that purpose, (3) the information is not within the Commission's possession, and (4) the subpoenas were issued in accordance with the requisite administrative procedures. United States v. Powell, 379 U.S. 48, 57-58 (1964). See also RNR Enters., Inc. v. SEC, 122 F.3d 93, 96-97 (2d Cir.

---

[2]     Under Exchange Act Section 21(c), venue in this matter properly lies in the Southern District of New York because this district is "the jurisdiction [in] which [the] investigation . . . is carried on." 15 U.S.C. § 78u(c).

1997) (affirming District Court order directing compliance with Commission subpoenas); SEC v. Arthur Young & Co., 584 F.2d 1018, 1021, 1024 (D.C. Cir. 1978) (enforcing Commission subpoenas: "[I]t has long been clear that 'it is sufficient if the inquiry is within the authority of the agency, the demand is not too indefinite and the information sought is reasonably relevant.'") (quoting Morton Salt, 338 U.S. at 652-53.). A respondent seeking to defeat enforcement of a Commission subpoena bears the burden of demonstrating that the subpoena is unreasonable. SEC v. Brigadoon Scotch Distrib. Co., 480 F.2d 1047, 1056 (2d Cir. 1973) (citations omitted) (affirming decision to enforce Commission subpoena and reversing decision denying enforcement of Commission subpoena). In the present matter, the Commission satisfies each of the requirements for enforcement of the subpoenas issued to Finazzo and South Bay, as evidenced by the Birnbaum Declaration. See RNR Enfers., Inc. v. SEC, 122 F.3d at 97 ("'An affidavit from a government official is sufficient to establish a prima facie showing that these requirements have been met.'") (quoting In re McVane, 44 F.3d 1127, 1136 (2d Cir. 1995)).

First, the Commission's Aeropostale Investigation is being conducted for a legitimate purpose within the Commission's authority to investigate whether any persons or entities have violated provisions of the Securities Act or Exchange Act. Aeropostale has common stock registered with the Commission pursuant to Section 12(b) of the Exchange Act, 15 U.S.C. § 78l(b), and files periodic reports pursuant to Section 13 of the Exchange Act, 15 U.S.C. § 78m. The Commission is investigating whether anyone violated the securities laws in connection with Aeropostale's failure to disclose in its filings with the Commission Finazzo's and his family's interests in and dealings with certain of Aeropostale's vendors. This information first came to light through the disclosures in Aeropostale's November 8, 2006 Form 8-K and February 3, 2007 Form 10-K filings that the company filed with the Commission. Section 21(a)(1) of the

11

Exchange Act, 15 U.S.C. § 78u(a)(1), expressly authorizes the Commission to investigate suspected violations of the Exchange Act and the rules thereunder. Thus, the Aeropostale Investigation is being conducted for a legitimate purpose within the Commission's authority. See SEC v. Arthur Young & Co., 584 F.2d at 1024 (matters under investigation were "all areas of legitimate concern to the Commission in the discharge of its statutory responsibilities" and concerned information "generally required to be submitted to the Commission and disclosed to the investing public").

Second, the information that the Commission is seeking from Finazzo and South Bay is relevant to the Aeropostale Investigation. To satisfy this requirement, the Commission need only show that the information sought is "not plainly incompetent or irrelevant to any lawful purpose." Arthur Young, 584 F.2d at 1029 (D.C. Cir. 1978) (quoting Endicott Johnson Corp. v. Perkins, 317 U.S. 501, 509 (1943)). See also SEC v. Jerry T. O'Brien, Inc., 467 U.S. 735, 741 (1984) (the Commission has "broad authority to conduct investigations into possible violations of the federal securities laws and to demand the production of evidence relevant to such investigations"); SEC v. Dresser Industries, Inc., 628 F.2d 1368, 1379 (D.C. Cir. 1980) (en banc) (Congress authorized the Commission "in its discretion, [to] make such investigations as it deems necessary" into possible violations of the securities laws). The subpoenas call for Finazzo and South Bay to provide information concerning Finazzo's relationship and dealings with South Bay. (Birnbaum Decl. ¶¶ 5-6, Exs. 4, 5.) The failure to disclose the relationships and the details of the relationships is directly related to the matters Aeropostale disclosed in the November 8, 2006 Form 8-K and February 3, 2007 Form 10-K. Thus, the subpoenas seek information that is relevant to the Commission's statutory duties. RNR Enters., Inc. v. SEC, 122 F.3d at 97. Tellingly, neither Finazzo nor South Bay has objected to the subpoenas on the grounds that the

12

information sought is irrelevant.

Third, the Commission staff does not possess the information sought in the subpoenas to Finazzo and South Bay. (Birnbaum Decl. ¶¶ 7, 13, 20.) Neither Finazzo nor South Bay has produced documents in response to the subpoena, and Finazzo has not testified as called for by the subpoena. Finazzo and South Bay are likely the only sources of much of the information sought by the subpoenas.

Finally, the subpoenas comply with applicable administrative procedures. In particular, an officer designated by the Commission issued the subpoenas. (Birnbaum Decl. ¶ 4; see also Exchange Act Section 21(b), 15 U.S.C. § 78u(b) (authorizing issuance of subpoenas).) Further, the Commission staff properly served the subpoenas. (Birnbaum Decl. ¶¶ 8, 16; see also 17 C.F.R. §§ 201.150(c)(3) and 201.232(c) (authorizing service of administrative subpoenas via commercial courier service).)

Accordingly, the Court should enter an order directing Finazzo and South Bay to comply with the Finazzo and South Bay Subpoenas.

**B.    Respondents Have No Legitimate Explanation
For Their Failure to Comply with the Subpoenas**

Finazzo appears to base his refusal to comply with the Finazzo Subpoena on his contention that Aeropostale allegedly acted improperly in reviewing and possibly utilizing a document Finazzo claims was privileged. Simply put, this is not a legitimate basis to refuse to comply with a properly issued and served administrative subpoena. Because the Commission staff lacks sufficient information to evaluate Finazzo's claim of privilege at this stage, the staff made clear to Finazzo that it was not challenging his claim of privilege. Rather, the Commission

13

staff requested that Finazzo produce all non-privileged documents responsive to the Finazzo Subpoena, and provide a log identifying documents as to which Finazzo claims a privilege.[3]

This dispute, therefore, is not about whether Finazzo's claim of privilege is appropriate, but whether that narrow claim can form the basis of a wholesale refusal to comply with the Finazzo Subpoena. Finazzo can point to no authority that supports such a position.

Finazzo's argument appears to be that because Aeropostale purportedly violated Finazzo's privilege, everything following that breach, including the Commission's investigation, is "tainted" and must be stopped. That argument is clearly wrong. The Commission is charged with investigating and enforcing the federal securities laws. Aeropostale made two public filings in which it disclosed possible violations of the federal securities laws. The Commission opened an investigation to determine whether in fact there were violations of the federal securities laws in connection with Aeropostale's failure to disclose Finazzo's related-party transactions.

In a January 25, 2008 letter to the Commission staff, Finazzo's attorney directed the Commission staff to a decision that he claimed was "instructive," SEC v. OKC Corp., 474 F. Supp. 1031 (N.D. Tex. 1979). In fact, the OKC decision unambiguously supports the Commission's Application here. In OKC, the court granted the Commission's application to enforce its subpoena to OKC Corp. See id. at 1042. In reaching this decision, the OKC court rejected the very argument that Finazzo has made in refusing to comply with the Finazzo Subpoena – namely, that the possibly improper use of a particular document "tainted" the Commission's investigation. Id. at 1040. Furthermore, the court in OKC distinguished (i) those cases where improper *government* intrusion into one's privilege may provide grounds for

---

[3]     Because Finazzo's claimed infringement of privilege by the company is irrelevant to his obligation to respond to the Commission's subpoena, the Commission does not address here whether any such communications were in fact privileged or whether any such privilege was waived by use of his employer's computer system.

14

limiting the government's authority to utilize the fruits of that intrusion, and (ii) those cases where an intrusion into one's privilege is by a private party working without government cooperation. Id. at 1039-40. See also United States v. Bonnell, 483 F. Supp. 1070, 1081 (D. Minn. 1979) (granting application to enforce an IRS subpoena in a case the court called "remarkably similar" to OKC). In this matter, there was no government intrusion into Finazzo's privilege. Indeed, the alleged intrusion occurred prior to the press release that led to the Commission's investigation. Accordingly, the facts in the instant Application warrant enforcement of the Finazzo and South Bay Subpoenas.

The policy goal of excluding evidence derived from a violation of a privilege is to deter such violations. United States v. Bonnell, 483 F. Supp at 1081 (citing United States v. Calandra, 414 U.S. 338, 347 (1974)). There is no deterrent effect in suppressing the fruits of a third party's violation. Indeed, the Supreme Court has held that a grand jury investigation could not be restricted based on a claim that the inquiry was based on an unlawful search and seizure. United States v. Calandra, 414 U.S. 338, 353-55 (1974).

Finally, as to South Bay, the company has not articulated *any* reason for failing to comply with the South Bay Subpoena. Instead, South Bay simply informed the Commission staff that, after learning of Finazzo's objections – about which South Bay stated it "take[s] no position" – South Bay "believe[s] the best course of action is to allow the staff and Mr. Finazzo to resolve the privilege issue either amicably or through judicial proceedings." Thus, South Bay cannot demonstrate that the Commission acted unreasonably in issuing the South Bay Subpoena, and South Bay has no reasonable basis for its refusal to comply with the subpoena.

## IV. CONCLUSION

For the foregoing reasons, the Commission respectfully requests that the Court order the respondents Finazzo and South Bay to show cause why they should not comply with the Finazzo and South Bay Subpoenas, and thereafter order them to comply fully with the subpoenas.

Dated:  February 27, 2008
        New York, New York

                                    Respectfully Submitted,
                                    Mark K. Schonfeld
                                    Regional Director

                                    By: Paul G. Gizzi (PG-1866)

                                    ATTORNEY FOR THE APPLICANT
                                    SECURITIES AND EXCHANGE COMMISSION
                                    New York Regional Office
                                    3 World Financial Center
                                    New York, New York 10281
                                    (212) 336-0077 (Gizzi)

Of Counsel:

Andrew M. Calamari
Doria Bachenheimer
Paul G. Gizzi
Meaghan Cheung
Michael D. Birnbaum

16

# Exhibit C

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x
                                                            :
SECURITIES AND EXCHANGE COMMISSION,                         :
                                                            :
                            Applicant,                      :
                                                            :
            - against -                                     :          Misc. Action No. 18-304 (HB)
                                                            :
CHRISTOPHER FINAZZO and                                     :          OPINION & ORDER
SOUTH BAY APPAREL, INC.,                                    :
                                                            :
                            Respondents.                    :
                                                            :
------------------------------------------------------------x

Hon. HAROLD BAER, JR., Part I Judge:

        The Securities and Exchange Commission (the "Commission") has applied to this Court

to enforce administrative subpoenas issued to respondents Christopher Finazzo ("Finazzo") and

South Bay Apparel, Inc. ("South Bay") in connection with the Commission's non-public

investigation, *In the Matter of Aéropostale, Inc.* (the "Aéropostale Investigation"). At the

argument on March 25, 2008, Finazzo urged this Court to deny the Commission's application

outright or, alternatively, to hold the Commission's application in abeyance while Finazzo

conducts discovery in connection with an alleged violation by third parties of his attorney-client

privilege. South Bay is essentially ready to comply but awaits this opinion and order. For the

reasons set forth below, the Commission's application is GRANTED and the Respondents are

hereby ORDERED to comply with the subpoenas issued to them by the Commission staff in the

Aéropostale Investigation.

## I. FACTUAL BACKGROUND

        On August 24, 2006, while Finazzo was still employed by Aéropostale, Inc.

("Aéropostale") as Executive Vice President and Chief Merchandising Officer, his estate

planning lawyer, Angela Siegel ("Siegel"), sent him an email at his Aéropostale email address

(the "Attorney Siegel Email"). Finazzo's Mem. in Opp'n to Staff's Mot. to Enforce Subpoena

(Mar. 19, 2008) ("Finazzo Mem.") 1; *see* Decl. of Robert J. A. Zito (Mar. 19, 2008) ("Zito

Decl.") Ex. A. The Attorney Siegel Email was clearly from a lawyer and contained a standard

"Privilege and Confidentiality Notice." Siegel attached to her email a Word document titled

"Finazzo Family Assets" that contained a list of Finazzo's and his family's interests in various

1

business entities, including South Bay, one of Aéropostale's largest vendors. Finazzo Mem. 2.

During September 2006 Aéropostale undertook an internal investigation, which Finazzo claims had nothing to do with him, of certain business expenses. *Id.* In the course of this inquiry, investigators from Kroll, an outside firm retained by Aéropostale's counsel, Katten Muchin Rosenman LLP ("KMR"), found, opened and read the Attorney Siegel Email and its attachment on Finazzo's work computer. *Id.* Kroll revealed the email and attachment to KMR and Aéropostale, but no one told Finazzo. *Id.* at 3. Ultimately, Aéropostale terminated Finazzo's employment "for cause" because Finazzo had not disclosed to the company his or his family's ownership interests in South Bay and perhaps other entities listed on the Attorney Siegel Email attachment. *Id.*

On November 8, 2006, Aéropostale issued a press release and filed with the Commission a Form 8-K that announced it had terminated Finazzo's employment for cause because the company's internal investigation

> revealed that Mr. Finazzo had concealed personal ownership interests in, and served as an officer of, entities affiliated with one of [Aéropostale's] largest vendors, South Bay Apparel, Inc. These activities by Mr. Finazzo and their concealment, constitute conflicts of interest in breach of the Company's Code of Business Ethics, and violations of Mr. Finazzo's employment agreement.

Decl. of Michael D. Birnbaum (Feb. 25, 2008) ("Birnbaum Decl.") Ex. 1. On April 2, 2007, Aéropostale issued its Annual Report for the fiscal year ended February 3, 2007, in which it elaborated on Finazzo's undisclosed conflicts of interest and added that he had executed, without the company's knowledge, a corporate Guaranty Agreement that, had it been enforceable, would have obligated Aéropostale to guarantee any payments due from South Bay to a third-party manufacturer. Birnbaum Decl. Ex. 2.

After reviewing Aéropostale's 10-K disclosure, the Commission issued a Formal Order on January 10, 2008, directing Commission staff to conduct a private investigation of Aéropostale to determine whether any persons or entities had violated the securities laws. Birnbaum Decl. ¶ 4. Pursuant to the Formal Order, on January 16 and 17, 2008, an officer of the Commission served subpoenas on Finazzo (the "Finazzo Subpoena"), calling for the production of documents and testimony, and on South Bay (the "South Bay Subpoena"), seeking the production of documents. Birnbaum Decl. Exs. 4, 5. Both Finazzo and South Bay have expressly refused to comply with the subpoenas. Birnbaum Decl. ¶ 7. On February 27, 2008, the SEC filed the instant application to enforce the Finazzo and South Bay Subpoenas.

2

On March 4, 2008, Finazzo filed a declaratory action against the Commission seeking to enjoin its investigation. *Finazzo v. SEC*, No. 08 Civ. 2176 (S.D.N.Y.) (J. Sullivan). On March 4 and 5, 2008, Finazzo served subpoenas on four nonparties for documents and depositions: (1) Aéropostale, (2) KMR, (3) Kroll, and (4) Deloitte & Touche LLP ("Deloitte"), Aéropostale's auditor, each of which has objected to the subpoena. Zito Decl. Exs. C-F.

## II. STANDARD OF REVIEW

Section 21(c) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78u(c), authorizes the Commission to seek an order from this Court compelling respondents to comply with the subpoenas. "The courts' role in a proceeding to enforce an administrative subpoena is extremely limited." *RNR Enters., Inc. v. SEC*, 122 F.3d 93, 96 (2d Cir. 1997) (quoting *In re McVane*, 44 F.3d 1127, 1135 (2d Cir. 1995)). To have its subpoenas enforced, the Commission "must show (1) that the investigation will be conducted pursuant to a legitimate purpose, (2) that the inquiry may be relevant to the purpose, (3) that the information sought is not already within the Commission's possession, and (4) that the administrative steps required . . . have been followed . . . ." *Id.* (quoting *United States v. Powell*, 379 U.S. 48, 57-58 (1964)). "An affidavit from a government official is sufficient to establish a prima facie showing that these requirements have been met." *Id.* at 97 (quoting *McVane*, 44 F.3d at 1136).

A respondent who seeks to defeat enforcement of a Commission subpoena bears the burden of demonstrating that the subpoena is unreasonable or was issued in bad faith or for an "improper purpose," or that compliance would be *"unnecessarily* burdensome." *Id.* at 97 (quoting *SEC v. Brigadoon Scotch Distrib. Co.*, 480 F.2d 1047, 1056 (2d Cir. 1973), *cert. denied*, 415 U.S. 915 (1974)).

## III. DISCUSSION

The Declaration of Michael D. Birnbaum ("Birnbaum"), an attorney in the Commission's Enforcement Division, and its exhibits are sufficient to establish a *prima facie* showing that the Commission has met the subpoena enforcement requirements.    First, the Aéropostale investigation is conducted pursuant to a legitimate purpose, to determine whether any individual or entity violated the securities laws in connection with Aéropostale's failure to disclose in its public filings Finazzo's and his family's interests in and dealings with certain of its vendors, including South Bay. Decl. of Birnbaum (Feb. 25, 2008) ("Birnbaum Decl.") ¶ 3. Section 21(a)(1) of the Exchange Act, 15 U.S.C. § 78u(a)(1), expressly authorizes the Commission to investigate suspected violations of the Exchange Act and the rules thereunder.    Second, the

Finazzo and South Bay Subpoenas are relevant to the investigation's legitimate purpose because they request information about Finazzo's relationships and dealings with South Bay. Birnbaum Decl. ¶¶ 5-6, Exs. 4, 5. Neither respondent has objected to the subpoenas on the ground that the information sought is irrelevant. Third, the Commission does not possess the information sought from Finazzo and South Bay, Birnbaum Decl. ¶¶ 7, 13, 20. Fourth, the Commission followed the required administrative steps because an officer designated by the Commission issued the subpoenas, which were properly served. Birnbaum Decl. ¶¶ 4, 8, 16.

Because the Commission has made a *prima facie* showing that the subpoenas should be enforced, Finazzo and South Bay bear the burden of demonstrating that the subpoenas are unreasonable or issued in bad faith or for an improper purpose, or that compliance would be unnecessarily burdensome. Finazzo appears to assert that the subpoenas were issued in bad faith or for an improper purpose. His sole argument is that the alleged violations of attorney-client privilege by Aéropostale, KMR and Kroll "tainted" the Commission's investigation.[1] Finazzo reasons that if Aéropostale, KMR and Kroll had not violated the attorney-client privilege by reading and acting upon the Attorney Siegel Email and attachment, Aéropostale would not have fired him or disclosed his related-party transactions and the Commission would not have commenced its investigation or issued the subpoenas.

No party cites a case in this Circuit, and there appears to be none, that has decided the validity of an administrative subpoena issued by an agency in response to public disclosures founded on allegedly privileged information. Indeed, Finazzo suggests his argument raises a question of first impression. Given the courts' "extremely limited role" in proceedings to enforce administrative subpoenas and the burden borne by Finazzo, I find that Finazzo has not shown that the Finazzo or South Bay Subpoenas were issued in bad faith or for an improper purpose.

Several cases upon which Finazzo relies involved situations where a party sought to obtain privileged information or to admit privileged information into evidence. *See Surgical Design Corp. v. Correa*, 21 A.D.3d 409, 410 (N.Y. App. Div. 2005) (suppression of attorney-client privileged documents); *Manuf. & Traders Trust*, 132 A.D.2d 392, 398 (N.Y. App. Div. 1987) (protective order covering attorney-client privileged documents); *United States v. Longo*, 70 F. Supp. 2d 225, 266 (W.D.N.Y. 1999) (no evidence of privilege violation where party only

---

[1] That the alleged violations of attorney-client privilege "tainted" the Commission's investigation is also the gravamen of Finazzo's declaratory action before Judge Sullivan.

speculated that Government agents may have provided prosecutor with apparently non-privileged information that they obtained through knowledge of privileged communication); *SEC v. Forma,* 177 F.R.D. 516, 526-27 (S.D.N.Y. 1987) (discussing alternative approaches when Commission breaks attorney-client privilege); *In re Asia Global Crossing, Ltd.,* 322 B.R. 247, 253 (Bankr. S.D.N.Y. 2005) (trustee in bankruptcy proceeding sought documents that may have been subject to attorney-client privilege). Finazzo points to other case law showing that the proper remedy of a breach of attorney-client privilege is to restore the injured party as close as possible to the *status quo ante. See, e.g., Church of Scientology v. United States,* 506 U.S. 9, 13 (1992).

Here, however, the Commission expressly seeks *non-privileged* information in the Finazzo and South Bay Subpoenas.[2]   On January 28, 2008, Birnbaum, on behalf of the Commission, sent a letter to Finazzo's counsel explaining that "the Commission does not seek privileged material but, rather, seeks non-privileged documents along with a description of any materials withheld on the basis of any privilege" and requesting "non-privileged documents and a privilege log" and for Finazzo to "testify regarding non-privileged matters." Birnbaum Decl. ¶ 10, Ex. 8.  On February 4, 2008, Birnbaum sent a letter to South Bay's counsel to clarify that the Commission did not expect South Bay to produce privileged documents, but did "expect that South Bay will produce all non-privileged, responsive documents." *Id.* ¶ 19, Ex. 14.

Finazzo further argues that, even if the Finazzo and South Bay Subpoenas seek only non-privileged information, that information would be suppressed as evidence under a "fruit of the poisonous tree" doctrine.  First, the admission or suppression of evidence is not before the Court in this subpoena enforcement proceeding.  Second, Finazzo has not cited any authority that would preclude the Commission from relying on the non-privileged information sought by the Finazzo and South Bay Subpoenas. *In re Beiny,* 129 A.D.2d 126, 141 (N.Y. App. Div. 1987), upon which Finazzo relies, is distinguishable on its facts because it involved "willful disregard of procedural rules, deceit, and the covert acquisition of otherwise unobtainable privileged material" by attorneys in a trust accounting proceeding.  The court suppressed the privileged material and disqualified the attorneys because in light of the extent of privileged information it would be "virtually impossible . . . to keep the tainted information which [the attorneys] possess[] from surreptitiously finding its way back into the proceeding." *Id.* at 142.

---

[2] Moreover, the Commission claims it does not possess the purportedly privileged Attorney Siegel Email and attachment.  Commission's Reply Mem. (Mar. 24, 2008) 5.

In *In re Shell Oil Refinery*, 143 F.R.D. 105, 107-08 (E.D. La. 1992), another case cited by Finazzo, a plaintiff circumvented the normal discovery process by surreptitiously and inappropriately obtaining the defendant's proprietary documents from one of defendant's employees without the defendant's knowledge. The court, however, expressly permitted plaintiff to use documents that were "publicly available." *Id.* at 109. Here, the Commission has followed proper subpoena procedures and seeks non-privileged information stemming from Aéropostale's public disclosures.

*SEC v. OKC Corp.*, 474 F. Supp. 1031, 1039 (N.D. Tex. 1979), upon which Finazzo relies, actually supports the SEC's position. In that case, the respondent argued that the Commission's subpoena was unenforceable because the Commission had used a confidential report prepared by the respondent's outside counsel to further its investigation. The respondent argued that the Commission, "by using the report as a basis for developing independent, unprivileged evidence, will effectively undermine that privilege." *Id.* The court nevertheless enforced the Commission's subpoena, distinguishing between (1) improper *government* intrusion into one's privilege and (2) improper intrusion by a *private party* working without government cooperation. *Id.* at 1039-40. Here, the Commission did not intrude into Finazzo's privilege, or Aéropostale's internal investigation, where the allegedly privileged document surfaced, occurred prior to the disclosures that triggered the Commission's investigation. *See also United States v. Bonnell*, 483 F. Supp. 1070, 1079, 1081 (D. Minn. 1979), (holding that "respondents may not resist production of unprivileged evidence [to the IRS] on the ground that the summons is based on work product" and observing that "the IRS is conducting an investigation, not introducing evidence at a trial" and "[a]dministrative agencies have broad powers to gather information . . . regardless of whether the information collected would be admissible at trial").

Therefore, because the Commission is not seeking privileged information and is merely conducting an investigation, not introducing evidence at trial, Finazzo has not shown that the Court should refuse to enforce the Finazzo and South Bay Subpoenas. This Court need not decide whether the Attorney Siegel Email was privileged or whether Finazzo waived the privilege by receiving the email at his Aéropostale email address. It thus would serve no purpose to hold the Commission's application in abeyance while Finazzo engages in limited discovery to determine whether the Attorney Siegel Email is privileged, or whether the Commission has received privileged documents from other sources. Such discovery would be irrelevant to this subpoena enforcement proceeding.

Finally, Finazzo's argument that "the Commission is complicit in the corporate investigation that Aéropostale engaged in which led to the violation of the attorney-client privilege" is unsupported. *See* Finazzo Mem. at 20. It is undisputed that the Commission publicly encourages corporations to engage in self-regulation and to disclose any unlawful conduct uncovered by internal investigations. It is something else to allege that the Commission encourages, or condones, internal corporate investigations that violate an employee's attorney-client privilege.

## IV. CONCLUSION

Therefore, for the foregoing reasons, the Commission's application is GRANTED and the Respondents are hereby ORDERED to comply with the subpoenas issued to them by the Commission staff in the Commission's nonpublic investigation *In the Matter of Aéropostale, Inc.* (Internal File No. NY-7802), and to do so within ten days from the date hereof.

IT IS SO ORDERED.
New York, New York
March 26, 2008

U.S.D.J.

7